**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| iM3NY LLC, *et al.*, | Case No. 24-10131 (BLS) |
| Debtors.[1] | (*Joint Administration Pending*) |

**DECLARATION OF LUKASZ P. CIANCIARA IN**
**SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Under 28 U.S.C. § 1764, I, Lukasz Cianciara, declare as follows under the penalty of perjury:

1. I am the Chief Executive Officer (**"CEO"**) of Imperium3 New York, Inc. (**"Imperium3,"** and together with of iM3NY LLC (**"iM3NY"** the debtors and debtors-in-possession in the above-captioned cases, collectively, the **"Debtors,"** or the **"Company"**). I have been affiliated with the Company since August 29, 2021, when I was hired as an advisor to the board of directors. On September 1, 2022, I assumed the role of advisor to the CEO of the Company. Subsequently, I was appointed as Imperium3's Chief Administrative Officer on December 18, 2023, and assumed the role of Interim CEO of Imperium3 on August 6, 2024. On December 1, 2024, I was promoted to the position of full time CEO of the Company. I hold a bachelor's degree in finance, investments & banking, with a specialization in international business, from the University of Wisconsin-Madison, School of Business and a master's degree in finance from the University of Wisconsin-Madison, Graduate School of Business. I am a

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: (i) iM3NY LLC (N/A); and (ii) Imperium3 New York, Inc. (4574). The address of the Debtors' corporate headquarters is 1093 Clark Street, Endicott, New York 13760.

Chartered Financial Analyst (CFA) charterholder and also hold NASD series 7, 24, 52 and 63 licenses.

2.      I have 35 years of business, finance, banking and investment experience across renewable energy, battery manufacturing, private equity, and investment banking companies.  Prior to joining the Debtors' organization, from October 2015 until July 2021, I was a managing director of Brean Capital, LLC, founding their renewable energy and infrastructure banking practice.  From August 2011 through October 2015, I was the general manager of Castlepines Global Equity Americas, establishing the Americas investment arm for this international private equity firm.  From April 2010 through August 2011, I was a director of Citadel Securities.  Before this period, I held a variety of finance and commercial positions.

3.      As the Company's CEO, I am familiar with the operations and financial activities of both Debtors, and I am generally familiar with the Debtors' business, financial condition, policies and procedures, day-to-day operations, and books and records.  Except as otherwise noted, and understood from the Debtors' other employees or retained advisers, I have personal knowledge of such matters.  I am authorized by each of the Debtors to submit this declaration on their behalf.  References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in this declaration.

4.      I submit this declaration on behalf of the Debtors (a) in support of the Debtors' voluntary petitions for relief that were filed under chapter 11 of the Bankruptcy Code, (b) in support of the Debtors' request for relief in the form of motions and applications (collectively, the "**First Day Pleadings**") filed contemporaneously with this declaration, and (c) to assist this Court

and other interested parties in understanding the circumstances giving rise to the commencement of the Debtors' chapter 11 cases (the "**Chapter 11 Cases**"). I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and the maximization of the value of the Debtors' estates.

5.   To familiarize the Court with the Debtors and the relief that the Debtors seek early in these Chapter 11 Cases, this Declaration is organized in four parts. **Part I** provides an introduction to the Debtors and detailed information on their corporate history and business operations. **Part II** describes the Debtors' prepetition organization and capital structure. **Part III** describes the events that led to the commencement of these Chapter 11 Cases and the Debtors' prepetition restructuring efforts. **Part IV** provides an overview of the First Day Pleadings.

## PART I:
## INTRODUCTION

A.   **THE CHAPTER 11 CASES.**

6.   The Company intends to be the first commercial U.S. designed and developed "Giga-scale" lithium-ion battery manufacturing company in the United States. The Company's manufacturing facility is located in Endicott, New York (the "**Facility**") and currently employs 22 people.

7.   As more fully set forth below, the Debtors are a pre-revenue company that has exhausted all of their current funds and filed these cases to begin a marketing process to identify potential financial and strategic partners for the Debtors and execute on any potential asset sales, in an effort to maximize value for all parties-in-interest.

8.     On January 27, 2025 (the "**Petition Date**"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have requested that the Chapter 11 Cases be jointly administered for administrative purposes only.

9.     The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

10.    To date, the Office of the United States Trustee for Region 3 (the "**U.S. Trustee**") has not appointed a creditors' committee in these Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

B.   **THE DEBTORS' BUSINESS OPERATIONS.**

   i.   **General**

11.    iM3NY is a limited liability company organized under the laws of Delaware with its headquarters in Endicott, New York. Substantially all of the assets of the Company are held by its operating subsidiary, Imperium3. Imperium3 is a New York-based manufacturer of lithium-ion batteries that was founded in 2017 by a group of companies, including Charge CCCV LLC ("**C4V**"), Magnis Energy Technologies Ltd ("**Magnis**"), Boston Energy and Innovation, Primet Precision Materials, and C&D Assembly, to foster U.S. domestic manufacturing and to utilize C4V's exclusive U.S. manufacturing license for prismatic cell design, supply chain and manufacturing processes within the Company's state-of-the-art facility. The Company received additional equity capital infusions from Magnis and a few other strategic investors.

12.    More specifically, C4V licenses its intellectual property in electrode design and process development to the Company pursuant to that certain Amended and Restated License Agreement (as amended, the "**License Agreement**") dated as of April 12, 2021.

13. Under the License Agreement, C4V licenses certain patents and proprietary know-how it owns, which are related to the production of biomineralized lithium mixed-metal phosphate cathode materials ("**BM-LMP**"). These materials are produced using specific licensed materials obtained from approved suppliers.

14. The Company is in the final stages of establishing and operating a manufacturing facility with the capacity to produce one GWh of lithium-ion cells, known as a "Giga-Factory," in the United States. Once the Company is fully operational, it will produce competitive-scale lithium-ion battery cells with BM-LMP materials that are expected to be more efficient and less costly than others on the market for use in "Grid Energy Storage" systems, or energy storage installations having a single site combined storage capacity more than 20 KWh.

15. The Company has achieved UN38.3, UL1973 and UL 1642 certifications and is in the process of obtaining various certifications to manufacture, transport and market the BM-LMP cell technology that has an increased energy density, high-rate capability, and unrivalled safety in the event of thermal runaway or fire exposure.

## PART II:
## THE DEBTORS' CORPORATE AND CAPITAL STRUCTURE

16. Magnis is the majority equity holder in iM3NY, holding approximately 62.0% of iM3NY's outstanding common units and approximately 73.0% of its Class A preferred units. Magnis is a public company organized under the laws of Australia with its headquarters in Sydney, Australia. Magnis is a vertically integrated lithium-ion battery company, and its shares are listed on the Australian Securities Exchange, although Magnis' shares are currently suspended from trading.

17. C4V is a minority equity holder in iM3NY, holding approximately 31.0% of iM3NY's outstanding common units and approximately 26.7% of its Class A preferred units. C4V

is a limited liability company organized under the laws of New York with its headquarters in Vestal, New York.

18. iM3NY LLC owns 95.5% of Imperium3. The other 4.5% of Imperium3 is owned by Riverstone Credit Partners (4%); Prisma Pelican Fund LLC (.25%) and HSBC Bank PLC (.25%). A corporate organization chart of the Debtors is attached hereto as **Exhibit A**. To date, the Debtors raised in excess of $70 million of equity contributions from their investors and over $100 million of debt to fund the Debtors' business operations. As of year-end 2024, Imperium3 had incurred a total net operating loss of $142.6 million.

A. PREPETITION TERM CREDIT AGREEMENT

19. The Debtors are a party to that certain Senior Secured Term Loan Credit Agreement, dated as of April 14, 2022 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Credit Agreement**") between and among Imperium3, iM3NY, C4V, the lenders from time to time party thereto, ACP Post Oak Credit I LLC, as administrative agent (in such capacity, "**Administrative Agent**") and collateral agent (in such capacity, "**Collateral Agent**"; and, together with the Administrative Agent, individually and collectively, "**Agent**").

20. On October 24, 2024, the former lender, R-SPV II, L.L.C. (the "**Former Lender**"), assigned all of its interests in the Credit Agreement and other loan documents to HSBC Bank PLC ("**HSBC**" or the "**Prepetition Secured Lender**") pursuant to the terms of that certain Loan Purchase, Assignment and Agreement (the "**Assignment Agreement**").

21. After the Assignment Agreement was consummated, the Prepetition Secured Lender made available to Imperium3 certain Loans (as defined in the Credit Agreement) in an aggregate original principal amount of (a) Six Hundred Thousand Dollars ($600,000) as of October

25, 2024 (the "**October 25 Loan**"), (b) Three Hundred Twenty Thousand Dollars ($320,000) as of November 8, 2024 (the "**November 8 Loan**"), (c) Three Hundred Twenty Thousand Dollars ($320,000) as of November 22, 2024 (the "**November 22 Loan**"), (d) Three Hundred Twenty Thousand Dollars ($320,000) as of December 12, 2024 (the "**December 12 Loan**"), (e) Two Hundred Thousand Dollars ($200,000) as of December 17, 2024 (the "**December 17 Loan**"), (f) Seven Hundred Fifty Thousand Dollars ($750,000) as of December 24, 2024 (the "**December 24 Loan**"), Three Hundred Twenty Thousand Dollars ($320,000) as of January 8, 2025 (the "**January 8 Loan**," and collectively with the October 25 Loan, the November 8 Loan, the November 22 Loan, the December 12 Loan, the December 17 Loan, the December 24 Loan, and the January 8 Loan, the "**Emergency Bridge Funding**").

22.     As of the Petition Date, the Debtors are indebted to the Prepetition Secured Lender in an aggregate principal amount of approximately $125.8 million, including the Emergency Bridge Funding and accrued and unpaid interest, fees and other claims (the "**Prepetition Secured Obligations**").  The Prepetition Secured Obligations are secured by first-priority liens and security interests in substantially all the Debtors' assets (the "**Prepetition Liens**").

23.     The Debtors are in default of the Credit Agreement.  On or about December 18, 2024, the Debtors entered into a forbearance agreement (the "**Forbearance Agreement**") whereby the Agent and Prepetition Secured Lender agreed to forbear from enforcing remedies with respect to certain specified events of default (the "**Specified Defaults**").  Under the Forbearance Agreement, the Company granted releases in favor of HSBC and the Administrative Agent, and acknowledged the extent validity priority and perfection of the Prepetition Secured Obligations and Prepetition Liens.

24. In addition to establishing other milestones, the Forbearance Agreement required the Debtors to retain an investment banker (the "**Investment Banker**"), acceptable to the Agent and Prepetition Secured Lender and begin a marketing process, to identify potential financial and strategic partners for the Debtors, identify and execute on any capital raises, and to identify and execute on any potential asset sales.

25. The Forbearance Agreement also contained certain milestones (the "**Milestones**"), relating to UL certifications necessary for commercial sale of the Company's battery production and for commencing these bankruptcy cases.

26. As of the Petition Date, default interest on the Prepetition Secured Obligations are accruing at approximately 12.62%.

B. **OTHER CREDITORS**

27. As of the Petition Date, the Debtors had approximately $10 million in unsecured trade debt.

## PART III:
## EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

A. **PREPETITION FUNDING EFFORTS**

28. The Company completed construction of its Facility in mid-2022. By late 2022, the Facility was commissioned and ready for operation and began producing battery cells. However, by early 2023, technical and production challenges delayed the manufacturing process, necessitating additional engineering and capital expenditures to optimize the existing production processes and equipment. The Company required additional funding to address these challenges, but despite its best efforts, it was unable to find viable sources of capital.

29. By the end of 2023, the Company had breached several covenants under the Credit Agreement and the Former Lender asserted its rights under the Credit Agreement and related

documentation to appoint two independent board members. At this point, the Company was still a pre-revenue generating company, and the Former Lender was the sole source of working capital for the Company.

30. During this time, the Company and its equity sponsors continued to look for additional investors. In January 2024, the Company received an investment proposal from a reputable metals and mining asset manager, but the asset manager and the Former Lender were unable to come to satisfactory terms and the transaction was terminated in April 2024. In the summer of 2024, the Company received a non-binding term sheet from a strategic investor, however, the investor was unable to obtain their financing for the acquisition of the Company, and the proposed transaction was not consummated.

31. In September 2024, the Former Lender declined to provide additional working capital to fund the Company's continued operations, forcing the Company to temporarily lay-off all of its employees in October 2024. The Company was planning to commence bankruptcy cases under chapter 7, but for the Emergency Bridge Funding provided by HSBC.

32. As set forth above, on October 24, 2024, the Former Lender assigned all of its interests in the Credit Agreement and other loan documents to HSBC, pursuant to the terms of the Assignment Agreement. HSBC replaced the two independent board members appointed by the Former Lender with Brian Ford and Wayne Morrison, two highly regarded independent board members to help guide the Company through this restructuring process.

33. Thereafter, HSBC provided additional working capital through the Emergency Bridge Funding which enabled the Company to rehire 22 employees to restart and continue operations. On a limited budget, funded by the Emergency Bridge Funding, the Company was able to achieve key third-party certifications in the 4th quarter of 2024 and January 2025 and

position the Company to begin commercialization of its lithium-ion battery cells in the beginning of 2025.

B.  **PREPETITION MARKETING EFFORTS**

34. On December 31, 2024, the Debtors engaged Hilco Corporate Finance (**"Hilco"**) as its investment banker to advise and help execute on a sale of the Debtors' business and/or substantially all their assets, or a restructuring of the Debtors' balance sheet (the **"Prepetition Marketing Process"**).

35. During the Prepetition Marketing Process, Hilco created a list of potential buyers and investors, a teaser (the **"Teaser"**) and a detailed confidential information memorandum (the **"CIM"**) about the Company. Hilco has sent, or is in the process of sending, the Teaser and a form of non-disclosure agreement (**"NDA"**) to over 200 potential buyers and investors. Several of these potential buyers and investors have already returned comments to the form of NDA. Hilco and the Debtors are in the process of reviewing these comments and sending a CIM to these parties. The Prepetition Marketing Process will continue during these Chapter 11 Cases to ensure the Debtors maximize the value of the Debtors' assets for the benefit of all parties in interest.

C.  **POST-PETITION FINANCING**

36. Given the Debtors' impending liquidity issues and inability to raise new funds to continue operations in the ordinary course of business, as more fully set forth above, the Debtors anticipated the need for post-petition financing. Just before the filing of these cases, the Debtors approached the Prepetition Secured Lender (as a **"DIP Lender"**) about providing a post-petition term loan.

37. The DIP Lender provided the Debtors with a proposal for debtor-in-possession financing to fund the costs of continued operations and these Chapter 11 Cases. The proposal is

reflected in a DIP Term Sheet (the "**DIP Term Sheet**") that provides for a proposed $2.5 million (the "**DIP Loan Commitment**") multi-draw priming debtor-in-possession term loan credit facility (the "**DIP Facility**," and the loans outstanding thereunder, the "**DIP Loans**").  The DIP Loan Commitment includes a new money facility in the aggregate principal amount up to $2,500,000 plus a roll up of $15,000,000 of the Prepetition Secured Obligations ("**Roll up**"), the sum of which shall be DIP Obligations[2] upon the entry of the Interim DIP Order.  The proposed DIP Facility contains typical adequate protection provisions for the Prepetition Secured Lender.  A copy of the DIP Term Sheet is attached to the Debtors' motion to approve the DIP Facility and is incorporated herein by reference.

38.     The DIP Facility shall mature on the earliest to occur of (i) ninety (90) days after the entry of the Interim DIP Order; provided, such date may be extended for up to 45 days at the option of the DIP Lender based on, among other things, the prior achievement of certain DIP Milestones (as defined below); (ii) the effective date of a chapter 11 plan, which has been confirmed by an order of the Bankruptcy Court and the conversion of the DIP Loans into a portion of an exit facility; (iii) the dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under chapter 7 of the Bankruptcy Code; (iv) the acceleration of the DIP Loans and the termination of the commitments under the DIP Facility; and (v) the closing of a sale of all or substantially all assets or equity of the Loan Parties.

39.     As security for the DIP Obligations (as defined in the DIP Term Sheet) under the DIP Facility, the DIP Lender, shall be granted automatically and properly perfected liens and security interests (the "**DIP Liens**"), subject to the Carve-Out, in all assets and properties of each

---

[2]  Capitalized terms in this section not otherwise defined herein, shall have the meanings ascribed to them in the DIP Term Sheet.

of the Debtors as set forth in the DIP Term Sheet pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code.

40. The DIP Obligations shall also be allowed superpriority administrative expense claims under section 364(c) of the Bankruptcy Code (the "**DIP Superpriority Claims**") against each of the Debtors, on a joint and several basis, which claims shall have priority, subject to the Carve-Out, over any and all administrative expense claims against the Debtors and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, and 1114 of the Bankruptcy Code, with recourse against all Debtors.

41. Under the proposed DIP Facility, the Debtors shall also be permitted to use cash collateral for the purposes and to the extent provided for in the Approved Budget, subject to Permitted Variances, the Interim DIP Order and the Final DIP Order.

42. The proposed DIP Facility contains certain customary DIP milestones (the **"DIP Milestones"**), including, without limitation:

(A) the Debtors are required to commence respective voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (**"Bankruptcy Court"**) by January 27, 2025;

(B) no later than one (1) day following the Petition Date, the Debtors shall have engaged an investment banker for the sale of all or substantially all of their assets (the **"Investment Banker"**);

(C) the Debtors are required to obtain entry by the Bankruptcy Court of the Interim DIP Order no later than five (5) business days after the Petition Date;

(D) ten (10) business days after the Petition Date, the Debtors are required to file with the Bankruptcy Court a motion seeking approval of bidding procedures, in form and substance reasonably acceptable to the DIP Lender;

(E) Within forty (40) days after the Petition Date, the Debtors are

      required to have obtained from the Bankruptcy Court an order approving the bidding procedures, all in form and substance reasonably acceptable to the DIP Lender (the "**Bidding Procedures Order**");

(F)     on or before February 14, 2025, the Debtors shall provide to the DIP Lender copies of certificates or compliance reports confirming that all applicable UL certifications are complete;

(G)     no later than February 18, 2025, the Debtors shall deliver to the DIP Lender letters or expressions of interest, including non-binding expressions, that are to be acceptable to the DIP Lender in its sole discretion;

(H)     no later than March 14, 2025, the Debtors shall deliver to the DIP Lender an executed purchase agreement and shall have received a nonrefundable deposit, which purchase agreement shall be acceptable to the DIP Lender in its sole discretion[3];

(I)     the Debtors are required to obtain entry by the Bankruptcy Court of the Final DIP Order no later than thirty (30) days after the Petition Date;

(J)     Within seventy-six (76) days after the Petition Date, the Debtors are required to conduct an auction, or otherwise designate the successful bidder(s) without an auction, in accordance with the Bidding Procedures Order; and

(K)     Within ninety (90) days after the Petition Date, the Debtors are required to have obtained from the Bankruptcy Court an order approving the sale of substantially all of the Debtors' assets and/or equity, in form and substance reasonably acceptable to the DIP Lender.

43.     As described further in the declaration filed in support of the proposed DIP Facility, the Debtors conducted a market check seeking competing DIP financing offers. No other proposals were received. Based upon the Debtors' efforts to arrange financing with other prospective

---

[3] In the event that the Debtors deliver an executed purchase agreement no later than March 14, 2025, in form and substance reasonably acceptable to the DIP Lender, the DIP Lender may, at its sole discretion, increase the DIP Loan Commitment in accordance with the Approved Budget.

lenders, the Debtors and their advisors believe that no other, better options for DIP financing are available to them other than the proposed DIP Facility.

44. Ultimately, the Debtors, in conjunction with their advisors, determined that the terms and conditions of the proposed DIP Facility were and remain the best and only funding available under the circumstances, and that the proposed funding adequately addresses the Debtors' financing needs during these Chapter 11 Cases through February 28, 2025. Importantly, the proposed DIP Facility was negotiated at arms' length among the proposed DIP Lender and the Debtors' proposed counsel and advisors.

45. The Debtors do not have the ability to borrow under their existing Credit Agreement. The Debtors require funds to sustain their operations and pay for the costs of the Chapter 11 process so they can run a process to identify potential financial and strategic partners for the Debtors, identify and execute on any capital raises, and identify and execute on any potential asset sales to maximize value for all parties-in-interest. The Debtors require the funds to be provided under the proposed DIP Facility to support their limited operations and the costs of these Chapter 11 Cases. The proposed DIP Facility is the best and only path forward to ensure that the Debtors can continue operating their businesses while providing sufficient liquidity to administer these Chapter 11 Cases to facilitate their restructuring process and maximize value for all parties-in-interest.

## PART IV
## FIRST DAY PLEADINGS

46. To facilitate their restructuring efforts, the Debtors have filed various First Day Pleadings set forth on **Exhibit B** concurrently with this Declaration.

47. I have reviewed each of the First Day Pleadings and proposed orders (including the exhibits thereto), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief and are incorporated herein by reference.

48. I believe that the relief sought in each First Day Pleading is vital to enable the Debtors' transition into Chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value, is necessary to avoid immediate and irreparable harm, and constitutes a critical element in maximizing value during these Chapter 11 Cases.

49. Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each of the First Day Pleadings be granted in its entirety.

## DECLARATION

Pursuant to Section 1746 of Title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 27, 2025

By: /s/ *Lukasz P. Cianciara*
Name: Lukasz P. Cianciara
Title: Chief Executive Officer

# EXHIBIT A



# **EXHIBIT B**

**LIST OF FIRST DAY PLEADINGS**

1. Debtors' Motion for Entry of an Order Directing Joint Administration of Cases

2. Debtors' Application for the Appointment of Stretto, Inc. as Claims and Noticing Agent

3. Motion of Debtors for Entry of an Order (I) Authorizing Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor; (B) File a Consolidated List of Top Twenty (20) Largest Unsecured Creditors; and (C) Redact Certain Personally Identifiable Information of Natural Persons; and (II) Granting Related Relief

4. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Existing Cash Management System, Bank Accounts, and Business Forms and Payment of Related Prepetition Obligations; (II) Modifying Certain Deposit Requirements; and (III) Authorizing Continuance of Intercompany Transactions and Honoring Certain Related Prepetition Obligations

5. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief

6. Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Related Obligations

7. Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to (I) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder, (II) Continue Insurance Premium Financing Program and Pay All Obligations Arising Thereunder, (III) Renew, Revise, Extend, Supplement, Change, or Enter into New Insurance Policies, and (IV) Maintain Surety Bonds

8. Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to (I) Pay Prepetition Wages, Compensation, and Employee Benefits and (II) Maintain and Continue Employee Benefits and Employee-Related Programs

9. Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief