## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| iM3NY LLC, *et al.*, | Case No. 25-10131 (BLS) |
| Debtors.[1] | (*Joint Administration Pending*) |

### DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDER; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF

iM3NY LLC (**"iM3NY"**) and Imperium3 New York, Inc. (**"Imperium3"**), the debtors and debtors-in-possession in the above-captioned cases (collectively, the **"Debtors,"** or the **"Company"**) state as follows in support of this motion (this **"Motion"**):

### RELIEF REQUESTED

1.     The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the **"Interim Order"**),[2] and a final order (the **"Final Order"** and, together with the Interim Order, the **"DIP Orders"**):

(a)     authorizing Debtors, (as the **"Borrowers"** or **"Loan Parties"**) to obtain and be obligated in respect of postpetition financing (the **"DIP Facility"**) in the form of that certain DIP Term Sheet (the **"DIP Term Sheet"**), by and among the Debtors and the lender, HSBC Bank PLC (the **"DIP Lender"**), attached to the Interim Order as **Exhibit 1**, and which DIP Facility shall include up to a maximum principal amount of $2,500,000 as new money funding (such funds the **"DIP Loans"**) on a final basis, to be loaned pursuant to the DIP Term Sheet by and among the Loan Parties and the DIP Lender, pursuant to the terms of the DIP Orders and any subsequent credit agreement and related security agreements and

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: (i) iM3NY LLC (N/A); and (ii) Imperium3 New York, Inc. (4574). The address of the Debtors' corporate headquarters is 1093 Clark Street, Endicott, New York 13760.

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Interim Order or the DIP Term Sheet (as defined herein), as applicable.

other documents required to be executed or delivered by or in connection with the DIP Facility (each as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and the Interim Order, collectively, the **"DIP Documents"**), to enable the Debtors to pay the expenses in the DIP loan budget (**"Approved Budget"**) attached as <u>Exhibit 2</u> to the Interim Order);

(b)     authorizing the Borrowers to execute and deliver the DIP Documents and to perform their respective obligations thereunder and to perform such other and further acts as may be required in connection with the DIP Documents;

(c)     authorizing the Borrowers to borrow (i) up to $1,500,000 of DIP Loans pursuant to the Interim Order (the **"Interim DIP Amount"**) and (ii) up to the full amount of the DIP Loans, inclusive of the Interim DIP Amount, pursuant to the Final Order;

(d)     authorizing a superpriority term loan facility in the outstanding principal amount of not less than $15,000,000 of Prepetition Secured Obligations (as defined below) to be converted into DIP Obligations (the **"Roll Up"**) upon the entry of the Interim Order;

(e)     authorizing the Borrowers to grant security interests, liens, and superpriority claims (including superpriority claims pursuant to 11 U.S.C. § 364(c)(1) (**"Superpriority Claims"**) and liens pursuant to 11 U.S.C. §§ 364(c)(2), 364(c)(3), and 364(d) (the **"DIP Liens"**)) to the DIP Lender, in each case payable from, and having recourse to substantially all of the Debtors' assets, as set forth in the DIP Documents (the **"DIP Collateral"**), and all proceeds thereof; <u>provided</u>, <u>however</u>, that such security interests, liens, and Superpriority Claims shall have the priority described in the DIP Documents and the DIP Orders;

(f)     authorizing the Debtors to use cash collateral (the **"Cash Collateral"**), as such term is defined in 11 U.S.C. § 363(a), in accordance with the Debtors' weekly cash flow forecast setting forth all projected post-petition cash receipts and cash disbursements as set forth in the Approved Budget, and all future budgets, pursuant to the terms of the Interim Order to be followed by the Final Order;

(g)     granting adequate protection in favor of the Prepetition Secured Party (as defined below) in accordance with the Interim Order;

(h)     subject to entry of the Final Order, authorizing the waiver by the Debtors of the right to (i) assert claims to surcharge against the DIP Collateral pursuant to 11 U.S.C. § 506(c) and (ii) seek marshaling with respect to the DIP Collateral;

(i)     modifying the automatic stay imposed under 11 U.S.C. § 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders, as applicable;

(j)     scheduling a Final Hearing within approximately 21 days of the commencement of these chapter 11 cases to consider entry of the Final Order; and

(k)     granting related relief.

2.      In support of the Motion, the Debtors rely on the *Declaration of Lukasz Cianciara in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [D.I. 10] (the **"First Day Declaration"**) and the *Declaration of Rob Vanderbeek in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lender; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the **"DIP Declaration"**), each of which is filed substantively contemporaneously herewith and incorporated herein by reference.

## JURISDICTION AND VENUE

3.      The United States Bankruptcy Court for the District of Delaware (the **"Court"**) has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

4.      The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**) and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the **"Local Rules"**), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested herein are sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c), and 507 of title 11 of

the United States Code (the **"Bankruptcy Code"**), Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1(b), 4001-2, and 9013.

## BACKGROUND

7.     iM3NY is a limited liability company organized under the laws of Delaware with its headquarters in Endicott, New York.  Substantially all of the assets of iM3NY are held by its operating subsidiary, Imperium3.  Imperium3 is a New York-based manufacturer of lithium-ion batteries that was founded in 2017 by Charge CCCV LLC (**"C4V"**) to foster U.S. domestic manufacturing and use its exclusive U.S. manufacturing license from C4V for prismatic cell design, supply chain and manufacturing processes to be scaled in the Company's state-of-the-art facility.  The Company's manufacturing facility is located in Endicott, New York and currently employs 22 people.

8.     Additional factual background regarding the Debtors' business operations, corporate and capital structures, and prepetition funding efforts are described in greater detail in the First Day Declaration, filed contemporaneously with this Motion and incorporated herein by reference.

9.     On January 27, 2025 (the **"Petition Date"**), the Debtors commenced with the Court voluntary cases (the **"Chapter 11 Cases"**) under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their business and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in these Chapter 11 Cases.

10.     Contemporaneously with the filing of this Motion, the Debtors have filed with the Court a motion requesting joint administration of the Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

4907-3382-2214, v. 3

## PRELIMINARY STATEMENT

11.     The Debtors require immediate access to incremental liquidity in the form of postpetition financing to avoid immediate harm, preserve the value of the Debtors' estates, undertake a successful reorganization process, and maximize recoveries for all stakeholders. Accordingly, the Debtors seek authorization to enter into the DIP Facility in an aggregate principal amount of up to $2,500,000, with up to $1,500,000 of such amount available upon interim approval of this Motion.

12.     The Debtors will use the proceeds of the DIP Facility to, among other things, (a) pay the fees, costs, and expenses incurred in connection with these Chapter 11 Cases, (b) fund any obligations benefitting from the Carve-Out, (c) permit the orderly continuation of the operation of their business, (d) maintain business relationships with customers, vendors, and suppliers, (e) make payroll and provide benefits to employees, and (f) satisfy other working capital and operational needs.  Obtaining an immediate injection of cash is critical.  The incurrence of new debt under the DIP Term Sheet and use of Cash Collateral is necessary and vital to the preservation and maintenance of the going concern value of the Debtors.  Immediate and irreparable harm will be caused to the Debtors and their estates if immediate financing is not obtained and permission to use Cash Collateral is not granted.

13.     For these reasons, and for the reasons set forth below and in the DIP Declaration and First Day Declaration, the Debtors believe, in the exercise of their business judgment, that approval of the DIP Facility will maximize value for the Debtors' stakeholders.  Accordingly, the Debtors respectfully request that the Court enter the DIP Orders authorizing the Debtors' access to the DIP Facility.

## CONCISE STATEMENT PURSUANT TO BANKRUPTCY
## RULE 4001 AND LOCAL RULE 4001-2

14.     As required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local

Rule 4001-2, the Debtors submit the following concise statement of the material terms of the DIP

Facility:[3]

| Summary of Material Terms | |
|---|---|
| **Parties to the Proposed DIP Facility**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Borrowers**:  Imperium3 New York, Inc. and iM3NY LLC.<br><br>**DIP Lender**: HSBC Bank PLC as lender under the Prepetition Credit Agreement. |
| **Purpose**<br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)* | The Debtors have an immediate and critical need to obtain financing pursuant to the DIP Facility and to continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other things, (a) pay the fees, costs, and expenses incurred in connection with these Chapter 11 Cases, (b) fund any obligations benefitting from the Carve-Out, (c) permit the orderly continuation of the operation of their business, (d) maintain business relationships with customers, vendors, and suppliers, (e) make payroll and provide benefits to employees, and (f) satisfy other working capital and operational needs.<br><br>*See* Interim Order ¶ G(iii). |
| **Borrowing Limits**<br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)A* | The DIP Facility provides for the following:<br><br>$1,500,000 shall be available upon entry of the Interim Order;<br><br>$2,500,000 shall be available upon entry of the Final Order.<br><br>*See* DIP Term Sheet - Type and Amount of DIP Facility; *See* Interim Order ¶ 3. |
| **Initial Approved Budget**<br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(iii)* | A copy of the Approved Budget is attached as <u>Exhibit 2</u> to the Interim Order. |
| **Interest Rate**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Loan shall have an interest rate of SOFR + 6.00%. The DIP Loan shall have an original issue discount earned upon the Closing Date.<br><br>*See* DIP Term Sheet - Payments and Interest Rates. |
| **Maturity Date** | The DIP Facility shall mature on the earliest to occur of: |

---

[3]     This concise statement is qualified in its entirety by, and subject to, the DIP Documents.  To the extent there is any conflict between this concise statement and the DIP Documents, the terms of the DIP Documents shall control.

4907-3382-2214, v. 3

| **Summary of Material Terms** |
|---|

| | |
|---|---|
| *Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)* | (i)      ninety (90) days after the Closing Date; provided, such date may be extended for up to 45 days at the option of the DIP Lender based on, among other things, the prior achievement of certain Milestones; |
| | (ii)     the effective date of a chapter 11 plan of any Loan Party, which has been confirmed by an order of the Bankruptcy Court in any of the Chapter 11 Cases and the conversion of the DIP Loans into a portion of an exit facility; |
| | (iii)    dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under chapter 7 of the Bankruptcy Code; |
| | (iv)    the acceleration of the DIP Loans and the termination of the commitments under the DIP Facility; and |
| | (v)     the closing of a sale of all or substantially all assets or equity of the Loan Parties.<br>*See* DIP Term Sheet – Maturity. |
| **Commitment**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | The DIP Facility provides for the following:<br><br>$1,500,000 shall be available upon entry of the Interim Order;<br><br>$2,500,000 shall be available upon entry of the Final Order.<br><br>*See* DIP Term Sheet - Type and Amount of DIP Facility; *See* Interim Order ¶ 3. |
| **Conditions Precedent to Closing and Lending**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E)* | The date of the satisfaction (or waiver) of each of the condition's precedent to the Initial DIP Loan after entry of the Interim Order (the "Closing Date") under the DIP Facility, shall be subject to customary conditions to closing for facilities of this type, including, without limitation, the following:<br><br>(i)      entry of the Interim Order, and the Interim Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended, or stayed without the prior written consent of the DIP Lender;<br><br>(ii)     the preparation, authorization and execution of the DIP Documents with respect to the DIP Facility, in form and substance consistent with the DIP Term Sheet and otherwise reasonably acceptable to the Loan Parties, and the DIP Lender, unless waived on an interim basis in which case funding shall be permitted under the DIP Term Sheet and the Interim Order;<br><br>(iii)    the delivery of a 13-week cash flow projection (the "Approved Budget") in form and substance acceptable to the DIP Lender, subject to standard and customary permitted variances, determined on a line by line basis of actual receipts and expenses against budgeted receipts and expenses provided for in the Approved Budget not to be less than 85% of the aggregate receipts for the applicable measuring period or more than 115% of aggregate expenses for the applicable measuring period, as determined by the DIP Lender (the "Permitted Variances") reflecting (i) the Loan Parties' anticipated cash receipts and disbursements for each calendar week during the period from the week in which the Petition Date occurs through and including the end of the thirteenth (13th) calendar week thereafter and (ii) a professional fee accrual budget with respect to the anticipated fees and expenses to be incurred by professionals retained by the Loan Parties and other professionals during the thirteen (13) week period;<br><br>(iv)    the delivery of (i) a secretary's (or other officer's) certificate of the Borrowers and each of the other Loan Parties, dated as of the Closing Date and in |

| Summary of Material Terms |
| --- |

|  | such form as is customary for the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments; and (ii) a customary closing officer's certificate of the Borrowers; |

(vi)     the DIP Lender shall have received from each of the Loan Parties, at least three (3) business days prior to the Closing Date, to the extent requested in writing at least five (5) business days prior to the Closing Date, (a) documentation and other information requested by any DIP Lender that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and (b) if a Borrower qualifies as a "legal entity customer" under the beneficial ownership regulations, the DIP Lender shall have received from such Borrower, at least three (3) business days prior to the Closing Date, a beneficial ownership certification in relation to such Borrower;

(vii)     the DIP Lender shall have a first priority priming, fully perfected, unavoidable, enforceable lien on the DIP Collateral ("DIP Lien") pursuant to the Interim Order; and

(viii)     the Closing Date shall have occurred on or before the date that is three (3) calendar days after the date of entry of the Interim Order unless the DIP Lender consent to a later date.

The Final DIP Loan shall be subject to customary conditions to closing for facilities of this type, including, without limitation, the following:

(i)     no later than thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order, and the Final DIP Order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified, amended, or stayed without the prior written consent of the DIP Lender;

(ii)     The Loan Parties shall be in compliance in all material respects with each order entered in the Chapter 11 Cases, including the DIP Orders and the Cash Management Order;

(iii)     no later than February 14, 2025, the Loan Parties shall provide the DIP Lender copies of certificates or compliance reports confirming that all applicable UL certifications are complete;

(iv)     no later than February 18, 2025, receipt of non-binding letters of interest which is acceptable to the DIP Lender in its sole discretion;

(v)     no later than March 14, 2025, the Loan Parties shall deliver to the DIP Lender an executed purchase agreement and shall have received a nonrefundable deposit, which purchase agreement shall be acceptable to the DIP Lender in its sole discretion; and

(vi)     The Loan Parties shall be in compliance with the Approved Budget (subject to Permitted Variances).

*See* DIP Term Sheet - Conditions Precedent to Closing, Initial Borrowing, and Additional Borrowing.

| **Events of Default**<br><br>*Fed. R. Bankr. P.* | The DIP Documents will contain customary events of default (each, an "Event of Default"), and others appropriate for the DIP Loans to be mutually and reasonably agreed among the Borrowers and the DIP Lender, including, without limitation: |

| **Summary of Material Terms** | |
|---|---|
| *4001(c)(1)(B); Local Rule 4001-2(a)(i)(M)* | (i)  the Final DIP Order, in form and substance reasonably satisfactory to the DIP Lender, shall not have been entered within thirty (30) days following the Petition Date; <br><br> (ii)  the Debtors fail to comply with the Approved Budget (subject to Permitted Variances); <br><br> (iii)  the Debtors fail to satisfy any of the DIP Milestones; <br><br> (iv)  the use by the Debtors of DIP Collateral not authorized by the DIP Orders and the DIP Documents; <br><br> (v)  the DIP Orders shall (a) have been vacated, stayed, amended, modified, or reversed (without the prior written consent of the DIP Lender, which consent may be withheld by the DIP Lender in their respective sole discretion) or (b) cease to create a valid and perfected lien with such priority required by this term sheet; <br><br> (vi)  upon written notice from the DIP Lender that the DIP Orders shall have been violated or breached; <br><br> (vii)  the Loan Parties' failure to pay expenses including professional fees when due under the DIP Documents or the DIP Orders; <br><br> (viii)  the Loan Parties failure to materially comply with all regulations applicable to the Loan Parties' operations; and <br><br> (ix)  In the event the Debtors, in consultation with the DIP Lender, determine that section 1129(a)(10) of the Bankruptcy Code cannot be satisfied or that the Debtors cannot otherwise confirm the Plan of Reorganization, the Loan Parties' failure to consummate a 363 sale of substantially all of the Debtors' assets or equity, subject in all respects to the Sale Milestones. <br><br> *See* DIP Term Sheet – Events of Default. |
| **Carve-Out** <br><br> *Fed. R. Bankr. P. 4001(b)(1)(B)(ii)* <br><br> *Local Rule 4001-2(a)(ii)* | The Prepetition Liens, the liens and security interests in the DIP Collateral, the Adequate Protection Liens, and all superpriority administrative expense claims granted under the DIP Orders, shall be subject and subordinate to the Carve-Out. <br><br> "Carve-Out" means an amount equal to the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court under section 156(c) of title 28 of the United States Code and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the applicable statutory rate (without regard to the notice set forth in (iii) below) (collectively, the "Statutory Fees"), which Statutory Fees shall not be subject to any budget; (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent permitted to be paid at any time, whether by interim order, procedural order, or otherwise (which order has not been vacated or stayed), all unpaid fees and expenses of professionals pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "Professionals" and such claims, the "Allowed Professional Claims") subject to the Approved Budget and with an aggregate cap of $1,380,000.00 (the "Carve-Out Cap").  . <br><br> *See* DIP Term Sheet – Carve-Out; *See* Interim Order ¶ 29. |

| Summary of Material Terms | |
|---|---|
| **Priority of Claims and Liens; Collateral**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(i);*<br><br>*Local Rule 4001-2(a)(i)(G)* | As security for the prompt payment and performance of all amounts due under the DIP Facility, including, without limitation, all principal, the Roll Up, interest, premiums, payments, fees, costs, expenses, indemnities, or other amounts (collectively, the "DIP Obligations"), effective as of the Petition Date, the DIP Lender, shall be granted automatically and properly perfected liens and security interests (the "DIP Liens") in all assets and properties of each of the Loan Parties and their bankruptcy estates, whether tangible or intangible, real, personal, or mixed, wherever located, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, the Loan Parties (including under any trade names, styles, or derivations thereof), whether prior to or after the Petition Date, including, without limitation, all of the Loan Parties' rights, title, and interests in (1) all Prepetition Collateral, (2) all money, cash, and cash equivalents; (3) all funds in any deposit accounts, securities accounts, commodities accounts, or other accounts (together with all money, cash, and cash equivalents, instruments, and other property deposited therein or credited thereto from time to time); (4) all accounts and other receivables (including those generated by intercompany transactions); (5) all contracts and contract rights; (6) all instruments, documents and chattel paper; (7) all securities (whether or not marketable); (8) all goods, as-extracted collateral, furniture, machinery, equipment, inventory and fixtures; (9) all real property interests; (10) all interests in leaseholds, (11) all franchise rights; (12) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights, licenses and all other intellectual property; (13) all general intangibles, tax or other refunds, or insurance proceeds; (14) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (15) all investment property; (16) all supporting obligations; (17) all letters of credit and letter of credit rights; (18) all commercial tort claims, without regard to any description of any such commercial tort claims; (19) all claims and causes of action arising under chapter 5 of the Bankruptcy Code ("Avoidance Actions") and the proceeds of or property recovered, whether by judgment, settlement or otherwise, from Avoidance Actions ("Avoidance Action Proceeds"), subject to entry of the Final DIP Order; (20) all permits, licenses, employment contracts, and license agreements, books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records), certifications, approvals, and permits; (21) to the extent not covered by the foregoing, all other goods, assets or properties of the Loan Parties, whether tangible, intangible, real, personal or mixed; and (22) all products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to such Loan Party from time to time with respect to any of the foregoing, now owned or hereafter acquired (collectively, the "DIP Collateral").<br><br>The DIP Liens, subject to the Carve-Out and the Priorities set forth above, shall have the following priorities (subject in all cases to the Carve-Out):<br><br>(i)     Liens on Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to Permitted Prior Liens |

| Summary of Material Terms | |
|---|---|
| | (collectively, "Unencumbered Property"), including Avoidance Actions and Avoidance Action Proceeds, which DIP Liens shall be subject and subordinate only to the Carve-Out.<br><br>(ii)    Priming DIP Liens and Liens Junior to Certain Other Liens.  Under sections 364(c)(3) and 364(d) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected in all DIP Collateral (other than as described in clause (i) above), which DIP Liens (a) shall be subject and subordinate only to (1) the Carve-Out and (2) Permitted Liens, (b) shall be senior to any and all other liens and security interests in DIP Collateral, including, without limitation, all liens and security interests in any DIP Collateral that would otherwise be subject to the Prepetition Liens (including, without limitation, any Adequate Protection Liens), and (c) shall otherwise be subject to the priorities set forth herein.<br><br>(iii)    Liens Senior to Other Liens.  Except to the extent expressly permitted hereunder, subject to the Carve-Out, the DIP Liens and the DIP Superpriority Claims (defined below) shall not be made subject to or *pari passu* with (a) any lien, security interest, or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, including any lien or security interest granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board, or court for any liability of the Loan Parties, (b) any lien or security interest that is avoided or preserved for the benefit of the Loan Parties and their estates under section 551 of the Bankruptcy Code or otherwise, (c) any intercompany or affiliate claim, lien, or security interest of the Loan Parties or their affiliates, or (d) any other lien, security interest, or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof.<br><br>*See* DIP Term Sheet – Collateral and Priority; *See* Interim Order ¶ 5. |
| **Adequate Protection / Identity of Each Entity with Interest in Cash Collateral**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ii); (b)(1)(B)(i), (iv);*<br><br>*Local Rule 4001-2(a)(i)(K) & (P)* | As adequate protection against the risk of any diminution in the value of the Prepetition Liens in all Collateral, as such term is defined in the Prepetition Credit Agreement (the "Prepetition Collateral"), which results from, arises from, or is attributable to, the priming of the Prepetition Liens, the imposition of the automatic stay under section 362 of the Bankruptcy Code, or the use, sale, or lease of such Prepetition Collateral, or the grant of a lien under section 364 of the Bankruptcy Code and applicable case law interpreting the same (any such diminution, "Diminution in Value"), the Prepetition Secured Lender shall be granted the following adequate protection, subject in all cases to the Carve-Out (defined below), the DIP Liens (defined below), DIP Superpriority Claims (defined below), and the Permitted Liens:<br><br>(A) To the extent of any Diminution in Value of the Prepetition Liens in the Prepetition Collateral, validly perfected replacement liens in all DIP Collateral (defined below) (the "Adequate Protection Liens"), which adequate protection liens shall have the priority set forth in "Priorities" below, as applicable; (B) to the extent of any Diminution in Value of the Prepetition Liens in Prepetition Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Loan Parties and their estates, on a joint and several basis, which claim shall have priority over any and all administrative expense claims against the Loan Parties and their estates, now existing or hereafter |

| Summary of Material Terms | |
|---|---|
| | arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code (other than the Carve-Out (defined below)) (the "Adequate Protection Claims"), which claims shall be subject to the priorities set forth in "Priorities" below, as applicable; (C) accrual of unpaid pre and postpetition interest at the nondefault rate (as set forth in the Prepetition Credit Agreement) as the same becomes due and payable under the Prepetition Credit Agreement; (D) accrual of reasonable and documented out-of-pocket fees and expenses of the Prepetition Admin Agent and the Prepetition Secured Lender, (E) the Borrowers shall provide copies of any financial reports (including the weekly delivery of a rolling 13 week cash flow, budget, and supporting information) to the extent otherwise provided to the DIP Lender; and (F) the "first day" orders shall be reasonably acceptable to the DIP Lender.<br><br>*See* DIP Term Sheet – Adequate Protection; *See* Interim Order ¶ 13. |
| **Debtors' Stipulations**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii);*<br><br>*Local Rule 4001-2(a)(i)(B)* | Upon entry of the Interim Order:<br><br>(i)  The Loan Parties shall stipulate (a) to the validity, extent, security, enforceability, priority, unavoidability and perfection of the Prepetition Liens and Prepetition Secured Obligations, (b) to the amount, validity, and lack of defense, counterclaim or offset of any kind to the Prepetition Secured Obligations, and (c) that all cash of the Loan Parties constitutes "cash collateral" of the Prepetition Secured Lender for purposes of section 363 of the Bankruptcy Code (the "Cash Collateral") (subject to a challenge period acceptable to the DIP Lender and consistent with applicable local rules).<br><br>(ii)  The Loan Parties shall waive any right to surcharge pursuant to section 506(c) of the Bankruptcy Code the DIP Collateral with respect to the DIP Lender, and the Prepetition Collateral with respect to the Prepetition Secured Lender, subject to entry of the Final DIP Order.<br><br>(iii)  The Loan Parties shall waive the equitable doctrine of "marshalling" against the DIP Collateral with respect to the DIP Lender, and the Prepetition Collateral with respect to the Prepetition Secured Lender, subject to entry of the Final DIP Order.<br><br>(iv)  The Prepetition Secured Lender shall be entitled to the benefit of section 552(b) of the Bankruptcy Code, and the Loan Parties shall waive the "equities of the case exception" under section 552(b) of the Bankruptcy Code with respect to the Prepetition Secured Lender, subject to entry of the Final DIP Order.<br><br>(v)  The Loan Parties shall waive and forever release and discharge any and all claims and causes of action against each of the DIP Lender and Prepetition Secured Lender (and their respective related parties and representatives) as of the date of the applicable DIP Order. |

| Summary of Material Terms | |
|---|---|
| | (vi)      No Cash Collateral, proceeds of the DIP Facility, or any cash or other amounts may be used to (a) investigate, challenge, object to, or contest the validity, extent, enforceability, security, perfection, or priority of any of the DIP Liens, Prepetition Liens, DIP Obligations, or Prepetition Secured Obligations, (b) investigate or initiate any claim or cause of action against any of the DIP Lender or Prepetition Secured Lender, (c) object to or seek to prevent, hinder, or delay or take any action to adversely affect the rights or remedies of the DIP Lender or the Prepetition Secured Lender, or (d) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under the DIP Documents and the DIP Orders) that are senior to or pari passu with the DIP Liens, DIP Superpriority Claims, the Adequate Protection Liens or claims granted hereunder, or the Prepetition Liens. |
| | (vii)      The DIP Lender and the Prepetition Secured Lender shall be entitled to good faith protection under section 364(e) of the Bankruptcy Code. |
| | *See* DIP Term Sheet – Stipulations, Waivers, Releases, and Protections; *See* Interim Order ¶ F. |
| **Waiver/Modification of the Automatic Stay** *Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | The automatic stay of section 362 of the Bankruptcy Code will be modified and vacated to the extent necessary to permit the Debtors, the DIP Lender and/or the Prepetition Secured Party to accomplish the transactions contemplated by the Interim Order. |
| | *See* Interim Order ¶ 18. |
| **Milestones** *Fed. R. Bankr. P. 4001(c)(1)(B)(vi);* *Local Rule 4001-2(i)(a)(H)* | The Debtors shall comply with certain customary DIP milestones (the "DIP Milestones"), which DIP Milestones shall be incorporated into the DIP Credit Agreement, including, without limitation: |
| | (i)      the Debtors shall commence respective voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") by January 27, 2025 (the "Petition Date"); |
| | (ii)      no later than one (1) day following the Petition Date, the Debtors shall have engaged an investment banker for the sale of all or substantially all of their assets (the "Investment Banker"); |
| | (iii)      the Debtors shall obtain entry by the Bankruptcy Court of the Interim DIP Order no later than five (5) business days after the Petition Date; |
| | (iv)      ten (10) business days after the Petition Date, the Debtors shall file with the Bankruptcy Court a motion seeking approval of bidding procedures, in form and substance reasonably acceptable to the DIP Lender; |

| | Summary of Material Terms | |
|---|---|---|
| | (v) | Within forty (40) days after the Petition Date, the Debtors shall have obtained from the Bankruptcy Court an order approving the bidding procedures, all in form and substance reasonably acceptable to the DIP Lender (the "Bidding Procedures Order"); |
| | (vi) | on or before February 14, 2025, the Debtors shall provide to the DIP Lender copies of certificates or compliance reports confirming that all applicable UL certifications are complete; |
| | (vii) | no later than February 18, 2025, the Debtors shall deliver to the DIP Lender letters or expressions of interest, including non-binding expressions, that are to be acceptable to the DIP Lender in its sole discretion; |
| | (viii) | no later than March 14, 2025, the Debtors shall deliver to the DIP Lender an executed purchase agreement and shall have received a nonrefundable deposit, which purchase agreement shall be acceptable to the DIP Lender in its sole discretion; |
| | (ix) | the Debtors shall obtain entry by the Bankruptcy Court of the Final DIP Order no later than thirty (30) days after the Petition Date; |
| | (x) | within seventy-six (76) days after the Petition Date, the Debtors shall conduct an auction, or otherwise designate the successful bidder(s) without an auction, in accordance with the Bidding Procedures Order; and |
| | (xi) | within ninety (90) days after the Petition Date, the Debtors shall have obtained from the Bankruptcy Court an order approving the sale of substantially all of the Debtors' assets and/or equity, in form and substance reasonably acceptable to the DIP Lender. |
| | *See* DIP Term Sheet – Milestones. | |
| **Indemnification**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)(ix)* | The Debtors shall provide for customary indemnification by each of the Debtors, on a joint and several basis, of the DIP Lender (together with their related parties and representatives).<br><br>*See* DIP Term Sheet - Expenses and Indemnification; *See* Interim Order ¶ 33. | |
| **506(c) Waiver /**<br>**Section 552(b) Waiver**<br><br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)(x)*<br><br>*Local Rule 4001-*<br>*2(a)(i)(C)* | Subject to entry of the Final Order, in light of (i) the DIP Lender's agreement that their liens and superpriority claims shall be subject to payment of the Carve-Out and (ii) the Prepetition Secured Party's agreement that, with respect to the Prepetition Collateral, their respective liens and claims, including any adequate protection liens and claims, shall be subject to payment of the Carve-Out, and subordinate to the DIP Liens, the DIP Lender and the Prepetition Secured Party have negotiated for, and the Debtors intend to seek in the Final Order, (a) a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, (b) a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the | |

| Summary of Material Terms | |
|---|---|
| | DIP Collateral, the DIP Obligations, or the Prepetition Collateral, as applicable, and (c) a waiver of the surcharge provisions of section 506(c) of the Bankruptcy Code. *See* DIP Term Sheet – Stipulations, Waivers, Releases, and Protections; *See* Interim Order ¶ 38. |
| **Roll-Up** *Fed. R. Bankr. P. 4001(c)(1)(B)(ii)* *Local Rule 4001-2(a)(i)(N)&(0)* | The DIP Commitments shall include a new money facility in the aggregate principal amount up to $2,500,000 plus a roll up of $15,000,000 of the Prepetition Secured Obligations, the sum of which shall be a DIP Obligation as of the entry of the Interim Order. *See* DIP Term Sheet – Roll up; *See* Interim Order ¶ G(vi). |
| **Liens on Avoidance Actions** *Fed. R. Bankr. P. 4001(c)(1)(B)(xi)* | Subject to entry of the Final Order, the DIP Liens include any proceeds or property recovered, unencumbered or otherwise from all of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code and under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and similar statutes or common law. *See* Interim Order ¶ 5. |
| **Fees** *Bankruptcy Rule 4001(c)(1)(B)* *Local Rule 4001-2(a)(i)(K) and 2(a)(ii)* | The Debtors shall pay all costs and expenses of the DIP Lender in kind, including, without limitation, the payment in kind of all reasonable and documented fees and expenses of the DIP Lender's professionals and advisors. The Borrowers shall pay the DIP Lenders (i) an upfront non-refundable fee of 0.50% of the aggregate principal amount of DIP Loans drawn, which shall be fully earned, due and payable in kind on the date of any such draw; (ii) an exit fee of 2.50% of aggregate principal amount of DIP Loans drawn due and payable in kind *See* DIP Term Sheet – Expenses and Indemnification; Payments and Interests Rates; *See* Interim Order ¶ 32. |

## I.    **Debtors' Prepetition Capital Structure**

15.    As of the Petition Date, the Debtors are obligated as borrowers, or guarantors on that certain Senior Secured Term Loan Credit Agreement, dated as of April 14, 2022 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the **"Prepetition Credit Agreement"**) between and among Imperium3, iM3NY, C4V, the lenders from time to time party thereto, ACP Post Oak Credit I LLC, as administrative agent (in such capacity, **"Administrative Agent"**) and collateral agent (in such capacity, **"Collateral Agent"**; and, together with the Administrative Agent, individually and collectively, **"Agent"**).

4907-3382-2214, v. 3

16.     On October 24, 2024, the former lender, R-SPV II, L.L.C. (the **"Former Lender"**), assigned all of its interests in the Prepetition Credit Agreement and other loan documents to HSBC Bank PLC (**"HSBC"** or the **"Prepetition Secured Lender"**) pursuant to the terms of that certain Loan Purchase, Assignment and Agreement (the **"Assignment Agreement"**).

17.     After the Assignment Agreement was consummated, the Prepetition Secured Lender made available to Imperium3 certain Loans (as defined in the Credit Agreement) in an aggregate original principal amount of (a) Six Hundred Thousand Dollars ($600,000) as of October 25, 2024 (the "**October 25 Loan**"), (b) Three Hundred Twenty Thousand Dollars ($320,000) as of November 8, 2024 (the "**November 8 Loan**"), (c) Three Hundred Twenty Thousand Dollars ($320,000) as of November 22, 2024 (the "**November 22 Loan**"), (d) Three Hundred Twenty Thousand Dollars ($320,000) as of December 12, 2024 (the "**December 12 Loan**"), (e) Two Hundred Thousand Dollars ($200,000) as of December 17, 2024 (the "**December 17 Loan**"), (f) Seven Hundred Fifty Thousand Dollars ($750,000) as of December 24, 2024 (the **"December 24 Loan"**), Three Hundred Twenty Thousand Dollars ($320,000) as of January 8, 2025 (the **"January 8 Loan,"** and collectively with the October 25 Loan, the November 8 Loan, the November 22 Loan, the December 12 Loan, the December 17 Loan, the December 24 Loan, and the January 8 Loan, the **"Emergency Bridge Funding"**).

18.     As of the Petition Date, the Debtors are indebted to the Prepetition Secured Lender in an aggregate principal amount of approximately $125.8 million, including the Emergency Bridge Funding and accrued and unpaid interest, fees and other claims (the **"Prepetition Secured Obligations"**). The Prepetition Secured Obligations are secured by first-priority liens and security interests in substantially all the Debtors' assets (the **"Prepetition Liens"**).

19.     The Debtors are in default of the Prepetition Credit Agreement.  On or about December 18, 2024, the Debtors entered into a forbearance agreement (the **"Forbearance Agreement"**) whereby the Agent and Prepetition Secured Lender agreed to forbear from enforcing remedies with respect to certain specified events of default (the **"Specified Defaults"**).  Under the Forbearance Agreement, the Company granted releases in favor of HSBC and the Administrative Agent, and acknowledged the extent validity priority and perfection of the Prepetition Secured Obligations and Prepetition Liens.

20.     In addition to establishing other milestones, the Forbearance Agreement required the Debtors to retain an investment banker (the "**Investment Banker**"), acceptable to the Agent and Prepetition Secured Lender and begin a marketing process, to identify potential financial and strategic partners for the Debtors, identify and execute on any capital raises, and to identify and execute on any potential asset sales.

21.     The Forbearance Agreement also contained certain milestones (the "**Milestones**"), relating to UL certifications necessary for commercial sale of the Company's battery production and for commencing these bankruptcy cases.

22.     As of the Petition Date, default interest on the Prepetition Secured Obligations are accruing at approximately 12.62%.

**(d)     Other Creditors**

23.     As of the Petition Date, the Debtors had approximately $10 million in unsecured trade debt.  To the extent any creditor has a valid, fully perfected, and unavoidable lien, that is senior to the Prepetition Liens held by the Prepetition Secured Lender, they are considered permitted liens (**"Permitted Liens"**) under the proposed DIP Facility.

## II.    Debtors' Need for Postpetition Financing

24.    Despite its efforts to continue to raise funds, as of the Petition Date, the Company had only minimal cash on hand and no remaining availability under its Prepetition Credit Agreement.  Given the Company's current cash position, the Company does not have the ability to pay any of its operating costs in the ordinary course of business, absent approval of the DIP financing.  Just prior to the Petition Date, the Prepetition Secured Lender provided the Debtors with the DIP Term Sheet for debtor-in-possession financing to fund limited operations and the costs of these Chapter 11 Cases to run a sale process to maximize the value of the Debtors' assets. The DIP Facility is the best and only path forward to ensure that the Debtors can continue operating their business while providing sufficient liquidity to administer these Chapter 11 Cases and facilitate the restructuring process.

## III.    Debtors' Efforts to Obtain Postpetition Financing

25.    In order to obtain access to essential liquidity to support the Debtors' postpetition operations and the proposed restructuring process, the Debtors, through their proposed financial advisor, NOVO Advisors (**"NOVO"**), conducted a market check by seeking competing DIP financing offers from three (3) other prospective lenders.  No other proposals were received.  The primary reasons for the lack of competing proposals are because (i) the Prepetition Secured Lender is unwilling to permit a priming lien in favor of a third party, and (ii) the other potential lenders are unwilling to provide a DIP facility junior to the Prepetition Secured Lender.  Based upon NOVO's efforts to arrange refinancing with prospective lenders, the Debtors and their advisors believe that no other better options for DIP financing are available to them other than the proposed DIP Facility.

26.    On or around December 13, 2024, the Debtors and the Prepetition Secured Lender began materially advancing negotiations regarding the terms of the Prepetition Secured Lender's

DIP financing proposal.  When concluded, the Debtors determined, in their business judgment, that there was no proposal for debtor-in-possession financing available to the Debtors on terms better than those provided by the Prepetition Secured Lender.  In particular, no party was willing to extend debtor-in-possession financing to the Debtors on an unsecured or junior basis. Accordingly, the Debtors and the DIP Lender intend to enter into the DIP Term Sheet, which is attached to the Interim Order as <u>Exhibit 1</u>.

**BASIS FOR RELIEF REQUESTED**

**1.**    **<u>Debtors Should Be Authorized to Enter into the DIP Term Sheet</u>**

    **A.**    **Entering into the DIP Facility is a Sound Exercise of Debtors' Business Judgment**

27.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  Indeed, "courts will almost always defer to the business judgment of a debtor in the selection of the lender." *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011); *See also In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. Jun. 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing

- 19 -

agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

28.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code"). Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. This includes the recognition that a debtor may have to enter into "hard bargains" to acquire funds for its reorganization. *In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986). Finally, the Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. As the Bankruptcy Court for the Southern District of New York has explained:

> Although all parties . . . are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

*In re ION Media Networks, Inc.*, No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. Jul. 6, 2009).

29.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an extensive arm's-length negotiation process and careful evaluation of available alternatives.  Having analyzed the advantages and disadvantages of the proposed DIP Facility, as well as the advantages and disadvantage of other potential financing sources, the Debtors believe that they have obtained the best financing available under the totality of the circumstances and that the proposed DIP Facility will position the Debtors to maximize the value of their estates.  Accordingly, the Court should authorize the Debtors' entry into the DIP Facility.

**B.      The Debtors Should Be Authorized to Grant Liens, Including Priming Liens, and Superpriority Claims**

30.     The Debtors propose to obtain the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) and 364(d) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lender continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and DIP Liens on the DIP Collateral.  The Debtors also seek authority to grant the DIP Lender Superpriority Claims.

31.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

32.     In addition, under section 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain postpetition credit secured by a "priming" lien from affected secured parties if (a) the debtor obtains the consent of such parties or (b) the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected.

4907-3382-2214, v. 3

11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
>
> (A) the [debtor] is unable to obtain credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

33.    In evaluating proposed postpetition financing under sections 364(c) and 364(d)(1) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider various factors including whether:

a.    unencumbered credit or alternative financing without superpriority status is available to the debtor;

b.    the credit transactions are necessary to preserve assets of the estate;

c.    the terms of the credit agreement are fair, reasonable, and adequate;

d.    the proposed financing agreement was negotiated in good faith and at arm's length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

e.    the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

4907-3382-2214, v. 3

34.     As described further in the DIP Declaration, NOVO, the Debtors' financial advisor, conducted a market check seeking competing DIP financing offers.  No other proposals were received.

35.     Ultimately, the Debtors, in conjunction with their advisors, determined that the terms and conditions of the proposed DIP Facility were and remain the best and only available under the circumstances and adequately addresses the Debtors' financing needs during these Chapter 11 Cases.  Importantly, the DIP Facility was negotiated at arms' length among the proposed DIP Lender and the Debtors' proposed counsel and advisors.

36.     The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.  Given their current financial condition, financing arrangements, and capital structure, and the circumstances of these Chapter 11 Cases, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility.

37.     Further, the Prepetition Secured Party has consented to the Debtors incurring debtor-in-possession financing, the priming of their Prepetition Liens, and the use of their Cash Collateral, only on the terms of and subject to the conditions set forth in the DIP Documents and the Interim Order.

38.     The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c)

credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.

39.    Financing on a postpetition basis is not otherwise available without granting the DIP Lender: (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims and priming liens to the extent set forth in the Interim Order and the DIP Documents, and (3) the other protections set forth in the Interim Order.

40.    Based upon NOVO's efforts to arrange refinancing with prospective lenders, the Debtors and their advisors believe that no other, better options for DIP financing are available to them other than the proposed DIP Facility.  Additionally, as noted above and described in the DIP Declaration, the Debtors believe that the proposed DIP Facility is critical to preserving the Debtors' enterprise value and positioning the Debtors to run a value-maximizing restructuring process.  Thus, the Debtors have determined that the DIP Facility provides the best and only opportunity available to the Debtors under the circumstances to fund these Chapter 11 Cases.

41.    Absent the proposed DIP Facility, which will provide the Debtors with access to liquidity to operate the Debtors business and administer these Chapter 11 Cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Without postpetition financing, the Debtors lack sufficient funds to continue operations, pay their debts as they come due, and cover the projected costs of the Chapter 11 Cases.  Under the circumstances, the Debtors believe that the terms of the proposed DIP Facility, taken as a whole, are fair and reasonable.

42.    For the reasons discussed herein, including the terms of the proposed DIP Facility as well as the unavailability of actionable alternative sources of financing, the Debtors satisfy the

standards required to access postpetition financing on a superpriority claim and priming lien basis

under sections 364(c) and 364(d) of the Bankruptcy Code.

### C.     The Partial Roll Up is Appropriate and Should be Approved

*43.*     The DIP Lender would not have agreed to extend postpetition financing without a

partial roll-up of the Debtors' Prepetition Secured Obligations, including the recent Emergency

Bridge Funding made by the Prepetition Ledner to support the Debtors just prior to the filing of

these Chapter 11 Cases.  Notwithstanding the partial roll-up, the Interim Order preserves the rights

of other parties in interest, including any statutory committee of unsecured creditors, to investigate

and challenge the validity, enforceability, perfection, and priority of the Prepetition Secured

Obligations and the liens and security interests granted in connection therewith.  The repayment

of prepetition debt is a common feature in debtor-in-possession financing arrangements.  Courts

in this jurisdiction have approved similar DIP features on the first day of the case. *See, e.g.,*

*EveryWare Global, Inc.*, No. 15-10743 (LSS) (Bankr. D. Del. April 10, 2015) (authorizing ABL

DIP Facility providing for collection and payment related to ABL Collateral be first applied to pay

down prepetition ABL Facility); *In re Tactical Intermediate Holdings, Inc.*, No. 14-11659 (KG)

(Bankr. D. Del. July 9, 2014) (authorizing $2.8 million DIP that included full roll-up of bridge

loan in the approximate amount of $1 million pursuant to interim order); *In re MACH Gen, LLC,*

No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP

that included roll-up of approximately $144 million prepetition debt pursuant to interim order); *In*

*re Furniture Brands Int'l, Inc*., No. 13-12329 (CSS) (Bankr. D. Del. Sept.  11, 2013) (authorizing

4907-3382-2214, v. 3

approximately $140 million DIP that included roll-up of approximately $91 million prepetition debt pursuant to interim order).[4]

44.     Under the circumstances, the Debtors believe that the terms of the proposed DIP Facility, including the partial roll-up, taken as a whole, are fair and reasonable and should be approved.

### D.    The Debtors Should Be Authorized to Pay DIP Fees

45.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay the DIP Lender certain fees and expenses as noted above and set forth in the DIP Term Sheet. It is understood and agreed by all parties, including the Debtors, that this compensation is an integral component of the overall terms of the DIP Facility, and was required by the DIP Lender as consideration for the extension of postpetition financing.

46.     The Debtors believe the DIP Lender agreed to provide the DIP Loans with the specific intent to both fully fund the Debtors' reorganization while simultaneously keeping the postpetition financing narrowly tailored to meet the Debtors' restructuring needs.  The DIP Lender and the Debtors, along with their advisors, extensively negotiated the terms of the proposed DIP Facility.  Such negotiations included drafts of key documents, including the proposed Interim Order and the DIP Term Sheet, and various discussions both amongst the Debtors, the DIP Lender, and their respective advisors.  The Debtors believe that the terms of the proposed DIP Facility, including the fees and conditions contained therein, represent the best available terms for the

---

[4]    Because of the voluminous nature of the orders cited herein, they are not attached to this Motion.  Copies of these orders are available on request of the Debtors' proposed counsel.

4907-3382-2214, v. 3

Debtors. Accordingly, the Court should authorize the Debtors to incur such obligations under the DIP Documents in connection with entering into those agreements.

**2.     The Debtors Should Be Authorized to Use Cash Collateral and Provide Adequate Protection**

47.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2) conditions use of Cash Collateral upon (a) obtaining consent of each party that has an interest in the Cash Collateral; or (b) "the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." Further, the use of cash collateral may be prohibited or conditioned, upon proper request, as is necessary to adequately protect any interest in cash collateral. *See* 11 U.S.C. §363(e).

48.     Here, the Prepetition Secured Lender consents to the Debtors' use of the Cash Collateral (as well as the Prepetition Collateral), subject to the terms and limitations set forth in the DIP Term Sheet and the Interim Order. As explained more fully herein, the Debtors have provided the Prepetition Secured Lender with fair and reasonable adequate protection, as set forth in the Interim Order. Accordingly, the Court should authorize the Debtors' use of Cash Collateral in accordance with the terms and conditions set forth in the DIP Term Sheet and the Interim Order.

49.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by a debtor in possession, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). If a secured creditor does not consent to the debtor's proposed use of cash collateral, the court must ensure that the creditor's interests are adequately protected. *See id*. Thus, courts are required to balance the protection offered to a secured creditor against the debtor's need to use cash in its reorganization effort. *Stein v. U.S. Farmers Home Admin. (In re Stein)*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982). In determining whether a creditor is adequately

protected, courts "will generally permit the business operation to continue, at least to the point of

plan formulation, if the debtors make a solid evidentiary showing to support their projections." *In*

*re Dynaco Corp.*, 162 B.R. 389, 395 (Bankr. D.N.H. 1993).

50.     "The concept of 'adequate protection' is not defined in the [Bankruptcy] Code

except by the implications of the examples of adequate protection listed in § 361."  *In re Beker*

*Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).   Section 361 of the Bankruptcy Code

contains a non-exhaustive list of acceptable forms of adequate protection, including a cash

payment or periodic cash payments, additional liens, replacement liens, and the "indubitable

equivalent of such entity's interest in such property." 11 U.S.C. § 361.  While section 361 of the

Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement

liens and administrative claims, courts decide what constitutes sufficient adequate protection on a

case-by-case basis. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994).

51.     The concept of adequate protection exists to protect a secured creditor from

diminution in value of its interest in collateral during the pendency of the bankruptcy case.  *See In*

*re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured

party's interest is protected from diminution or decrease as a result of the proposed use of cash

collateral); s*ee also In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180,81 (Bankr. D. Del. 1993) (holding

that adequate protection for use of cash collateral under section 363 is limited to use-based decline

in value).

52.     After arms' length and good faith negotiations, the Prepetition Secured Lender has

agreed to consent to the use of the Prepetition Collateral (as defined in the Interim Order),

including Cash Collateral, subject to the provision by the Debtors of adequate protection.  Among

other things, the adequate protection contemplated by the DIP Orders is designed to protect the

Prepetition Secured Lender's interests in the Debtors' property from any diminution in value caused by the automatic stay, by the Debtors' use of the Cash Collateral, during the pendency of these Chapter 11 Cases and by the priming of the Prepetition Secured Lender's liens by the DIP Liens.  Specifically, the Debtors have agreed to provide the following forms of adequate protection more fully set forth in the Interim Order (collectively, the **"Adequate Protection Obligations"**):

a)    valid and automatically perfected replacement liens and security interests in and upon the DIP Collateral under sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code;

b)    superpriority administrative claims under section 507(b) of the Bankruptcy Code;

c)    The Prepetition Secured Lender shall receive monthly reimbursement of their respective reasonable and documented fees and expenses including any professional fees (in each case, without the need for the filing of formal fee applications), including as to any amounts arising before, on, or after the Petition Date;

d)    The Debtors shall provide the Prepetition Secured Party with all reports, documents, and other materials, including financial reports, as may be required in the Interim Order and the DIP Term Sheet, and shall continue to provide all financial reporting required by the Prepetition Loan Documents; and

e)    The Debtors shall comply with, and shall use cash, including Cash Collateral, solely in accordance with the Approved Budget (subject to the Permitted Variances).

53.    Therefore, the Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Lender from any diminution in value to the Cash Collateral and Prepetition Collateral. *See In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6, *7 (Bankr. D. Del. Dec. 7, 2012) (finding that "(i) interest payments at the applicable default rate, (ii) payment of the Secured Lender's legal fees and expenses incurred in these chapter 11 cases and (iii) replacement liens on the collateral" to be appropriate forms of adequate protection that "protect a secured creditor from diminution in the value of its interest in

the particular collateral during the period of use by the debtor."); COLLIER ON BANKR. ¶ 361.01 (16th ed. 2020) ("Section 361 of the Code suggests three forms of adequate protection, but the list is not inclusive: (1) periodic payments; (2) additional or replacement liens; and (3) such other relief as will result in the realization of the 'indubitable equivalent' of the entity's interest.").

54.     In light of the foregoing, the Debtors further submit that the proposed Adequate Protection Obligations, to be provided for the benefit of the Prepetition Secured Lender, are appropriate.   Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of their estates and all parties in interest.

**3.      Scope of Carve Out is Appropriate**

55.     The Interim Order provides that each of the DIP Liens, the Superpriority Claim, Replacement Lien, Prepetition Liens, and Superpriority Claim (all as defined in the Interim Order) shall be subject and subordinate to the Carve-Out.  Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be compensated in these Chapter 11 Cases would be restricted. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties-in-interest of possible rights and powers.  Additionally, the Carve-Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for the payment of amounts to the Clerk of the Court or U.S. Trustee fees, and professional fees of the Debtors.

4.     **The DIP Lender Should Be Deemed a Good-Faith Lender under Bankruptcy Code Section 364(e)**

56.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Specifically, section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

57.     As explained herein and in the First Day Declaration and DIP Declaration, the terms of the DIP Facility are the result of (a) the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain vital postpetition financing, and (b) extensive arms'-length, good-faith negotiations between the Debtors and the DIP Lender. The Debtors submit that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to the DIP Lender other than as described herein.  Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded by that section.

5.     **The Automatic Stay Should Modified on a Limited Basis**

58.     The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lender to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to

validate and perfect the liens and security interests granted to them under the Interim Order. The Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Liens to the DIP Lender and to incur all liabilities and obligations set forth in the Interim Order. Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Lender to exercise all rights and remedies in accordance with the DIP Documents, or applicable law following five (5) business days' notice to the Debtors, any Committee, and the U.S. Trustee, during which time the Debtors may seek injunctive relief.

59.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases. *See, e.g.*, *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC,* No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

**6.      Request for Interim Hearing:  Failure to Obtain, on an Interim Basis, Immediate Access to the DIP Facility Would Cause Immediate and Irreparable Harm**

60.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion. However, Bankruptcy Rules 4001(b)(2) and (c)(2) allow the Court to

(a) hold a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral if so requested and (b) authorize, to the extent necessary to avoid immediate and irreparable harm to the estate, the use of cash collateral or the obtaining of credit.

61.     The Debtors request that the Court hold a hearing to consider entry of the Interim Order authorizing the Debtors—in the period from and after entry of the Interim Order until the Final Hearing—to borrow funds under the DIP Facility in accordance with the Approved Budget.

62.     The Approved Budget was developed by the Debtors and their professionals, and together with the DIP Lender, to ensure that the Debtors have sufficient funds to operate their business in the ordinary course while running a value-maximizing sale process and paying their administrative expenses.  Further, the Budget contemplates that in the period from and after entry of the Interim Order until the Final Hearing the Debtors will use only those funds necessary to avoid immediate and irreparable harm.

### **WAIVER OF BANKRUPTCY RULE 4001(a)(3)**

63.     Bankruptcy Rule 4001(a)(3) provides that an "order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As explained herein, access to the DIP Facility is essential to prevent irreparable damage to the Debtors' estates.

64.     Accordingly, ample cause exists to justify the waiver of the 14-day stay imposed by Bankruptcy Rule 4001(a)(3), and the Debtors requests of waiver of the stay, to the extent such stay applies.

### **WAIVER OF BANKRUPTCY RULES 6004(a) and (h)**

65.     To implement the relief requested in this Motion, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above, the relief

requested herein is necessary to avoid immediate and irreparable harm to the Debtors, such that there is ample cause to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## **RESERVATION OF RIGHTS**

66.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Interim Order and the Final Order is intended to or should be construed as: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

## **NOTICE**

67.     The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee; (b) the holders of the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Lender and the Prepetition Secured Lender; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service and applicable state taxing authorities; and (f) any other parties entitled to notice pursuant to Local Rules 2002-1(b) and 9013-1(m).  As this Motion is seeking "first day" relief, the Debtors will serve this Motion and any order entered with respect to this Motion as required by Local Rule 9013-1(m)(iii).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**WHEREFORE**, the Debtors respectfully request entry of the Interim and Final orders,

(a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated: January 27, 2025
Wilmington, Delaware

CHIPMAN BROWN CICERO & COLE, LLP

*/s/ William E. Chipman, Jr.*

William E. Chipman, Jr. (No. 3818)
David W. Carickhoff (No. 3715)
Mark D. Olivere (No. 4291)
Alan M. Root (No. 5427)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:     (302) 295-0191
Email:          chipman@chipmanbrown.com
                carickhoff@chipmanbrown.com
                olivere@chipmanbrown.com
                root@chipmanbrown.com

*Proposed Counsel for Debtors and*
*Debtors in Possession*

# EXHIBIT A

**(*Proposed* Interim Order)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| IM3NY LLC, *et al.*, | Case No. 25-10131 (BLS) |
| Debtors.[1] | (*Joint Administration Pending*) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO
(A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE
CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED LENDER; (III) MODIFYING THE AUTOMATIC STAY;
(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "DIP Motion")[2] of IM3NY LLC and Imperium3 New York, Inc. debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), seeking entry of an interim order (this "Interim Order") and a final order, pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-2, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure (the "Local Rules") promulgated by the United States Bankruptcy Court for the District of Delaware (the "Court"); the Court having considered the DIP Motion, that certain DIP Term Sheet, dated as of January 27, 2025 (the "DIP Term Sheet"), by and among the Debtors and the lender, HSBC Bank PLC (the "DIP Lender"), a copy of the DIP Term Sheet is attached to this Interim Order as **Exhibit 1**, and together with all security and collateral agreements, fee letters,

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: (i) iM3NY LLC (N/A); and (ii) Imperium3 New York, Inc. (4574).  The address of the Debtors' corporate headquarters is 1093 Clark Street, Endicott, New York 13760.

[2]    Capitalized terms used but not otherwise defined in this Interim Order have the meanings given to such terms in the DIP Motion.

instruments, certificates, notes and other documents executed, filed, and/or delivered related thereto (the "DIP Documents"), the *Declaration of Lukasz Cianciara in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [D.I. 10] (the "First Day Declaration"), and the *Declaration of Rob Vanderbeek in Support of the Debtors' DIP Financing Motion* [D.I. __] (the "DIP Declaration"), the evidence submitted and arguments proffered or adduced at the interim hearing held before this Court on [●], 2025 (the "Interim Hearing"); and upon the record of these Chapter 11 Cases; and adequate notice of the Interim Hearing on the DIP Motion having been given in accordance with Bankruptcy Rules 2002, 4001, and 9014 and the applicable Local Rules; and it appearing that no other or further notice need be provided; and all objections, responses, and reservations of rights, if any, with respect to the relief requested in the DIP Motion having been withdrawn, resolved, or overruled by the Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AND CONCLUDES THAT**:[3]

A.    **Petition Date**.  On January 27, 2025 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court thereby commencing these Chapter 11 Cases.  On or about the date hereof, the Court entered an order providing for the joint administration for administrative purposes only of the Debtors' Chapter 11 Cases.

B.    **Debtors-in-Possession**.  The Debtors continue in possession of and to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of these Chapter 11 Cases.

C.    **Jurisdiction and Venue**.  This Court has core jurisdiction over the Chapter 11 Cases, the DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    **Committee**.  As of the date hereof, the Office of the United States Trustee for Region 3 (the "U.S. Trustee") has not appointed an official committee of unsecured creditors or any other committee (any such committee, the "Committee") under section 1102(a) of the Bankruptcy Code.

E.    **Notice**.  Notice of the DIP Motion and this Interim Order has been sufficient and appropriate under the circumstances and no other or further notice is necessary or required.

F.    **Debtors' Stipulations**.  Each stipulation, admission, and agreement contained in this Interim Order, including, without limitation, the stipulations set forth below, shall be binding upon the Debtors, and any successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any Debtor) under all circumstances and for all purposes.  The Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.  The Debtors, on their own behalf and on behalf of their estates (subject to Paragraph 37 below), admit, stipulate, acknowledge, and agree as follows (collectively, the "Debtors' Stipulations"):

i.    _Prepetition Credit Agreement_.  Prior to the Petition Date, the Debtors, R-SPV II, L.L.C. (predecessor in interest to HSBC Bank PLC), and ACP Post Oak Credit I LLC, as administrative agent and collateral agent (the "Prepetition Administrative Agent"), among others, entered into that certain Senior Secured Term Loan Credit Agreement dated as of April 14, 2022

- 3 -

(as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, including as amended by that certain Amendment No. 1 to Senior Secured Term Loan Credit Agreement dated December 12, 2022, that certain Amendment No. 2 to Senior Secured Term Loan Credit Agreement dated December 27, 2023, that certain Amendment No. 3 to Senior Secured Term Loan Credit Agreement dated February 12, 2024, that certain Amendment No. 4 to Senior Secured Term Loan Credit Agreement dated March 26, 2024, that certain Amendment No. 5 to Senior Secured Term Loan Credit Agreement dated May 6, 2024, that certain Amendment No. 6 to Senior Secured Term Loan Credit Agreement dated June 4, 2024, that certain Amendment No. 7 to Senior Secured Term Loan Credit Agreement dated July 2, 2024, and that certain Amendment No. 8 to Senior Secured Term Loan Credit Agreement dated July 29, 2024, Amendment No. 9 to Senior Secured Term Loan Credit Agreement dated December 24, 2024, the "Prepetition Credit Agreement").  Pursuant to that certain Loan Purchase, Assignment and Agreement dated as of October 24, 2024 (the "Assignment Agreement"), R-SPV II, L.L.C. assigned all of its title, interests, claims, obligations, and liens in the Prepetition Credit Agreement to HSBC Bank PLC (the "Prepetition Lender"), and, together with the Prepetition Administrative Agent, (the "Prepetition Secured Party") .  The Prepetition Credit Agreement, each fee letter, guaranty, collateral document, and each subordination agreement related thereto, and all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Prepetition Secured Party in connection with, evidencing or securing the Prepetition Secured Obligations (as defined herein), each as the same may be amended, restated, renewed, replaced, supplemented or otherwise modified from time to time, are referred to herein as the "Prepetition Loan Documents".

   ii. Prepetition Secured Obligations.  As of the Petition Date, the Debtors were jointly and severally, justly and lawfully indebted and liable to the Prepetition Secured Party, without

defense, counterclaim or offset of any kind, in an amount not less than the principal amount due of $125,799,355.59, plus accrued but unpaid interest, fees, premiums, and other amounts (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, solely to the extent that they are chargeable or reimbursable under the Prepetition Loan Documents), charges, indemnities and all other Obligations (as defined in the Prepetition Credit Agreement) incurred or accrued in connection therewith (whether arising before, on, or after the Petition Date) as provided in the Prepetition Loan Documents (collectively, the "Prepetition Secured Obligations").

      iii.  <u>Security for Prepetition Secured Obligations</u>.  As more fully set forth in the Prepetition Loan Documents, prior to the Petition Date, the Debtors granted to the Prepetition Secured Party security interests in and liens on (the "<u>Prepetition Liens</u>") all of their right, title and interest in all of their properties, the Collateral (as defined in the Prepetition Loan Documents, the "<u>Prepetition Collateral</u>").  In addition, further, to secure the Prepetition Secured Obligations Charge CCC V LLC ("<u>C4V</u>"), an entity that owns a minority interest in IM3NY LLC, guaranteed the Prepetition Secured Obligations and secured such guaranty with a grant of security interests in and liens on all of C4V's property.

      iv.  <u>Validity of Prepetition Secured Obligations</u>.  The Prepetition Secured Obligations owing to the Prepetition Secured Party constitute legal, valid, unavoidable and binding obligations of the Debtors, jointly and severally, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition Secured Obligations owing to, or any transfers made to the Prepetition Secured Party, is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery,

subordination, or any other legal or equitable challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity, and the Debtors are aware of no facts, circumstances or conditions that would support any claim, avoidance or equitable remedy against the Prepetition Secured Party or the Prepetition Secured Obligations.

v. <u>Validity, Extent, Perfection, and Priority of Prepetition Liens</u>.  The Prepetition Liens granted to the Prepetition Secured Party constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), unavoidable and perfected security interests in and liens on the Prepetition Collateral (including the proceeds thereof), at any time owned by any Debtor and thereafter acquired, were granted to, or for the benefit of, the Prepetition Secured Party for fair consideration and reasonably equivalent value, and are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or equity or regulation by any person or entity, including in any Successor Cases, and the Debtors are aware of no facts, circumstances or conditions that would support any claim, avoidance or equitable remedy against the Prepetition Secured Party or the Prepetition Liens.

vi. <u>No Challenges or Claims Related to Prepetition Secured Indebtedness</u>.  No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist, no facts, circumstance or occurrence supporting or giving rise to any offset, challenge, objection, defense, claim or counterclaim of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist, and no portion of the Prepetition Liens or Prepetition Secured Obligations are subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-

4915-7861-5815, v. 4

bankruptcy law or equity.  The Debtors and their estates have no valid or meritorious Claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action or basis for any equitable relief against the Prepetition Liens or other property of the Prepetition Secured Party, or the Prepetition Secured Party or any of its respective affiliates and its and their respective predecessors, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the Prepetition Loan Documents, the Prepetition Secured Obligations, the Prepetition Liens, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other Claims arising under sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable non-bankruptcy law equivalents.  The Prepetition Secured Obligations, to the extent of the Prepetition Secured Party's interest in the Debtors' interest in the Prepetition Collateral, constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

vii. <u>No Challenges or Claims Related to DIP Facility</u>.  No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the DIP Liens or DIP Obligations exist, no facts, circumstances or occurrence supporting or giving rise to any offset, challenge, objection, defense, claim or counterclaim of any kind or nature to any of the DIP Liens or DIP Obligations exist, and no portion of the DIP Liens or DIP Obligations are subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law or equity.  The Debtors and their estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action or basis for any equitable relief against the DIP Lender or any of

4915-7861-5815, v. 4

their respective affiliates and its and their respective predecessors, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the DIP Obligations, the DIP Liens, DIP Documents or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other Claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable non-bankruptcy law equivalents.

      viii. <u>Release</u>.  Subject to entry of the Final Order, the Debtors, on behalf of themselves and their respective estates (including any successor trustee or other estate representative in the Chapter 11 Cases and any Successor Cases (as defined herein), and any party acting by, through or under the Debtors or their estates), hereby release and forever and irrevocably discharge and acquit the Prepetition Secured Party, the DIP Lender, and their respective affiliates and each of its and their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case solely in their capacity as such (collectively, the "<u>Released Parties</u>"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, the Prepetition Loan

Documents and/or the transactions contemplated hereunder or thereunder including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, any and all claims and causes of action arising under the Bankruptcy Code, and any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Secured Party and/or the DIP Lender (collectively, the "<u>Released Claims</u>") that exist or may exist prior to the entry of this Interim Order by the Court.  Subject to entry of the Final Order, the Debtors further waive and release any defense, right of counterclaim, right of setoff or deduction to the payment of the Prepetition Secured Obligations and the DIP Obligations which the Debtors now have or may claim to have against the Released Parties arising out of, connected with, or relating to any and all acts, omissions or events occurring prior to the entry of this Interim Order by the Court.

ix. <u>Indemnity</u>.  The Prepetition Secured Party and the DIP Lender have acted in good faith, and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens (as defined below), any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to and all transactions contemplated by the foregoing.  Accordingly, the Prepetition Secured Party and the DIP Lender shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto, except for claims relating to gross negligence and willful misconduct.  No exception or defense in contract, law or equity exists as to any obligation set forth in this paragraph, in the Prepetition Loan Documents or in the DIP Documents, to indemnify and/or hold harmless

4915-7861-5815, v. 4

the Prepetition Secured Party or the DIP Lender, as the case may be, and any such defenses are hereby waived. Any pre-Petition Date indemnification obligations continue unimpaired by commencement of the Chapter 11 Cases or entry of this Interim Order.

      x.  <u>No Control</u>.  Neither the Prepetition Secured Party nor the DIP Lender control the Debtors or are insiders of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the extension of the DIP Facility, the DIP Documents, and/or the Prepetition Loan Documents.

      xi.  <u>Sale and Credit Bidding</u>.  The DIP Lender and/or the Prepetition Secured Party shall have the right, subject to section 363(k) of the Bankruptcy Code, to credit bid (independently or together) up to the full amount of the applicable outstanding Prepetition Secured Obligations and the DIP Obligations in each case, including, without limitation, any accrued fees, interest and expenses, in a sale of any DIP Collateral or Prepetition Collateral, as applicable, and whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise (including by any successor trustee or other estate representative in the Chapter 11 Cases and any Successor Cases (as defined herein), and any party acting by, through or under the Debtors or their estates).

      xii.  <u>Cash Collateral</u>.  All of the Debtors' cash and cash equivalents, including cash on deposit in any account or accounts as of the Petition Date, securities or other property, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral of the Prepetition Secured Party.

      G.  **<u>Findings Regarding Postpetition Financing and Use of Cash Collateral</u>**.

      i.  <u>Request for Postpetition Financing and Use of Cash Collateral</u>.  The Debtors seek authority to (a) enter into the Credit Agreement on the terms described in the DIP Motion, this

Interim Order, and in the DIP Documents, and (b) use Cash Collateral on the terms described herein to administer these Chapter 11 Cases and fund their operations in accordance with the Approved Budget (subject to Permitted Variances (as defined in the DIP Term Sheet)), the DIP Term Sheet, and the DIP Documents.   The Debtors' use of Cash Collateral is limited to postpetition receipts of Prepetition Collateral or DIP Collateral.

ii. <u>Priming of Prepetition Liens</u>.   The priming of the Prepetition Liens on the Prepetition Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of their estates and creditors, and the Debtors would not be able to obtain debtor-in-possession financing in a sufficient amount without granting such priming liens.   Consistent with the requirements of section 364(d) of the Bankruptcy Code, the Prepetition Secured Party shall receive adequate protection as set forth in this Interim Order under sections 361, 363, and 364 of the Bankruptcy Code for any decrease in the value of their interest in the Prepetition Collateral (including Cash Collateral) resulting from (A) the use, sale, or lease by the Debtors of the Prepetition Collateral during the pendency of these Chapter 11 Cases, (B) the DIP Liens and the Carve-Out pursuant to the DIP Documents and this Interim Order, or (C) the imposition of the automatic stay under section 362 of the Bankruptcy Code (such potential diminution, collectively, "<u>Diminution in Value</u>").

iii. <u>Immediate Need for Postpetition Financing and Use of Cash Collateral</u>.   The Debtors have an immediate and critical need to obtain financing pursuant to the DIP Facility and to continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other things, (a) pay the fees, costs, and expenses incurred in connection with these Chapter 11 Cases, (b) fund any obligations benefitting from the Carve-Out, (c) permit the orderly continuation of

4915-7861-5815, v. 4

the operation of their businesses, (d) maintain business relationships with customers, vendors, and suppliers, (e) make payroll and provide benefits to employees, and (f) satisfy other working capital and operational needs.  The incurrence of new debt under the DIP Documents and use of Cash Collateral is necessary and vital to the preservation and maintenance of the going concern value of the Debtors.  Immediate and irreparable harm will be caused to the Debtors and their estates if immediate financing is not obtained and permission to use Cash Collateral is not granted. The extensions of credit under the DIP Facility are fair and reasonable, and the Debtors' entry into the DIP Facility reflects the sound exercise of the Debtors' business judgment and are supported by reasonably equivalent value and fair consideration.

iv.  <u>No Credit Available on More Favorable Terms</u>.  The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.   Given their current financial condition, financing arrangements, and capital structure, and the circumstances of these Chapter 11 Cases, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility.  Further, the Prepetition Secured Party has consented to the Debtors incurring debtor-in-possession financing, the priming of their Prepetition Liens, and the use of their Cash Collateral, only on the terms of and subject to the conditions set forth in the DIP Documents and this Interim Order.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have also been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a postpetition basis

- 12 -

is not otherwise available without granting the DIP Lender: (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims and priming liens to the extent set forth in this Interim Order, the Credit Agreement, and the DIP Documents, and (3) the other protections set forth in this Interim Order.

 v. <u>Use of Cash Collateral and Proceeds of DIP Facility</u>.  As a condition to the Debtors' entry into the DIP Documents, the extension of credit under the DIP Facility and the authorization to use Prepetition Collateral, including Cash Collateral, the Debtors have agreed that Cash Collateral and the proceeds of the DIP Facility shall be used solely in accordance with the terms and conditions of this Interim Order (as may be amended and supplemented by the Final Order), the DIP Documents, and the Approved Budget (subject to Permitted Variances).

 vi. <u>Partial Roll Up</u>.  The commitments shall include a superpriority term loan facility in the outstanding principal amount of not less than $15,000,000.00 (the "<u>Roll Up</u>").  On the date of entry of this Interim Order, concurrently with the making of $2,500,000.00, the new money loan, the Prepetition Secured Obligations shall be deemed converted into DIP Obligations pursuant to this section (the "<u>Rolled-Up Obligations</u>").  The Roll Up shall be deemed funded on the date of entry of this Interim Order, without constituting a novation or termination, and without any further action by the Debtors or any other party, and the DIP Lender is authorized and directed to satisfy the then accrued and outstanding Rolled-Up Obligations (the "<u>Outstanding Rolled-Up Obligations</u>") from the portion of the DIP Facility constituting the Roll Up.

 H. **Adequate Protection**.  In exchange for their consent to (i) the priming of the Prepetition Liens by the DIP Liens and (ii) the use of the Cash Collateral to the extent set forth in this Interim Order, the Prepetition Secured Party shall receive, *inter alia*, adequate protection to

the extent of any Diminution in Value of their interests in the Prepetition Collateral, as more fully set forth in this Interim Order.

I.        **Sections 506(c) and 552(b)**.  In light of (i) the DIP Lender's agreement that their liens and superpriority claims shall be subject to payment of the Carve-Out and (ii) the Prepetition Secured Party's agreement that, with respect to the Prepetition Collateral, their respective liens and claims, including any adequate protection liens and claims, shall be subject to payment of the Carve-Out, and subordinate to the DIP Liens, the DIP Lender and the Prepetition Secured Party have negotiated for, and with respect to the period under this Interim Order and to the extent funded subject to the Approved Budget which includes all of the anticipated expenses for the covered period, the Debtors hereby (a) waive any "equities of the case" exception under section 552(b) of the Bankruptcy Code, (b) waive the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Facility Obligations, or the Prepetition Collateral, as applicable, and (c) waive the surcharge provisions of section 506(c) of the Bankruptcy Code, and thereafter the Debtors intend to seek in the Final Order, (a) a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, (b) a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Facility Obligations, or the Prepetition Collateral, as applicable, and (c) a waiver of the surcharge provisions of section 506(c) of the Bankruptcy Code.

J.        **Good Faith of DIP Lender and Prepetition Secured Party**.

i.        <u>Willingness to Provide DIP Financing</u>.  The DIP Lender has committed to provide financing to the Debtors subject to: (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility (as defined in the DIP Term Sheet) and those set forth in the DIP Documents, including the DIP Term Sheet; (c) satisfaction of the closing

conditions set forth in the DIP Documents; and (d) findings by this Court that the DIP Facility is essential to the Debtors' estates, that the DIP Lender is extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Lender's claims, superpriority claims, security interests and liens, and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

ii.  <u>Business Judgment</u>.  Based on the DIP Motion, the First Day Declaration, and the DIP Declaration, and the record presented to the Court at the Interim Hearing, (i) the terms of the financing embodied in the DIP Documents, including the fees, expenses, and other charges paid and to be paid thereunder or in connection therewith, (ii) the adequate protection authorized by the Interim Order and DIP Documents, and (iii) the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral), in each case pursuant to this Interim Order and the DIP Documents, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, constitute reasonably equivalent value and fair consideration, and represent the best financing and terms available under the circumstances.

iii.  <u>Good Faith Under Section 364(e)</u>.  The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and at arm's-length among the Debtors, the DIP Lender, and the Prepetition Secured Party with the assistance and counsel of their respective advisors.  Use of Cash Collateral and credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Lender and the Prepetition Secured Party within the meaning of section 364(e) of the Bankruptcy Code.

iv.  <u>Consent to DIP Facility and Use of Cash Collateral</u>.  The Prepetition Secured Party has consented to the Debtors' use of Cash Collateral and the other Prepetition Collateral, and the

4915-7861-5815, v. 4

Debtors' entry into the DIP Documents, in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

K.     **Good Cause**.  Good cause has been shown for immediate entry of this Interim Order, and the entry of this Interim Order is in the best interests of the Debtors, their estates and their stakeholders.  Among other things, the Debtors have an immediate need for the liquidity provided by the DIP Facility on an interim basis and interim use of Cash Collateral in order to avoid immediate, irreparable harm, and the relief granted herein will minimize disruption of the Debtors' business and permit the Debtors to pay critical expenses necessary to maximize the value of their estates.  The extensions of credit under the DIP Facility, the use of Cash Collateral, and the proposed adequate protection arrangements, as set forth in this Interim Order, are fair and reasonable under the circumstances, and reflect the Debtors' exercise of prudent business judgment.

L.     **Immediate Entry**.  Sufficient cause exists for the immediate entry and effectiveness of this Interim Order under Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules.

**NOW, THEREFORE**, based upon the foregoing findings of fact, the DIP Motion, and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.     **Motion Granted**.  The DIP Motion is GRANTED as set forth below.  Entry into the DIP Term Sheet and the other DIP Documents is hereby authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case, subject to the terms and conditions set forth in this Interim Order and in the DIP Documents, including, without limitation,

4915-7861-5815, v. 4

the Approved Budget (subject to Permitted Variances).  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

## DIP Facility Authorization

2.      **Authorization of the DIP Facility**.  The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to execute, deliver, and perform under all DIP Documents, including all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Documents and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Documents (the DIP Liens are perfected by entry of this Interim Order and such perfection shall continue upon entry of the Final Order without the need of the Debtors or any DIP Lender to take any action, file or record any mortgage, lien, or notice, or attach or take possession of any DIP Collateral).  The Debtors are hereby authorized to pay, in accordance with this Interim Order, any principal, interest, fees, expenses, and other amounts described in the DIP Documents and this Interim Order, as such amounts become due and owing, without the need to obtain further Court approval (except as otherwise provided in this Interim Order or in the DIP Documents) subject to and in accordance with the terms hereof and thereof, including, without limitation, and to the extent applicable, any closing fees and commitment fees, as well as reasonable and documented fees and disbursements of counsel to the DIP Lender and the Prepetition Secured Party, as set forth in this Interim Order and in the DIP Documents, whether or not such professional fees and disbursements arose before,

- 17 -

on, or after the Petition Date, and whether or not the transactions contemplated hereby or by the DIP Documents are consummated, and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order and the DIP Documents.  Upon execution and delivery, the DIP Documents shall represent legal, valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates, jointly and severally, in accordance with their terms.  Each officer of a Debtor acting individually is hereby authorized to execute and deliver each of the DIP Documents, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.

3.      **Authorization to Borrow**.  To prevent immediate and irreparable harm to the Debtors' estates, and to enable the Debtors to continue to operate their business and preserve and maximize the value of their estates, subject to the terms and conditions set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to borrow under the DIP Facility, subject to any limitations on, or conditions to, borrowing under the DIP Documents, which borrowings shall be used solely for purposes permitted under the DIP Documents, including, without limitation, to provide working capital for the Debtors and to pay adequate protection, interest, fees, costs, charges and expenses, in each case, in accordance with this Interim Order, the DIP Documents, and the Approved Budget (subject to Permitted Variances).  The DIP Facility shall be made available for the purposes set forth in the DIP Term Sheet and this Interim Order, subject to the satisfaction or waiver of the Conditions Precedent to Closing, Initial Borrowing, and Additional Borrowing as set forth in the DIP Term Sheet, in the amounts of (1) an initial borrowing up to an aggregate principal amount of $1,500,000.00 (the "Initial DIP Loan") on the date of the satisfaction (or waiver) of each of the conditions precedent to the Initial DIP Loan after entry of the Interim Order (the "Closing Date"); and (2) a final borrowing on February 24, 2025, up to an

aggregate principal amount of $1,000,000.00 (the "Final DIP Loan").  In the event that the Debtors deliver an executed purchase agreement no later than March 14, 2025, in form and substance reasonably acceptable to the DIP Lender, the DIP Lender may, at its sole discretion, increase the DIP Loan Commitment in accordance with the Approved Budget.

       4.      **DIP Obligations**.  The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations.  All DIP Obligations shall be enforceable against the Debtors, their estates, and any successors thereto, including without limitation, any trustee appointed in these Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"). Upon entry of this Interim Order, the DIP Obligations will include all loans, reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Lender, including, without limitation, all principal, accrued interest, costs, charges, fees, expenses, Roll Up and other amounts, in each case under the DIP Documents.  The Debtors shall be jointly and severally liable for the DIP Obligations.  Absent an Event of Default, the DIP Obligations shall become due and payable, without notice or demand, on the Maturity Date.  No obligation, payment, transfer, or grant of collateral as security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens) to the DIP Lender, including in connection with any adequate protection provided hereunder, shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547–550 of the Bankruptcy Code or under any applicable state or common law), or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization,

4915-7861-5815, v. 4

subordination (whether equitable, contractual, or otherwise), claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

5.      **DIP Collateral**.  To secure the DIP Obligations, effective as of the Petition Date, under sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Lender is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "DIP Liens") all property (as defined by section 541 of the Bankruptcy Code) of the Debtors' estates, the DIP Collateral.  The term "DIP Collateral" means, collectively but not limited to, all assets, rights, and privileges of each Debtor and its respective estate of any nature whatsoever, including avoidance actions under chapter 5 of the Bankruptcy Code subject to entry of a Final Order, now owned or hereafter acquired, wherever located, by whomsoever held and all proceeds thereof in whatever form received, whether first arising prior to, on, or following the Petition Date, including, but not limited to, any and all cash, cash equivalents and any investment of such cash or cash equivalents, inventory, goods, accounts, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, purchase orders, properties, plants, fixtures, machinery, equipment, general intangibles, payment intangibles, documents, instruments, securities, warranties, insurance policies and proceeds, tax claims, grants, chattel paper, interests in leaseholds (provided, however, that solely to the extent that any lease prohibits the granting of a lien thereon, or otherwise prohibits hypothecation of the leasehold interest, then in such event there shall only be a lien on the economic value of, proceeds of sale or other disposition of, and any other proceeds and products of such leasehold interests unless the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code), real property, deposit

4915-7861-5815, v. 4

accounts (except for any account created to hold an adequate assurance deposit for utility providers, pursuant to separate order of this Court, but not excepting the Debtors' or their estates' interest in any excess funds in such account after satisfaction of any applicable obligations to utility providers), securities accounts, investment property, letters of credit, letter-of-credit rights, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, commercial tort claims, capital stock of subsidiaries, wherever located, and the proceeds, products, rents, accession and profits of the foregoing, including, but not limited to, (i) all assets constituting Prepetition Collateral, (ii) the Cash Collateral, (iii) all assets of the Debtors that, as of the Petition Date, were not otherwise subject to a security interest, (iv) to the extent a DIP Lien is not permitted by law to attach to any property of any Debtor or its estate, the proceeds of such property, and (v) subject to entry of the Final Order, any proceeds or property recovered, unencumbered or otherwise from all of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code and under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and similar statutes or common law (collectively, "Avoidance Actions").

6.      **DIP Liens**.  The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien, other encumbrances on, or claim to any of the DIP Collateral, except that the DIP Liens shall be subject to payment of the Carve-Out, and shall otherwise be junior only to the Permitted Liens (as defined in the DIP Term Sheet).  Other than as set forth herein or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in these Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in these Chapter 11 Cases or any

- 21 -

Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. The DIP Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code.

7.      **DIP Superpriority Claims**.  Subject to payment of the Carve-Out, upon entry of this Interim Order, the DIP Lender is hereby granted, under section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (collectively, the "DIP Superpriority Claims") for all DIP Obligations (a) with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code, and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.

8.      **No Obligation to Extend Credit**.  The DIP Lender shall have no obligation to make any loan or advance under this Interim Order or the DIP Documents unless all of the conditions precedent under the DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Lender in accordance with the terms of the DIP Documents.

9.      **Use of DIP Facility Proceeds**.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Documents, and only in compliance with the Approved Budget (subject

- 22 -

to the Permitted Variances) and the terms and conditions in this Interim Order and the DIP Documents.

10.    **No Monitoring Obligation**.  The DIP Lender shall not have any obligation or responsibility to monitor any Debtor's respective use of the DIP Facility, and the DIP Lender may rely upon each Debtor's representation that the use of the DIP Facility at any time is in accordance with the requirements of this Interim Order and the DIP Documents, including, but not limited to, the Approved Budget (subject to the Permitted Variances).

<strong><u>Use of Cash Collateral</u></strong>

11.    **Authorization to Use Cash Collateral**.  Subject to the terms and conditions of this Interim Order and the DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), the Debtors are authorized to use Cash Collateral until the termination of the DIP Term Sheet.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted by this Interim Order, the DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), as applicable.

12.    **Consent of Prepetition Secured Party**.  The Prepetition Secured Party hereby consents to (a) the provisions of this Interim Order including the Debtors' entry into the DIP Facility on an interim basis, (b) the granting of the DIP Liens and DIP Superpriority Claims on the terms and subject to the conditions set forth herein, and (c) the Approved Budget (subject to the Permitted Variances).

13.    **Adequate Protection for Prepetition Secured Party**.  As adequate protection for any Diminution in Value of the Prepetition Secured Party's interests in the Prepetition Collateral

resulting from the subordination of the Prepetition Liens to the DIP Liens and the Carve-Out or otherwise, the Prepetition Secured Party shall receive:

     a.   <u>Adequate Protection Liens</u>.  Continuing valid, binding, enforceable, and perfected postpetition replacement liens under sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve-Out, the DIP Liens, and Permitted Liens (as defined in the Prepetition Loan Documents) (the "<u>Adequate Protection Liens</u>") and which (a) shall otherwise be senior to all other security interests in, liens on, or claims against the DIP Collateral, and (b) shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code.

     b.   <u>Adequate Protection Superpriority Claims</u>.  Administrative superpriority expense claims in each of the Chapter 11 Cases (the "<u>Adequate Protection Superpriority Claims</u>"), junior and subordinate only to payment of the Carve-Out and the DIP Obligations, pursuant to section 507(b) of the Bankruptcy Code, with priority over any and all other administrative expenses and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code.

     c.   <u>Payment of Prepetition Secured Party's Fees and Expenses</u>.  The Prepetition Secured Party shall receive monthly reimbursement of their respective reasonable and documented fees and expenses including any professional fees (in each case, without the need for the filing of formal fee applications), including as to any amounts arising before, on, or after the Petition Date,

incurred in connection with the Chapter 11 Cases.  For the avoidance of doubt, the foregoing shall be limited to the payment of all reasonable and documented fees and out-of-pocket expenses of DLA Piper LLP (US).

d.  <u>Financial Reporting</u>.  The Debtors shall provide the Prepetition Secured Party with all reports, documents, and other materials, including financial reports, as may be required in this Interim Order and the DIP Term Sheet, and shall continue to provide all financial reporting required by the Prepetition Loan Documents.  In addition, upon reasonable notice, the Debtors shall provide the Prepetition Secured Party and its representatives with access to the Debtors' premises, personnel (including, without limitation, senior management and any similar person or firm employed by the Debtors in the Chapter 11 Cases), advisors, books and records, and the Debtors shall cooperate fully in all reasonable requests for information and data made by the Prepetition Secured Party.

e.  <u>Compliance with Approved Budget</u>.  The Debtors shall comply with, and shall use cash, including Cash Collateral, solely in accordance with the Approved Budget (subject to the Permitted Variances).

14.  **<u>Adequate Protection Reservation</u>**.  Nothing in this Interim Order shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Party hereunder is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Cases.  The receipt by the Prepetition Secured Party of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Party are adequately protected, and this Interim Order shall not prejudice or limit the rights of the

- 25 -

Prepetition Secured Party to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

### General Provisions Regarding DIP Financing and Use of Cash Collateral

15.    **Amendments to the DIP Documents**.  The Debtors and the DIP Lender may enter into one or more amendments, waivers, consents, or other modifications to and under the DIP Documents, and no further approval of this Court shall be required for any amendment, waiver, consent, or other modification to and under the DIP Documents (and any fees paid in connection therewith) that does not materially and adversely affect the Debtors or which does not (i) shorten the maturity of the DIP Facility, (ii) increase the principal amount of, the rate of interest on, or the fees payable in connection with the DIP Facility, or (iii) change any Event of Default (as defined in the DIP Documents), add any covenants, or amend the covenants to be materially more restrictive; provided, however, notice of any such amendment or other modification shall be provided by the Debtors to the U.S. Trustee and the Committee (if any) two (2) days in advance of its effectiveness, to the extent reasonably practicable and such amendment or other modification shall be filed on the docket of these Chapter 11 Cases.  No consent to any such amendment, waiver, consent, or modification set forth in this paragraph shall be implied by any action, inaction, or acquiescence of the DIP Lender and/or the Prepetition Secured Party.  After obtaining the DIP Lender's and the Prepetition Secured Party's prior written consent, the Debtors are authorized and empowered, without further notice and hearing or approval of this Court so long as such amendment, or modification is not of the type set forth in clauses (i)–(iii) above, to amend, modify, supplement, or waive any provision of the DIP Documents in accordance with the provisions thereof.

16.    **Approved Budget**.

a.    Attached to this Interim Order as **Exhibit 2** is a 13-week budget approved by the DIP Lender and the Prepetition Secured Party, which sets forth, among other things, projected cash receipts and cash disbursements.  Such budget shall be updated from time to time as set forth in the DIP Documents.  As of any date of determination, the budget or the updated budget that has most recently become the "Approved Budget" in accordance with and as defined in the DIP Term Sheet shall be referred to herein as the "Approved Budget."  Until any updated budget has become the Approved Budget, the Debtors shall be subject to and be governed by the terms of the Approved Budget then in effect (subject to Permitted Variances).  As set forth in the DIP Term Sheet, "Permitted Variance" means, with respect to the Approved Budget, cumulative actual cash receipts to be not less than 85% of cumulative budgeted receipts for the applicable measuring period or cumulative actual expenses to be not more than 115% of cumulative budgeted expenses for the applicable measuring period, in each case, as determined by the DIP Lender; provided that if for any four (4)-week rolling period, actual cash receipts exceed expected cash receipts and actual cash expenditures exceed expected cash expenditures, the Permitted Variance for cash expenditures for the period ending with that week will be deemed to have been met if the cumulative actual net cash flow for such period is equal to or greater than the cumulative expected net cash flow for such period.  For the avoidance of doubt, documented fees and out-of-pocket expenses paid to the Lender or their respective professionals shall not be included in the foregoing variance testing; provided, however, documented fees and out-of-pocket expenses paid to the Debtors' professionals or any professionals retained by any official committee formed during the Chapter 11 Cases shall be included in the foregoing variance testing.

- 27 -

b.   The Approved Budget is approved on an interim basis.  The proceeds of the DIP Facility and Cash Collateral under this Interim Order shall be used by the Debtors in accordance with and limited by the Approved Budget (subject to Permitted Variances), this Interim Order, and the DIP Documents.

c.   Other than with respect to the Carve-Out, neither the DIP Lender's nor the Prepetition Secured Party's consent to, or acknowledgement of, the Approved Budget shall be construed as consent to use the proceeds of the DIP Facility or Cash Collateral beyond the Maturity Date (as defined in the DIP Term Sheet) or a termination of the DIP Term Sheet, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

d.   Notwithstanding anything to the contrary herein, the Debtors shall pay the reasonable and documented fees, costs, and expenses of the DIP Lender Professionals (as defined below) in accordance with the DIP Documents and this Interim Order.

e.   Absent relief from the Court, any amendment or modification of the terms and conditions set forth in this Interim Order related to the Approved Budget, or any amendment or modification of the Approved Budget itself, shall be subject to prior written express consent and approval of the DIP Lender and the Prepetition Secured Party.  In the event of a dispute concerning the Approved Budget, all rights of the Debtors, the DIP Lender, and the Prepetition Secured Party are reserved.

17.   **Budget Reporting**.  The Debtors shall at all times comply with the Approved Budget (subject to the Permitted Variances) and shall further comply with the Permitted Variance and other reporting requirements set forth in the DIP Term Sheet.

18.   **Modification of the Automatic Stay**.  The automatic stay of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors,

the DIP Lender and/or the Prepetition Secured Party to accomplish the transactions contemplated by this Interim Order.

19. **Perfection of DIP Liens and Adequate Protection Liens**.  This Interim Order shall be sufficient and conclusive evidence of the creation, extent, validity, perfection, and priority of all liens granted in the DIP Term Sheet, any security DIP Document executed and delivered in connection therewith or herewith, or granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, attachment, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens or to entitle the DIP Lender and the Prepetition Secured Party to the priorities granted in this Interim Order.  Notwithstanding the foregoing, the DIP Lender and the Prepetition Secured Party are authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Adequate Protection Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Adequate Protection Liens.  The DIP Lender and the Prepetition Secured Party may, in its discretion, file an electronic copy or photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments.

To the extent that the Prepetition Secured Party is, with respect to the DIP Collateral, a secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, credit card processor notices or agreements, bailee letters, custom broker agreements, financing statement, account control agreements or any other Prepetition Loan Documents or is listed as loss payee, lenders' loss payee or additional insured under any of the Debtors' insurance policies, the DIP Lender shall also be deemed to be the secured party or mortgagee, as applicable, under such documents or to be the loss payee or additional insured, as applicable.

20.    **Proceeds of Subsequent Financing**.  If the Debtors, any trustee, any examiner, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt under sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations (other than unasserted contingent obligations that expressly survive termination of the DIP Documents which shall be cash collateralized) and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, then, after satisfaction of the Carve-Out, and unless otherwise agreed by the DIP Lender, all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender to be distributed in accordance with this Interim Order and the DIP Documents.  For the avoidance of doubt, if the Debtors, any trustee, any examiner, or any responsible officer subsequently appointed in the Chapter 11 Cases, or any Successor Cases, shall obtain credit or incur debt (other than the DIP Facility) under section 364(d) of the Bankruptcy Code in violation of the DIP Documents at any time prior to the indefeasible repayment in full of the Prepetition Secured Obligations (other than unasserted contingent obligations that expressly survive termination of the Prepetition Loan Documents which shall be cash collateralized), the Prepetition Secured Party's and/or the DIP Lender's rights

- 30 -

to object to the Debtors' use of Cash Collateral and assert a lack of adequate protection shall be fully preserved.

21.    **Maintenance of DIP Collateral**.  Until the payment in full of the DIP Obligations and the Prepetition Secured Obligations, or the conversion of such DIP Obligations or Prepetition Secured Obligations in accordance with a plan of reorganization filed in these Chapter 11 Cases, the Debtors shall: (a) insure the DIP Collateral as required under the DIP Documents or the Prepetition Loan Documents, as applicable; and (b) maintain the cash management system consistent with the terms and conditions of the Cash Management Order and the DIP Documents.

22.    **Rights to Credit Bid**.

a.    Under section 363(k) of the Bankruptcy Code and the Prepetition Loan Documents, the Prepetition Secured Party may credit bid all or any portion of their claims, including, without limitation, the Prepetition Secured Obligations and the Adequate Protection Superpriority Claim, in connection with any proposed sale of any, all, or substantially all of the Debtors' assets, including, without limitation, any sale occurring pursuant to section 363 of the Bankruptcy Code or included as part of a reorganization plan under section 1123 of the Bankruptcy Code, including a plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii), or a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code in any Successor Cases.

b.    Under section 363(k) of the Bankruptcy Code and the DIP Documents, the DIP Lender may credit bid all or any portion of their claims, including, without limitation, the DIP Obligations and the DIP Superpriority Claims, in connection with any proposed sale of any, all, or substantially all of the Debtors' assets, including, without limitation, any sale occurring pursuant to Bankruptcy Code section 363 or included as part of a reorganization plan under section 1123 of

4915-7861-5815, v. 4

the Bankruptcy Code, including a plan subject to confirmation under Bankruptcy Code section

1129(b)(2)(A)(ii), or a sale or disposition by a chapter 7 trustee for any Debtor under section 725

of the Bankruptcy Code in any Successor Cases.

23. **DIP Milestones**. As a condition to the DIP Facility and the use of Cash Collateral,

the Debtors have agreed to the following milestones (the "DIP Milestones"):

a. no later than one (1) day following the Petition Date, the Debtors shall have engaged an investment banker for the sale of all or substantially all of their assets (the "Investment Banker");

b. the Debtors shall have obtained entry by the Court of this Interim Order no later than five (5) business days after the Petition Date;

c. no later than seven (7) days following the Petition Date, the Debtors, in coordination and consultation with their Investment Banker, shall have commenced a marketing process for all or substantially all of their assets;

d. ten (10) business days after the Petition Date, the Debtors shall file with the Court a motion seeking approval of bidding procedures, in form and substance reasonably acceptable to the DIP Lender;

e. within forty (40) days after the Petition Date, the Debtors shall have obtained from the Court an order approving the bidding procedures, all in form and substance reasonably acceptable to the DIP Lender (the "Bidding Procedures Order");

f. on February 14, 2025, the Debtors shall provide to the DIP Lender copies of certificates or compliance reports confirming that all applicable UL certifications are complete;

g. no later than February 18, 2025, the DIP Lender shall receive non-binding letters of interest which may be acceptable to the DIP Lender, in its sole discretion;

h. no later than March 14, 2025, the DIP Lender shall receive an executed and binding agreement which may be acceptable to the DIP Lender, in its sole discretion;

i. the Debtors shall obtain entry by the Court of the Final Order no later than thirty (30) days after the Petition Date;

j. within seventy-six (76) days after the Petition Date, the Debtors shall conduct an auction, or otherwise designate the successful bidder(s) without an auction, in accordance with the Bidding Procedures Order; and

- 32 -

k.   within ninety (90) days after the Petition Date, the Debtors shall have obtained from the Court an order approving the sale of substantially all of the Debtor's assets and/or equity, in form and substance reasonably acceptable to the DIP Lender.

For the avoidance of doubt, unless waived by the DIP Lender and the Prepetition Secured Party, each in their sole discretion, or otherwise ordered by the Court, the failure of the Debtors to meet any DIP Milestone by the applicable specified deadline set forth therefor shall constitute an Event of Default under the DIP Documents and this Interim Order.

24.     **Termination Date**.   On the applicable Termination Date (defined below), all applicable DIP Obligations shall be immediately due and payable and all commitments to extend credit under the applicable DIP Facility will terminate.

25.     **Events of Default**.  Until the payment in full of the DIP Obligations, the occurrence of any of the events under the DIP Term Sheet, unless waived by the Lender in writing (which may be by electronic mail) and in accordance with the terms of the DIP Documents, shall constitute an event of default hereunder (collectively, the "Events of Default").

26.     **Rights and Remedies Upon Event of Default**.   Upon the occurrence and continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Court, other than as set forth in this Interim Order: (a) the DIP Lender may send a written notice to the Debtors, counsel to the Committee (if appointed), and the U.S. Trustee (any such declaration shall be referred to herein as a "Termination Declaration") declaring (1) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (2) the commitment of the DIP Lender to make DIP Loans to be terminated, whereupon such commitments and obligation shall be terminated to the extent any such commitment remains under the DIP Facility, (3) the termination of the DIP Facility and the DIP Documents as to any future liability or obligation of

- 33 -

the DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations, and (4) the application of the Carve-Out has occurred; (b) interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Documents; (c) the DIP Lender and/or the Prepetition Secured Party, as applicable, may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, except to satisfy payroll, tax, and benefits obligations, in each case necessary to avoid immediate and irreparable harm to the Debtors and their estates. The earliest date on which a Termination Declaration is delivered by the DIP Lender shall be referred to herein as the "Termination Date." Following a Termination Date, neither the DIP Lender nor the Prepetition Secured Party shall be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facility. The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Committee (if any), and the U.S. Trustee.

27.    **Emergency Hearing**. The Debtors may seek an emergency hearing during the three (3) business days following the date a Termination Declaration is delivered (such three (3) business day period, the "Remedies Notice Period") to contest whether an Event of Default has occurred or is continuing. During the Remedies Notice Period, the Debtors shall continue to have the right to use Cash Collateral in accordance with the terms of Paragraph 26 this Interim Order, solely to satisfy payroll, tax, and benefits obligations, in each case necessary to avoid immediate and irreparable harm to the Debtors and their estates to assert that no Event of Default has occurred and is continuing. Nothing in this paragraph shall preclude the Court from hearing anything in its discretion beyond what is expressly set forth above.

28.    **Rights and Remedies Following Termination Date**. Following a Termination Date and unless the Court has entered an order prior to the expiration of the Remedies Notice

- 34 -

Period finding that an Event of Default has not occurred, the DIP Lender shall be entitled to exercise all rights and remedies in accordance with the DIP Documents, this Interim Order, and applicable law, including causing a sale of the DIP Collateral.

29. **Carve-Out**.

a. <u>Carve-Out Definition</u>.   As used in this Interim Order and the DIP Facility Documents, the term "Carve-Out" shall mean the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses not to exceed $25,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent permitted to be paid at any time, whether by interim order, procedural order, or otherwise (which order has not been vacated or stayed), all unpaid fees and expenses of professionals pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "<u>Professionals</u>" and such claims, the "<u>Allowed Professional Claims</u>") subject to the Approved Budget and with an aggregate cap of $1,380,000 (the "<u>Carve-Out Cap</u>").

b. <u>No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees</u>.  The DIP Lender and the Prepetition Secured Party shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Case Professionals incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender or the Prepetition Secured Party in any way to pay compensation to, or to reimburse expenses of, any of the Case Professionals, or to guarantee that the Debtors or their estates have sufficient funds to pay such compensation or reimbursement.  Nothing herein shall be construed

- 35 -

as consent to the allowance of any Professional Fees or Expenses of any of the Debtors, the Committee, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of the DIP Lender and/or the Prepetition Secured Party to object to the allowance and payment of any such fees and expenses.

30.     **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order**.    The DIP Lender and the Prepetition Secured Party have acted in good faith in connection with the DIP Facility, the DIP Documents, the Prepetition Loan Documents, and this Interim Order, and are entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code.    Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, and notwithstanding any reversal or modification on appeal of any or all of the provisions of this Interim Order by a subsequent order of this Court or any other court, the DIP Lender and Prepetition Secured Party are entitled to the protections provided in section 364(e) of the Bankruptcy Code.

31.     **Approval of DIP Fees**.    In consideration for the DIP Facility and the consent to the use of Cash Collateral in accordance with the terms of this Interim Order, the DIP Lender shall be paid all fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, and to the extent applicable, commitment fees, exit fees, and the reasonable and documented fees and expenses of the DIP Lender in connection with the DIP Facility, without regard to whether or not the transactions contemplated hereby are consummated (all such fees, together, the "DIP Fees").    The DIP Fees are hereby deemed to be fully earned and payable in accordance with the terms of the DIP Documents without the need for any further order of this Court.    The DIP Fees shall be part of the DIP Obligations.

4915-7861-5815, v. 4

32.    **Lender Professional Fees**.  Professionals for the DIP Lender (the "DIP Lender Professionals") and professionals for the Prepetition Secured Party ("Prepetition Professionals," and together with the DIP Lender Professionals, the "Lender Professionals") shall not be required to file applications or motions with, or obtain approval of, this Court for compensation and reimbursement of fees and expenses.  The DIP Lender Professionals shall submit copies of summary invoices to the Debtors, the U.S. Trustee, and counsel for any Committee prior to payment of such invoices.  The summary invoices shall provide only the total aggregate number of hours billed and a summary description of services provided, and the expenses incurred by the applicable party and/or professionals and shall be subject to all applicable privilege and work product doctrines.  The Debtors, U.S. Trustee, or any Committee shall have ten (10) days after receipt of such invoices (which, for the avoidance of doubt, may be by email) to object to the reasonableness of the fees and expenses of any Lender Professional.  If an objection is timely asserted and cannot be resolved within ten (10) days of when it is asserted, then the Debtors, U.S. Trustee, or the Committee, as the case may be, shall file with this Court and serve on such DIP Professional an objection (a "Fee Objection"), providing not less than ten (10) days for the Lender Professional to respond, and the Fee Objection will then be resolved by the Court at the next regularly scheduled omnibus hearing or such other hearing as the parties may agree (subject to Court availability) or the Court may order.  Any failure by any such party to (a) timely assert such objection within the ten (10) day period or (b) having timely asserted such objection, file a Fee Objection within such ten (10) day period shall constitute a waiver of any right of such party to object to the applicable invoice.  Notwithstanding any provision herein to the contrary, any objection to payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of the Lender Professionals shall be limited to the reasonableness of the particular items or

- 37 -

categories of the fees, costs, and expenses that are the subject of such objection.  The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs and expenses on any invoice to which no objection has been timely asserted or Fee Objection has been timely filed.

33. **Indemnification**.  The Debtors shall jointly and severally indemnify and hold harmless the DIP Lender and each of their affiliates and its and their respective directors, officers, employees, agents, attorneys, accountants, advisors, controlling persons, equity holders, partners, members, and other representatives and each of their respective successors and permitted assigns (each, an "Indemnified Party") against, and to hold each Indemnified Party harmless from, any and all losses, claims, damages, liabilities, and reasonable, documented and invoiced out-of-pocket fees and expenses (including, without limitation, fees and disbursements of counsel but limited, in the case of counsel, to the extent set forth in the DIP Documents) that may be incurred by or asserted or awarded against any Indemnified Party, in each case, arising out of, or in any way in connection with, or as a result of: (i) the execution or delivery of any of the DIP Documents, the performance by the parties thereto of their respective obligations thereunder and the other transactions contemplated thereby; (ii) the use of the proceeds of the DIP Facility; (iii) the enforcement or protection of their rights in connection with any of the DIP Documents; (iv) the negotiation of and consent to this Interim Order; or (v) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnified Party is a party thereto and regardless of whether such matter is initiated by a third party or the Debtors or any of their subsidiaries or affiliates or creditors; provided that the foregoing indemnity shall not apply to any claims arising (i) prior to the Petition Date or (ii) out of, or in any way in connection with, or as a

- 38 -

result of provisions of the Prepetition Loan Documents (for the avoidance of doubt, nothing in this Interim Order alters, amends, expands or minimizes any indemnification under the Prepetition Loan Documents, subject to applicable law); provided further that no Indemnified Party will be indemnified for any loss, claim, damage, liability, cost, or other expense to the extent such loss, claim, damage, liability, cost, or expense that (i) is determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from (A) the gross negligence, bad faith, or willful misconduct of such Indemnified Party or (B) a material breach of the obligations of such Indemnified Party under the DIP Documents or (ii) relates to any proceeding between or among Indemnified Parties other than claims arising out of any act or omission on the part of the Debtors in accordance with this paragraph.

34.     **Proofs of Claim**.  The DIP Lender and Prepetition Secured Party shall not be required to file a proof of claim in any of the Chapter 11 Cases or Successor Cases, and the Debtors' stipulations herein shall be deemed to constitute a timely filed proof of claim.  Any order entered by this Court in relation to the establishment of a bar date for any claim (including without limitation, administrative claims) in any of the Chapter 11 Cases or Successor Cases shall not apply to the DIP Lender and the Prepetition Secured Party.  Notwithstanding the foregoing, the DIP Lender and the Prepetition Secured Party, on behalf of themselves, are hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in the Chapter 11 Cases for any claim allowed herein.

35.     **Limitations on the Use of DIP Proceeds, Cash Collateral, the Carve-Out, and Other Funds**.  Except as otherwise permitted in this Interim Order and the Approved Budget, the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve-Out

- 39 -

may not be used, directly or indirectly, by any of the Debtors, the Committee, if any, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any Successor Cases) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) in connection with any of the following (each, a "Challenge") (a) seeking authorization to obtain liens or security interests that are senior to or *pari passu* with the DIP Liens or the Prepetition Liens or (b) investigating (including by way of examinations or discovery proceedings), preparing, asserting, joining, commencing, supporting or prosecuting any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, the DIP Lender and/or the Prepetition Secured Party, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing (all in their capacities as such), with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (ii) any so-called "lender liability" claims and causes of action, (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Liens, the DIP Documents, the Adequate Protection Liens, the Prepetition Liens, the Prepetition Loan Documents or the Prepetition Secured Obligations, (iv) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the DIP Obligations or the Prepetition Secured Obligations, (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (A) the DIP Lender or the Prepetition Secured Party under any of the DIP Documents or this Interim Order, or (B) the Prepetition Secured Party under any of the

Prepetition Loan Documents or this Interim Order (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the DIP Lender's or the Prepetition Secured Party's assertions, enforcements, realizations or remedies on or against the DIP Collateral or the Prepetition Collateral, as applicable, in accordance with the DIP Documents or the Prepetition Loan Documents, as applicable, and this Interim Order), or (vi) objecting to, contesting, or interfering with, in any way, the DIP Lender's or the Prepetition Secured Party's enforcement or realization upon any of the DIP Collateral or the Prepetition Collateral, as applicable, once an Event of Default has occurred, provided, however, that no more than $25,000 in the aggregate of the proceeds of the DIP Facility or the DIP Collateral (including Cash Collateral) may be used by any Creditors' Committee (if one is formed) to investigate the Prepetition Secured Obligations and the Prepetition Liens.

36.    **Payments Held in Trust**.  Except as expressly permitted in this Interim Order or the DIP Documents and other than with respect to the Prepetition Collateral, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the DIP Facility in accordance with the DIP Term Sheet, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Lender and shall immediately turn over such proceeds to the DIP Lender, for application in accordance with the DIP Term Sheet and this Interim Order.

4915-7861-5815, v. 4

37. **Releases; Challenge Rights**.

a. <u>Binding Effect on Debtors</u>.  Subject to entry of the Final Order, the Debtors' Stipulations and releases contained in Paragraph F of this Interim Order shall be binding in all circumstances upon the Debtors and upon their estates.

b. <u>Release of DIP Lender</u>.  Upon entry of this Interim Order, the Debtors, on their own behalf and their estates, forever and irrevocably: (a) release, discharge, and acquit the DIP Lender and each of its affiliates and their respective former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors-in-interest, in each case solely in their capacity as such, of and from any and all Challenges; and (b) waive, discharge and release any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations.

c. <u>Binding Effect on Non-Debtor Third Parties</u>.

i.  Subject to entry of the Final Order, the Debtors' Stipulations and releases contained in Paragraph F hereof and in section (ii) immediately above shall be binding upon the Debtors' estates and each other party-in-interest, including the Committee (and including any chapter 11 trustee or chapter 7 trustee), except to the extent such party in interest first obtains standing by no later than 75 calendar days following the date of entry of the Interim Order, (such time period shall be referred to as the "<u>Challenge Period</u>," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a contested matter, adversary proceeding, or other Challenge, such

- 42 -

Challenge is fully and finally adjudicated, (i) and (ii) shall be referred to as the "Challenge Period Termination Date") and second, obtains a final, non-appealable order in favor of such party-in-interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "Successful Challenge").

   ii. Except as otherwise expressly provided in this Interim Order, from and after the Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor Cases), and without further notice, motion, or application to, order of, or hearing before this Court, (i) any and all payments made to or for the benefit of the Prepetition Secured Party or otherwise authorized by this Interim Order (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance by any party in interest, (ii) any and all such Challenges by any party-in-interest shall be deemed to be forever released, waived, and barred, (iii) all of the Prepetition Secured Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtors' Stipulations shall be binding on all parties in interest in these Chapter 11 Cases or any Successor Cases, including any Committee or chapter 11 or chapter 7 trustee.

   iii. Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party-in-interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i)

through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge; <u>provided</u> that all other stipulations (other than those subject to a Successful Challenge) shall remain binding on any Committee or other party-in-interest.

   iv. Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtors' estates.  The failure of any party-in-interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this paragraph or to require or permit an extension of the Challenge Period Termination Date.

  38. **<u>Waivers</u>**.  Aas a further condition of the DIP Documents and any obligation of the DIP Lender to make credit extensions pursuant to the DIP Documents (and the consent of the DIP Lender to the payment of the Carve-Out to the extent provided herein and the consent of the Prepetition Secured Party of the priming of the Prepetition Liens by the DIP Facility and the use of Cash Collateral):

   a. <u>Limitation on Charging Expenses</u>.  No costs or expenses of administration of the Chapter 11 Cases or any Successor Cases shall be charged against or recovered from or against the DIP Lender and/or the Prepetition Secured Party with respect to the DIP Collateral or the Prepetition Collateral, in each case pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender or the Prepetition Secured

Party, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Lender or the Prepetition Secured Party.

b. <u>No Marshaling</u>. In no event shall the DIP Lender or the Prepetition Secured Party be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied in accordance with this Interim Order, the DIP Term Sheet, and the Prepetition Loan Documents, as applicable.

c. <u>Equities of the Case</u>. In no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Party or Prepetition Collateral.

39. **No Lender Liability**. In determining to make any loan (whether under the DIP Documents or the Prepetition Loan Documents or otherwise) or to permit the use of Cash Collateral, neither the DIP Lender nor the Prepetition Secured Party are or will be in control of the Debtors and none shall owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates. Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or the Prepetition Secured Party of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

40. **Limitation of Liability**. Nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or Prepetition Lender of (a) any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts or (b) any fiduciary duties to the Debtors, their respective creditors, shareholders, or estates. So long as the DIP Lender or the Prepetition

- 45 -

Lender comply with their obligations under the DIP Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any Diminution in Value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

41.    **No Third Party Beneficiaries**.  Except as explicitly provided for in this Interim Order, this Interim Order does not create any rights for the benefit of any third party, creditor, landlord, lessor, equity holder, or any direct, indirect, or incidental beneficiary.

42.    **Insurance Proceeds and Policies**.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender and the Prepetition Secured Party shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral or operation of the Debtors' business.

43.    **No Waivers or Modifications of Interim Order**.  The Debtors irrevocably waive any right to seek any modification or extension of this Interim Order without the prior written consent of the DIP Lender and the Prepetition Secured Party and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Lender or the Prepetition Secured Party.

44.    **Binding Effect of this Interim Order**.  Immediately upon entry of this Interim Order by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, the Prepetition Secured Party, all other creditors of any of the Debtors, the Committee, if any, and all other parties-in-interest and

their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any chapter 11 case or Successor Case; provided, that neither the DIP Lender nor the Prepetition Secured Party shall have an obligation to permit the use of DIP Collateral or Prepetition Collateral (including Cash Collateral) or to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the Debtors' estates.

45.    **Discharge; Conversion of DIP Liens**.  Except as otherwise agreed in writing by the DIP Lender or the Prepetition Secured Party, as applicable, or as otherwise provided in the DIP Term Sheet or this Interim Order, the DIP Obligations and the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (and, in the case of DIP Obligations, paid in full) or, as applicable, converted to Exit Facility Claims, on or before the effective date of such confirmed plan of reorganization.

46.    **Joint and Several Liability**.  Nothing in this Interim Order shall be construed to constitute or authorize a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of this Interim Order.

47.    **Survival**.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any

Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11 Cases or Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the DIP Lender and the Prepetition Secured Party pursuant to this Interim Order and the DIP Documents, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (i) in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been paid in full (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms); and (ii) in respect of the Prepetition Loan Documents, all of the Prepetition Secured Obligations pursuant to the Prepetition Loan Documents and this Interim Order, have been paid in full.  The terms and provisions concerning the indemnification of the DIP Lender shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, following termination of the DIP Facility and/or the indefeasible repayment of the DIP Obligations.  In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition Secured Party notwithstanding the satisfaction in full or termination of the DIP Obligations until the satisfaction in full of the Prepetition Secured Obligations.

48.    **Necessary Actions**.  The Debtors are authorized and directed to take any and all necessary actions to implement the terms of this Interim Order.

49.    **Enforceability**.    This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules, any applicable Local Rules, or Rule 62(a) of the Federal

4915-7861-5815, v. 4

Rules of Civil Procedure, this Interim Order shall be effective immediately and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

50. **Rights Reserved**. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the DIP Lender or the Prepetition Secured Party to seek any other or supplemental relief in respect of the Debtors; (b) the rights of the DIP Lender or the Prepetition Secured Party under the DIP Documents, the Prepetition Loan Documents, or the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any or all of the Chapter 11 Cases to a case under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Lender or the Prepetition Secured Party.

51. **Headings**. All paragraph headings used in this Interim Order are for ease of reference only and are not to affect the construction hereof or to be taken into consideration in the interpretation hereof.

52. **Final Hearing**. The Final Hearing is scheduled for [●], 2025, at [●] (prevailing Eastern Time), at which time any party in interest may present any timely filed objections to the entry of the Final Order. The Debtors shall promptly serve a copy of this Interim Order and a notice of the Final Hearing by regular mail upon (a) the parties that were provided notice of the Interim Hearing; (b) any party that has filed prior to such date a request for notices with this Court; and (c) counsel for the Committee, if any appointed. Such notice shall state that objections to the

entry of a Final Order shall be in writing and shall be filed with the Court no later than [●], 2025

at [●] (prevailing Eastern Time), which objections shall be served so as to be received on or before

such date by (i) proposed counsel to the Debtors, Chipman Brown Cicero & Cole, LLP, 1313

North Market Street, Suite 5400, Wilmington, Delaware 19801 (Attn: William E. Chipman, Jr.

[chipman@chipmanbrown.com]); (ii) counsel to the DIP Lender and the Prepetition Secured

Party, DLA Piper LLP (US), 1201 North Market Street, Suite 2100, Wilmington, DE 19801 (Attn:

Stuart M. Brown [stuart.brown@us.dlapiper.com]), 1251 Avenue of the Americas, 27th Floor,

New York, NY 10020 (Attn: Rachel Ehrlich Albanese [rachel.albanese@us.dlapiper.com]), and

444 West Lake Street, Suite 900, Chicago, IL 60606 (Attn: Oksana Koltko Rosaluk

[oksana.koltkorosaluk@us.dlapiper.com]), and (iii) the Office of the U.S. Trustee for Region 3,

844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Jane M. Leamy

[Jane.M.Leamy@usdoj.gov].  Any objections by creditors or other parties in interest to any of the

provisions of a Final Order incorporating the terms of this Interim Order, or including any other

or different provisions, shall be deemed waived unless filed and served in accordance with this

paragraph.

53.     **Retention of Jurisdiction**.  The Court shall retain jurisdiction with respect to all

matters arising out of or related to the interpretation, implementation, or enforcement of this

Interim Order or the DIP Facility.

## Exhibit 1

## DIP Term Sheet

# DIP FACILITY TERM SHEET

## IM3NY LLC and Imperium3 New York, Inc.

This DIP FACILITY TERM SHEET (together with all annexes, exhibits, and schedules attached hereto, this "DIP Facility Term Sheet") sets forth certain material terms of the proposed DIP Facility (defined below).  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Prepetition Credit Agreement.

| | |
|---|---|
| **Borrowers** | Imperium3 New York, Inc., a New York corporation ("Imperium3"), in its capacity as a debtor and debtor in possession and IM3NY LLC, a Delaware limited liability company, in its capacity as a debtor and debtor in possession ("IM3NY" and together with Imperium3, the "Borrowers", the "Debtors" or "Loan Parties"). |
| **DIP Lender** | HSBC Bank PLC as lender under the Prepetition Credit Agreement (defined below) (the "DIP Lender").  As discussed below, the DIP Lender shall provide the DIP Commitments set out below. |
| **Prepetition Loan Agreement** | That certain Senior Secured Term Credit Agreement, dated as of April 14, 2022 (as amended, restated or modified from time to time, the "Prepetition Credit Agreement"), by and among HSBC Bank PLC , successor in interest to R-SPV II, L.L.C., LLC, Imperium 3 New York, Inc., and ACP POST OAK CREDIT I LLC, as administrative agent and collateral agent (the "Prepetition Admin Agent"). IM3NY and Charge CCCV LLC, a New York limited liability company, are each a guarantor under that certain Guarantee and Collateral Agreement dated April 14, 2022, securing the Prepetition Secured Obligations (defined below). Pursuant to that certain Loan Purchase, Assignment and Agreement dated as of October 24, 2024 (the "Assignment Agreement"), R-SPV II, L.L.C. assigned all of its interests in the Prepetition Credit Agreement to HSBC Bank PLC (the "Prepetition Secured Lender") and the obligations thereunder and under related loan documents (the "Prepetition Secured Obligations"), the liens and security interests granted in connection therewith (the "Prepetition Liens"). |
| **Permitted Liens** | Any valid and unavoidable liens that are (i) in existence as of the Petition Date, (ii) either perfected as of the Petition Date or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code, and (iii) senior in priority to the Prepetition Liens or by operation of applicable non-bankruptcy law. |
| **Interim and Final DIP Orders** | The order approving the DIP Facility on an interim basis, which shall be in form and substance, and upon terms and conditions, acceptable in all respects to the DIP Lender (the "Interim DIP Order"), shall authorize and approve, among other matters, (i) the Loan Parties' entry into the DIP Documents (defined below), (ii) the making of the DIP Loans (defined below), (iii) the granting of the superpriority claims and first-priority priming liens against the Loan Parties and their assets in accordance with the DIP Documents with respect to the DIP Collateral (as defined below), (iv) those items set forth below in "Waivers, |

| | |
|---|---|
| | Releases, and Protections", (v) the use of Cash Collateral (defined below), and (vi) the granting of adequate protection to the Prepetition Secured Lender (collectively, the "DIP Matters"). |
| | The order approving the DIP Facility on a final basis, which shall be in form and substance, and upon terms and conditions, acceptable in all respects to the DIP Lender (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders"), shall authorize and approve, among other matters, the DIP Matters. |
| **Adequate Protection** | As adequate protection against the risk of any diminution in the value of the Prepetition Liens in all Collateral, as such term is defined in the Prepetition Credit Agreement (the "Prepetition Collateral"), which results from, arises from, or is attributable to, the priming of the Prepetition Liens, the imposition of the automatic stay under section 362 of the Bankruptcy Code, or the use, sale, or lease of such Prepetition Collateral, or the grant of a lien under section 364 of the Bankruptcy Code and applicable case law interpreting the same (any such diminution, "Diminution in Value"), the Prepetition Secured Lender shall be granted the following adequate protection, subject in all cases to the Carve-Out (defined below), the DIP Liens (defined below), DIP Superpriority Claims (defined below), and the Permitted Liens: |
| | (i)     (A) To the extent of any Diminution in Value of the Prepetition Liens in the Prepetition Collateral, validly perfected replacement liens in all DIP Collateral (defined below) (the "Adequate Protection Liens"), which adequate protection liens shall have the priority set forth in "Priorities" below, as applicable; (B) to the extent of any Diminution in Value of the Prepetition Liens in Prepetition Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Loan Parties and their estates, on a joint and several basis, which claim shall have priority over any and all administrative expense claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code (other than the Carve-Out (defined below)) (the "Adequate Protection Claims"), which claims shall be subject to the priorities set forth in "Priorities" below, as applicable; (C) accrual of unpaid pre and postpetition interest at the nondefault rate (as set forth in the Prepetition Credit Agreement) as the same becomes due and payable under the Prepetition Credit Agreement; (D) accrual of reasonable and documented out-of-pocket fees and expenses of the Prepetition Admin Agent and the Prepetition Secured Lender, (E) the Borrowers shall provide copies of any financial reports (including the |

2

| | |
|---|---|
| | weekly delivery of a rolling 13 week cash flow, budget, and supporting information) to the extent otherwise provided to the DIP Lender; and (F) the "first day" orders shall be reasonably acceptable to the DIP Lender. |
| **Carve-Out** | The Prepetition Liens, the liens and security interests in the DIP Collateral (defined below), the Adequate Protection Liens, and all superpriority administrative expense claims granted under the DIP Orders, shall be subject and subordinate to the Carve-Out. <br><br> For purposes of this DIP Facility Term Sheet, "Carve-Out" means an amount equal to the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court under section 156(c) of title 28 of the United States Code and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the applicable statutory rate (without regard to the notice set forth in (iii) below) (collectively, the "Statutory Fees"), which Statutory Fees shall not be subject to any budget; (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent permitted to be paid at any time, whether by interim order, procedural order, or otherwise (which order has not been vacated or stayed), all unpaid fees and expenses of professionals pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "Professionals" and such claims, the "Allowed Professional Claims") subject to the Approved Budget and with an aggregate cap of $1,380,000.00 (the "Carve-Out Cap"). |
| **Type and Amount of DIP Facility** | Senior secured superpriority multi-draw priming debtor-in-possession term loan credit facility (the "DIP Facility", and the loans outstanding thereunder, the "DIP Loans"), in the principal sum of commitments as new money funding of $2,500,000.00 (the "DIP Loan Commitment"), in accordance with which the DIP Lender shall provide new money term loans as set forth below: <br><br> (i) an initial borrowing on the Closing Date (as defined below) up to an aggregate principal amount of $1,500,000.00 (the "Initial DIP Loan"); and <br><br> (ii) a final borrowing on February 24, 2025, up to an aggregate principal amount of $1,000,000.00 (the "Final DIP Loan"). <br><br> In the event that the Debtors deliver an executed purchase agreement no later than March 14, 2025, in form and substance reasonably acceptable to the DIP Lender, the DIP Lender may, at its sole discretion, increase the DIP Loan Commitment in accordance with the Approved Budget. |
| **Roll Up** | The DIP Commitments shall include a new money facility in the aggregate principal amount of $2,500,000.00 plus a roll up of $15,000,000.00 of the Prepetition Secured Obligations ("Roll Up"), the sum of which is $17,500,000.00 and shall be a DIP Obligation as of the entry of the Interim DIP Order. |

3

| | |
|---|---|
| **Priorities** | The liens and related claims set forth herein shall be subject to the following priority schedule:<br><br>First: Carve-Out and Permitted Liens<br><br>Second: DIP Liens (including the Roll up) and DIP Superpriority Claims<br><br>Third: Adequate Protection Liens and Adequate Protection Claims<br><br>Fourth: Prepetition Liens and Prepetition Secured Claims. |
| **Use of Proceeds** | Solely in accordance with and subject to the terms and conditions of this Term Sheet and budget approved by the DIP Lender ("Approved Budget") and, once entered into, credit agreement governing the terms of the DIP Facility (the "DIP Credit Agreement",  together with all security and collateral agreements related thereto, the "DIP Documents"), the proceeds of (x) the Initial DIP Loan shall be used only for working capital, including for the payment of budgeted items for (i) adequate protection payments, including payment of Prepetition Secured Lender and Prepetition Agent expenses , as required in the DIP Documents and the DIP Orders, (ii) administrative costs of the Chapter 11 Cases, (iii) payment of fees and expenses in connection with selling or exiting one or more businesses or facilities, (iv) pre-approved capital expenditures, and (v) general corporate purposes. |
| **Closing Date** | The date of the satisfaction (or waiver) of each of the conditions precedent to the Initial DIP Loan after entry of the Interim DIP Order (the "Closing Date"). |
| **Maturity** | The DIP Facility shall mature on the earliest to occur of:<br><br>(i)    ninety (90) days after the Closing Date; provided, such date may be extended for up to 45 days at the option of the DIP Lender based on, among other things, the prior achievement of certain Milestones;<br><br>(ii)    the effective date of a chapter 11 plan of any Loan Party, which has been confirmed by an order of the Bankruptcy Court in any of the Chapter 11 Cases and the conversion of the DIP Loans into a portion of an exit facility;<br><br>(iii)    dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under chapter 7 of the Bankruptcy Code;<br><br>(iv)    the acceleration of the DIP Loans and the termination of the commitments under the DIP Facility; and<br><br>(v)    the closing of a sale of all or substantially all assets or equity of the Loan Parties. |
| **Payments and Interest Rates** | The DIP Loan shall have an interest rate of SOFR + 6.00% (payable in cash). The DIP Loan shall have an original issue discount earned upon the Closing Date. |

4

| | |
|---|---|
| | The original issue discount is reflected in the Schedule for fees. |
| **Collateral and Priority** | As security for the prompt payment and performance of all amounts due under the DIP Facility, including, without limitation, all principal, the Roll up, interest, premiums, payments, fees, costs, expenses, indemnities, or other amounts (collectively, the "<u>DIP Obligations</u>"), effective as of the Petition Date, the DIP Lender, shall be granted automatically and properly perfected liens and security interests (the "<u>DIP Liens</u>") in all assets and properties of each of the Loan Parties and their bankruptcy estates, whether tangible or intangible, real, personal, or mixed, wherever located, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, the Loan Parties (including under any trade names, styles, or derivations thereof), whether prior to or after the Petition Date, including, without limitation, all of the Loan Parties' rights, title, and interests in (1) all Prepetition Collateral, (2) all money, cash, and cash equivalents; (3) all funds in any deposit accounts, securities accounts, commodities accounts, or other accounts (together with all money, cash, and cash equivalents, instruments, and other property deposited therein or credited thereto from time to time); (4) all accounts and other receivables (including those generated by intercompany transactions); (5) all contracts and contract rights; (6) all instruments, documents and chattel paper; (7) all securities (whether or not marketable); (8) all goods, as-extracted collateral, furniture, machinery, equipment, inventory and fixtures; (9) all real property interests; (10) all interests in leaseholds, (11) all franchise rights; (12) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights, licenses and all other intellectual property; (13) all general intangibles, tax or other refunds, or insurance proceeds; (14) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (15) all investment property; (16) all supporting obligations; (17) all letters of credit and letter of credit rights; (18) all commercial tort claims, without regard to any description of any such commercial tort claims; (19) all claims and causes of action arising under chapter 5 of the Bankruptcy Code ("<u>Avoidance Actions</u>") and the proceeds of or property recovered, whether by judgment, settlement or otherwise, from Avoidance Actions ("<u>Avoidance Action Proceeds</u>"), subject to entry of the Final DIP Order; (20) all permits, licenses, employment contracts, and license agreements, books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records), certifications, approvals, and permits; (21) to the extent not covered by the foregoing, all other goods, assets or properties of the Loan Parties, whether tangible, intangible, real, personal or mixed; and (22) all products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to such Loan Party from time to time with respect |

to any of the foregoing, now owned or hereafter acquired (collectively, the "<u>DIP Collateral</u>").

The DIP Liens, subject to the Carve-Out and the Priorities set forth above, shall have the following priorities (subject in all cases to the Carve-Out):

(i)     *Liens on Unencumbered Property*. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to Permitted Prior Liens (collectively, "<u>Unencumbered Property</u>"), including Avoidance Actions and Avoidance Action Proceeds, which DIP Liens shall be subject and subordinate only to the Carve-Out.

(ii)    *Priming DIP Liens and Liens Junior to Certain Other Liens*.   Under sections 364(c)(3) and 364(d) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected in all DIP Collateral (other than as described in clause (i) above), which DIP Liens (a) shall be subject and subordinate only to (1) the Carve-Out and (2) Permitted Liens, (b) shall be senior to any and all other liens and security interests in DIP Collateral, including, without limitation, all liens and security interests in any DIP Collateral that would otherwise be subject to the Prepetition Liens (including, without limitation, any Adequate Protection Liens), and (c) shall otherwise be subject to the priorities set forth herein.

(iii)   *Liens Senior to Other Liens*.  Except to the extent expressly permitted hereunder, subject to the Carve-Out, the DIP Liens and the DIP Superpriority Claims (defined below) shall not be made subject to or *pari passu* with (a) any lien, security interest, or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, including any lien or security interest granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board, or court for any liability of the Loan Parties, (b) any lien or security interest that is avoided or preserved for the benefit of the Loan Parties and their estates under section 551 of the Bankruptcy Code or otherwise, (c) any intercompany or affiliate claim, lien, or security interest of the Loan Parties or their affiliates, or (d) any other lien, security interest, or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof.

| | |
|---|---|
| **DIP Superpriority Claims** | The DIP Obligations shall be allowed superpriority administrative expense claims under section 364(c) of the Bankruptcy Code against |

| | |
|---|---|
| | each of the Loan Parties, on a joint and several basis, which claims shall have priority, subject to the Carve-Out, over any and all administrative expense claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, and 1114 of the Bankruptcy Code, with recourse against all DIP Collateral (the "<u>DIP Superpriority Claims</u>"). |
| **Use of Cash Collateral** | The Loan Parties shall be permitted to use cash collateral for the purposes and to the extent provided for in the Approved Budget, subject to Permitted Variances (defined below), the Interim DIP Order and the Final DIP Order. |
| **Milestones** | The Loan Parties shall comply with certain customary DIP milestones (the "<u>DIP Milestones</u>"), which DIP Milestones shall be incorporated into the DIP Credit Agreement, including, without limitation: |
| | (i) the Loan Parties shall commence respective voluntary cases under chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Cases</u>") in the United States Bankruptcy Court for the District of Delaware ("<u>Bankruptcy Court</u>") by January 27, 2025 (the "<u>Petition Date</u>"); |
| | (ii) no later than one (1) day following the Petition Date, the Loan Parties shall have engaged an investment banker for the sale of all or substantially all of their assets (the "<u>Investment Banker</u>"); |
| | (iii) the Loan Parties shall obtain entry by the Bankruptcy Court of the Interim DIP Order no later than five (5) business days after the Petition Date; |
| | (iv) ten (10) business days after the Petition Date, the Loan Parties shall file with the Bankruptcy Court a motion seeking approval of bidding procedures, in form and substance reasonably acceptable to the DIP Lender; |
| | (v) Within forty (40) days after the Petition Date, the Loan Parties shall have obtained from the Bankruptcy Court an order approving the bidding procedures, all in form and substance reasonably acceptable to the DIP Lender (the "<u>Bidding Procedures Order</u>"); |
| | (vi) on or before February 14, 2025, the Loan Parties shall provide to the DIP Lender copies of certificates or compliance reports confirming that all applicable UL certifications are complete; |
| | (vii) no later than February 18, 2025, the Loan Parties shall deliver to the DIP Lender letters or expressions of interest, |

7

<table>
<tr><td></td><td>including non-binding expressions, that are to be acceptable to the DIP Lender in its sole discretion;<br><br>(viii)     no later than March 14, 2025, the Loan Parties shall deliver to the DIP Lender an executed purchase agreement and shall have received a nonrefundable deposit, which purchase agreement shall be acceptable to the DIP Lender in its sole discretion;<br><br>(ix) the Loan Parties shall obtain entry by the Bankruptcy Court of the Final DIP Order no later than thirty (30) days after the Petition Date;<br><br>(x) Within seventy-six (76) days after the Petition Date, the Loan Parties shall conduct an auction, or otherwise designate the successful bidder(s) without an auction, in accordance with the Bidding Procedures Order; and<br><br>(xi) Within ninety (90) days after the Petition Date, the Loan Parties shall have obtained from the Bankruptcy Court an order approving the sale of substantially all of the Debtors' assets and/or equity, in form and substance reasonably acceptable to the DIP Lender.</td></tr>
</table>

| | |
|---|---|
| **Representations and Warranties** | The DIP Documents shall contain usual and customary representations and warranties. |
| **Cash Flow and Variance Reporting; Testing** | The Loan Parties shall comply with the following reporting requirements:<br><br>(i)     weekly delivery of 13-week cash flow (which shall include, without limitation, actual bank balances);<br><br>(ii)     continued reporting consistent with and under Section 9.01 of the Prepetition Credit Agreement; and<br><br>(iii)     Customary variance reporting as described below as Permitted Variances, to be agreed. |
| **Financial Covenants** | None. |
| **Affirmative and Negative Covenants** | The DIP Documents shall contain usual and customary affirmative and negative covenants for facilities of this type, provided, the DIP Documents shall require, without limitation:<br><br>(i)     two (2) business days' advance delivery of all material pleadings, motions and other material documents filed with the Bankruptcy Court on behalf of the Loan Parties in the Chapter 11 Cases to the DIP Lender Advisors, unless not reasonably practicable under the circumstances (in which case, as soon as reasonably practicable prior to filing);<br><br>(ii)     monthly financial statements within thirty (30) days of the end of each calendar month; and |

8

| | |
|---|---|
| | (iii)    at the reasonable request of the DIP Lender Advisors or the DIP Lender, weekly conference calls or video calls among the Loan Parties' relevant senior management, the Loan Parties' advisors, the DIP Lender Advisors, and the DIP Lender, which update calls may cover the Loan Parties' financial performance, the latest budget approved for variance testing, the Loan Parties' variance reports, and the other information provided pursuant to the reporting covenant described above. |
| **Conditions Precedent to Closing, Initial Borrowing, and Additional Borrowing** | The Closing Date under the DIP Facility, the Initial DIP Loan, shall be subject to customary conditions to closing for facilities of this type, including, without limitation, the following:<br><br>(i)  entry of the Interim DIP Order, and the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended, or stayed without the prior written consent of the DIP Lender;<br><br>(ii) the preparation, authorization and execution of the DIP Documents with respect to the DIP Facility, in form and substance consistent with this DIP Facility Term Sheet and otherwise reasonably acceptable to the Loan Parties, and the DIP Lender, unless waived on an interim basis in which case funding shall be permitted under this DIP Facility Term Sheet and the Interim DIP Order;<br><br>(iii) the delivery of a 13-week cash flow projection (the "<u>Approved Budget</u>") in form and substance acceptable to the DIP Lender, subject to standard and customary permitted variances, determined on a line by line basis of actual receipts and expenses against budgeted receipts and expenses provided for in the Approved Budget not to be less than 85% of receipts for the applicable measuring period or more than 115% of expenses for the applicable measuring period, as determined by the DIP Lender (the "<u>Permitted Variances</u>") reflecting (i) the Loan Parties' anticipated cash receipts and disbursements for each calendar week during the period from the week in which the Petition Date occurs through and including the end of the thirteenth (13th) calendar week thereafter and (ii) a professional fee accrual budget with respect to the anticipated fees and expenses to be incurred by professionals retained by the Loan Parties and other professionals during the thirteen (13) week period;<br><br>(iv) the delivery of (i) a secretary's (or other officer's) certificate of the Borrowers and each of the other Loan Parties, dated as of the Closing Date and in such form as is customary for the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments; and (ii) a customary closing officer's certificate of the Borrowers; |

9

(v) the DIP Lender shall have received from each of the Loan Parties, at least three (3) business days prior to the Closing Date, to the extent requested in writing at least five (5) business days prior to the Closing Date, (a) documentation and other information requested by any DIP Lender that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and (b) if a Borrower qualifies as a "legal entity customer" under the beneficial ownership regulations, the DIP Lender shall have received from such Borrower, at least three (3) business days prior to the Closing Date, a beneficial ownership certification in relation to such Borrower;

(vi) the DIP Lender shall have a first priority priming, fully perfected, unavoidable, enforceable lien on the DIP Collateral ("<u>DIP Lien</u>") pursuant to the Interim DIP Order; and

(vii)       the Closing Date shall have occurred on or before the date that is three (3) calendar days after the date of entry of the Interim DIP Order unless the DIP Lender consent to a later date.

The Final DIP Loan shall be subject to customary conditions to closing for facilities of this type, including, without limitation, the following:

(i) no later than thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order, and the Final DIP Order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified, amended, or stayed without the prior written consent of the DIP Lender;

(ii) The Loan Parties shall be in compliance in all material respects with each order entered in the Chapter 11 Cases, including the DIP Orders and the Cash Management Order;

(iii) no later than February 14, 2025, the Loan Parties shall provide the DIP Lender copies of certificates or compliance reports confirming that all applicable UL certifications are complete;

(iv) no later than February 18, 2025, receipt of non-binding letters of interest which is acceptable to the DIP Lender in its sole discretion;

(v) no later than March 14, 2025, the Loan Parties shall deliver to the DIP Lender an executed purchase agreement and shall have received a nonrefundable deposit, which purchase agreement shall be acceptable to the DIP Lender in its sole discretion; and

10

| | |
|---|---|
| | (vi) The Loan Parties shall be in compliance with the Approved Budget (subject to Permitted Variances). |
| **Final DIP Order** | The Final DIP Order shall be subject to customary conditions and shall be subject to DIP Lender providing consent over the documentation to be entered into with respect to which the proceeds of such Final DIP Loan is intended to be used. |
| **Events of Default** | The DIP Documents will contain customary events of default (each, an "Event of Default"), and others appropriate for the DIP Loans to be mutually and reasonably agreed among the Borrowers and the DIP Lender, including, without limitation: |
| | (i)    the Final DIP Order, in form and substance reasonably satisfactory to the DIP Lender, shall not have been entered within thirty (30) days following the Petition Date; |
| | (ii)    the Debtors fail to comply with the Approved Budget (subject to Permitted Variances); |
| | (iii)    the Debtors fail to satisfy any of the DIP Milestones; |
| | (iv)    the use by the Debtors of DIP Collateral not authorized by the DIP Orders and the DIP Documents; |
| | (v)    the DIP Orders shall (a) have been vacated, stayed, amended, modified, or reversed (without the prior written consent of the DIP Lender, which consent may be withheld by the DIP Lender in their respective sole discretion) or (b) cease to create a valid and perfected lien with such priority required by this term sheet; |
| | (vi)    upon written notice from the DIP Lender that the DIP Orders shall have been violated or breached; |
| | (vii)    the Loan Parties' failure to pay expenses including professional fees when due under the DIP Documents or the DIP Orders; |
| | (viii)    the Loan Parties failure to materially comply with all regulations applicable to the Loan Parties' operations; and |
| | (ix)    In the event the Debtors, in consultation with the DIP Lender, determine that section 1129(a)(10) of the Bankruptcy Code cannot be satisfied or that the Debtors cannot otherwise confirm the Plan of Reorganization, the Loan Parties' failure to consummate a 363 sale of substantially all of the Debtors' assets or equity, subject in all respects to the Sale Milestones. |
| **Stipulations, Waivers, Releases, and Protections** | Upon entry of the Interim DIP Order: |

11

| | |
|---|---|
| (i) | The Loan Parties shall stipulate (a) to the validity, extent, security, enforceability, priority, unavoidability and perfection of the Prepetition Liens and Prepetition Secured Obligations, (b) to the amount, validity, and lack of defense, counterclaim or offset of any kind to the Prepetition Secured Obligations, and (c) that all cash of the Loan Parties constitutes "cash collateral" of the Prepetition Secured Lender for purposes of section 363 of the Bankruptcy Code (the "<u>Cash Collateral</u>") (subject to a challenge period acceptable to the DIP Lender and consistent with applicable local rules). |
| (ii) | The Loan Parties shall waive any right to surcharge pursuant to section 506(c) of the Bankruptcy Code the DIP Collateral with respect to the DIP Lender, and the Prepetition Collateral with respect to the Prepetition Secured Lender, subject to entry of the Final DIP Order. |
| (iii) | The Loan Parties shall waive the equitable doctrine of "marshalling" against the DIP Collateral with respect to the DIP Lender, and the Prepetition Collateral with respect to the Prepetition Secured Lender, subject to entry of the Final DIP Order. |
| (iv) | The Prepetition Secured Lender shall be entitled to the benefit of section 552(b) of the Bankruptcy Code, and the Loan Parties shall waive the "equities of the case exception" under section 552(b) of the Bankruptcy Code with respect to the Prepetition Secured Lender, subject to entry of the Final DIP Order. |
| (v) | The Loan Parties shall waive and forever release and discharge any and all claims and causes of action against each of the DIP Lender and Prepetition Secured Lender (and their respective related parties and representatives) as of the date of the applicable DIP Order. |
| (vi) | No Cash Collateral, proceeds of the DIP Facility, or any cash or other amounts may be used to (a) investigate, challenge, object to, or contest the validity, extent, enforceability, security, perfection, or priority of any of the DIP Liens, Prepetition Liens, DIP Obligations, or Prepetition Secured Obligations, (b) investigate or initiate any claim or cause of action against any of the DIP Lender or Prepetition Secured Lender, (c) object to or seek to prevent, hinder, or delay or take any action to adversely affect the rights or remedies of the DIP Lender or the Prepetition Secured Lender, or (d) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under the DIP Documents and the DIP Orders) that are senior to or *pari* |

12

| | |
|---|---|
| | *passu* with the DIP Liens, DIP Superpriority Claims, the Adequate Protection Liens or claims granted hereunder, or the Prepetition Liens. |
| | (vii)    The DIP Lender and the Prepetition Secured Lender shall be entitled to good faith protection under section 364(e) of the Bankruptcy Code. |
| **Automatic Relief from Stay** | In the event of a default or upon the occurrence and during the continuance of an Event of Default, after the passage of any cure period, upon the giving of a minimum of three (3) business days' written notice of default (the "<u>Remedies Notice Period</u>") to the Borrowers, the Prepetition Admin Agent, the Official Committee of Unsecured Creditors (if appointed) and the U.S. Trustee, as provided for in the DIP Documents, the DIP Lender, may exercise all rights and remedies against the DIP Collateral (including pursuing a sale of the DIP Collateral through a process approved by the Bankruptcy Court) and, as to an event of default related to non-payment of adequate protection, the Prepetition Admin Agent may exercise all rights and remedies. In any hearing during the Remedies Notice Period to modify the automatic stay or in any other hearing regarding any exercise of rights or remedies by the DIP Lender, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Borrowers hereby waive their rights to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Lender set forth in the DIP Orders or the DIP Documents. |
| **Credit Bidding** | The DIP Lender shall have the right to credit bid all or part of the obligations under the DIP Obligations and the Prepetition Secured Lender shall have the right to credit bid any or all of the Prepetition Secured Obligations in connection with any disposition of property of the Debtors under section 363(k) of the Bankruptcy Code. |
| **Expenses and Indemnification** | The Debtors shall pay of all costs and expenses of the DIP Lender, in kind including, without limitation, the payment in kind of all reasonable and documented fees and expenses of the DIP Lender's professionals and advisors (the "<u>DIP Lender Advisors</u>"). <br><br> The Debtors shall also provide for customary indemnification by each of the Loan Parties, on a joint and several basis, of each of the DIP Lender (together with their related parties and representatives). |
| **Assignments** | The DIP Credit Agreement shall contain assignment provisions that are usual and customary for financings of this type. |
| **Amendments** | Usual and customary for facilities of this type requiring the consent of the DIP Lender. |
| **Governing Law** | Federal bankruptcy law and the laws of the State of New York. |
| **Counsel to the DIP Lender** | DLA Piper LLP (US) |

14

**Schedule of Fees**

The Borrowers shall pay the DIP Lenders (i) an upfront non-refundable fee of 0.50% of the aggregate principal amount of DIP Loans drawn, which shall be fully earned, due and payable in kind on the date of any such draw; (ii) an exit fee of 2.50% of aggregate principal amount of DIP Loans drawn due and payable in kind.

15

## Exhibit 2

## Initial 13-Week Budget

# Imperium3 New York, Inc.

## 13 Week DIP Budget (1.27.25)

| Amt in $000 | | 1 | | 2 | | 3 | | 4 | | 5 | | 6 | | 7 | | 8 | | 9 | | 10 | | 11 | | 12 | | 13 | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | *Forecast* | | *Forecast* | | *Forecast* | | *Forecast* | | *Forecast* | | *Forecast* | | *Forecast* | | *Forecast* | | *Forecast* | | *Forecast* | | *Forecast* | | *Forecast* | | *Forecast* | | |
| Week ending | | 1/31/2025 | | 2/7/2025 | | 2/14/2025 | | 2/21/2025 | | 2/28/2025 | | 3/7/2025 | | 3/14/2025 | | 3/21/2025 | | 3/28/2025 | | 4/4/2025 | | 4/11/2025 | | 4/18/2025 | | 4/25/2025 | | Total |
| Initial Cash Balance | $ | 59 | $ | 585 | $ | 332 | $ | 85 | $ | 31 | $ | 418 | $ | 32 | $ | (355) | $ | (405) | $ | (1,035) | $ | (1,504) | $ | (1,720) | $ | (1,770) | $ | 59 |
| Cash Receipts | | 1,500 | | - | | - | | - | | 1,000 | | - | | - | | - | | - | | - | | - | | - | | - | | 2,500 |
| Cash Disbursements | | 974 | | 253 | | 247 | | 54 | | 613 | | 387 | | 387 | | 50 | | 630 | | 469 | | 216 | | 50 | | 497 | | 4,826 |
| **Remaining Cash Balance** | $ | 585 | $ | 332 | $ | 85 | $ | 31 | $ | 418 | $ | 32 | $ | (355) | $ | (405) | $ | (1,035) | $ | (1,504) | $ | (1,720) | $ | (1,770) | $ | (2,267) | $ | (2,267) |
| **Summary of Cash Disbursements** | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Payroll | $ | 199 | $ | 17 | $ | 104 | $ | 12 | $ | 147 | $ | 17 | $ | 104 | $ | 12 | $ | 147 | $ | 17 | $ | 104 | $ | 12 | $ | 127 | $ | 1,019 |
| Operating Expenses | | 38 | | 236 | | 108 | | 42 | | 46 | | 250 | | 108 | | 38 | | 50 | | 232 | | 112 | | 38 | | 52 | | 1,349 |
| Capital Expenses | | - | | - | | - | | - | | - | | - | | - | | - | | - | | - | | - | | - | | - | | - |
| Sample Production Materials | | 38 | | - | | - | | - | | - | | - | | - | | - | | - | | - | | - | | - | | - | | 38 |
| Restructuring expenses | | 579 | | - | | 35 | | - | | 420 | | - | | 175 | | - | | 433 | | 100 | | - | | - | | 319 | | 2,061 |
| Repairs and Maintenance | | 120 | | - | | - | | - | | - | | 120 | | - | | - | | - | | 120 | | - | | - | | - | | 360 |
| Total Cash Disbursements | $ | 974 | $ | 253 | $ | 247 | $ | 54 | $ | 613 | $ | 387 | $ | 387 | $ | 50 | $ | 630 | $ | 469 | $ | 216 | $ | 50 | $ | 497 | $ | 4,826 |