**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| iM3NY LLC, *et al.*, | Case No. 25-10131 (BLS) |
| Debtors.[1] | (*Joint Administration Pending*) |

**DECLARATION OF ROB VANDERBEEK IN SUPPORT OF DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Rob Vanderbeek, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: (i) iM3NY LLC (N/A); and (ii) Imperium3 New York, Inc. (4574). The address of the Debtors' corporate headquarters is 1093 Clark Street, Endicott, New York 13760.

1. I am a Partner of Novo Advisors, LLC ("**Novo**"), which has its principal office at 200 W. Madison St., Suite 1000 Chicago, Illinois 60606. I am authorized to make this declaration on behalf of Novo in support of the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**DIP Motion**"[2]).

2. Unless otherwise stated in this declaration, I have personal knowledge of the facts set forth herein or provide this declaration based upon information provided to me by other Paladin professionals.

3. I am authorized to submit this Declaration on behalf of iM3NY LLC and (ii) Imperium3 New York, Inc. ("**Imperium**" and together with certain of its affiliates, the debtors and debtors-in-possession in the above-captioned cases (collectively, the "**Debtors**," or the "**Company**") and am over the age of 18. If I were called upon to testify, I could and would testify to each of the facts set forth below.

A. **Novo and its Engagement by the Debtors**

4. Novo is a middle-market advisory firm that specializes in corporate restructuring, transaction advisory, operations performance improvement, interim management and strategic advisory services both in-and-out of court proceedings. Novo has a wealth of experience in providing chief restructuring and financial advisory services and enjoys an excellent reputation for the services it has rendered in complex chapter 11 cases on behalf of debtors and creditors.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the DIP Motion, as applicable.

5.  Novo's restructuring professionals have been actively involved in large chapter 11 cases, including, among others: *In re iSun, Inc., Case No. 24-11144 (Bankr. D. Del.), Epic! Space Creations, Inc. Case No. 24-11161(Bankr. D. Del.), Gigamonster Networks LLC, Case No. 23-10051, (Bankr. D. Del.), TRP Brands LLC Case No. 1:24-bk-01529 (Bankr. ND Ill)*

6.  The Debtors selected Novo because Novo's professionals have considerable expertise and experience in providing financial advisory services to financially distressed companies and to creditors, purchasers, bondholders, and other constituencies in chapter 11 cases and out-of-court proceedings.

7.  I have more than 30 years of experience in financial restructuring. I have advised many public and private companies, private equity sponsors, hedge funds, purchasers of distressed assets and businesses, key secured and unsecured creditors, DIP lenders, and creditors' committees. Before joining Novo, I was a managing director at Grant Thornton LLP for 5 years and before that was a Managing Director at both Goldin Associates and Huron Consulting.

**B.    Prepetition Recapitalization and Refinancing Efforts**

8.  The facts and circumstances leading to the commencement of these chapter 11 cases (**"Chapter 11 Cases"**) are set forth at length in the *Declaration of Lukasz P. Cianciara in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**").

9.  Novo was engaged prior to the Petition Date to provide financial advisory services to the Debtors. Since its engagement, Novo has worked closely with the Debtors' board of directors, management team and other professional advisors to assist the Debtors in preparing for these Chapter 11 Cases.

10. Specifically, Novo has assisted the Debtors in analyzing their liquidity and cash flows, preparing for the Chapter 11 Cases, and seeking to secure postpetition financing on the most

4913-4619-1366, v. 2

competitive terms and conditions available to the Debtors.  As a result of Novo's work to date, Novo has become well-acquainted with the Debtors' business operations and financial affairs, including the Debtors' current liquidity situation and financing requirements.

11. When Novo began to work for the Debtors, the Debtors were already in default of their Prepetition Credit Agreement and entered into a forbearance agreement.  As of the Petition Date, the Company had only $59,450.69 in cash on hand.

12. The Debtors filed these cases to preserve the Debtors' operations and ability to continue to provide uninterrupted product flow to their prospective customers while conducting a marketing process for the sale of substantially all of the Debtors' assets.

**C.     The Proposed DIP Financing**

13. The Debtors anticipated the need for post-petition financing.  In December, given the Debtors' impending liquidity issues and inability to raise new funds to continue operations in the ordinary course of business, the Debtors approached the Prepetition Secured Lender (as a "**DIP Lender**") about providing post-petition financing.  The DIP Lender provided the Debtors with a proposal for debtor-in-possession financing to fund the costs of continued operations and these Chapter 11 Cases.  The proposal is reflected in a DIP Term Sheet (the "**DIP Term Sheet**") that provides for a proposed $2.5 million (the "**DIP Loan Commitment**") multi-draw priming debtor-in-possession term loan credit facility (the "**DIP Facility**," and the loans outstanding thereunder, the "**DIP Loans**").  The DIP Loan Commitment includes a new money facility in the aggregate principal amount up to $2.5 million ($1.5 million initially and then $1.0 million on a final basis

subject to certain milestones) plus a roll up of $15.0 million of the Prepetition Secured Obligations ("**Roll up**"), the sum of which shall be DIP Obligations[3] upon the entry of the Interim DIP Order.

14. After confirming that its majority and minority equity holders were no longer willing or able to fund the Company, Novo checked with the new lenders who are no longer willing to provide additional Emergency Bridge Funding outside of these Chapter 11 Cases. The Debtors conducted a market check seeking competing DIP financing offers. No other proposals were received.

15. Under my direction, Novo conducted a market check by seeking competing DIP financing offers from three (3) other prospective lenders. No other proposals were received. The primary reasons for the lack of competing proposals are because (i) the Prepetition Secured Lenders are unwilling to permit a priming lien in favor of a third party, and (ii) the other potential lenders are unwilling to provide a DIP facility junior to the Prepetition Secured Lenders. Based upon Novo's efforts to arrange refinancing with prospective lenders, the Debtors and their advisors believe that no other, better options for DIP financing are available to them other than the proposed DIP Facility.

16. The Debtors have determined, in their business judgment, that there is no proposal for debtor in possession financing available on terms better than those provided by the Prepetition Secured Lenders. In particular, no party was willing to extend debtor in possession financing to the Debtors on an unsecured or junior basis.

17. The Debtors do not have the ability to borrow under their existing Prepetition Credit Agreement but require funds to sustain their operations and pay for the costs of these Chapter 11

---

[3]   Capitalized terms in this section not otherwise defined herein, shall have the meanings ascribed to them in the DIP Term Sheet or the DIP Motion as applicable.

- 6 -

Cases. The DIP Facility is the best and only path forward to ensure that the Debtors can continue operating their businesses while providing sufficient liquidity to administer these Chapter 11 Cases and facilitate the restructuring process.

18.  The Debtors will use the proceeds of the DIP Facility to, among other things, (a) pay the fees, costs, and expenses incurred in connection with these Chapter 11 Cases, (b) fund any obligations benefitting from the Carve-Out, (c) permit the orderly continuation of the operation of their business, (d) maintain business relationships with customers, vendors, and suppliers, (e) make payroll and provide benefits to employees, and (f) satisfy other working capital and operational needs. Obtaining an immediate injection of cash is critical. The incurrence of new debt under the DIP Credit Agreement and use of Cash Collateral is necessary and vital to the preservation and maintenance of the going concern value of the Debtors. Immediate and irreparable harm will be caused to the Debtors and their estates if immediate financing is not obtained and permission to use Cash Collateral is not granted.

19.  The Debtors believe the DIP Lenders agreed to provide the DIP Loans with the specific intent to both fund the Debtors' reorganization while simultaneously keeping the post-petition financing narrowly tailored to meet the Debtors' restructuring needs. The DIP Lenders and the Debtors, along with their advisors, extensively negotiated the terms of the proposed DIP Facility. The Debtors believe that the terms of the proposed DIP Facility, including the fees and conditions contained therein, represent the best available terms for the Debtors.

20.  Ultimately, the Debtors, in conjunction with their advisors, determined that the terms and conditions of the proposed DIP Facility were and remain the best and only available under the circumstances and adequately addresses the Debtors' financing needs during these Chapter 11 Cases. Importantly, the DIP Facility was negotiated at arms' length among the

4913-4619-1366, v. 2

proposed DIP Lenders and the Debtors' counsel and advisors.  Accordingly, the Debtors and the DIP Lenders intend to enter into DIP Term Sheet, which is attached to the Interim Order as Exhibit 1.

**WHEREFORE**, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  January 27, 2025

*/s/ Rob Vanderbeek*
ROB VANDERBEEK
Novo Advisors, LLC

*Proposed Financial Advisor to the Debtors and Debtors in Possession*