**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| iM3NY LLC, *et al.*, | Case No. 25-10131 (BLS) |
| Debtors.[1] | (Jointly Administered) |
| | Bidding Procedures Hearing Date: February 24, 2025, at 10:00 a.m. (Eastern Time)<br>Bidding Procedures Objection Deadline: February 17, 2025, at 4:00 p.m. (Eastern Time) |

**DEBTORS' MOTION FOR (I) AN ORDER ESTABLISHING BIDDING
PROCEDURES AND GRANTING RELATED RELIEF, AND
(II) AN ORDER APPROVING THE SALE OF THE ASSETS**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**" or the

"**Company**"), by and through their undersigned counsel, hereby submit this motion (the

"**Motion**"), pursuant to sections 105, 363, 365, 503, and 507 of title 11 of the United States Code,

11 U.S.C. §§ 101 – 1532 (the "**Bankruptcy Code**"), for the entry of (a) an order, substantially in

the form attached hereto as __Exhibit A__ (the "**Bidding Procedures Order**"), (i) scheduling a hearing

(the "**Sale Hearing**") on approval of a sale or other transaction ("**Sale**") for substantially all of the

Debtors' assets (the "**Assets**"), free and clear of all liens, claims, encumbrances, and other interests

(collectively, the "**Encumbrances**"), other than those Encumbrances permitted by any applicable

asset purchase agreement or other agreement for the Sale (each a "**Transaction Agreement**"),

including a Sale that may contemplate the acquisition of the Assets of the Debtors through a section

363 Sale or other transaction, and which may include the assumption and assignment of certain

executory contracts and unexpired leases (each, an "**Assumed Contract**," and collectively, the

"**Assumed Contracts**") in connection therewith, (ii) authorizing and approving certain proposed

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: (i) iM3NY LLC (N/A); and (ii) Imperium3 New York, Inc. (4574). The address of the Debtors' corporate headquarters is 1093 Clark Street, Endicott, New York 13760.

bidding procedures for the Sale in the form attached to the Bidding Procedures Order as **Exhibit 1** (collectively, the "**Bidding Procedures**"), certain proposed assumption and assignment procedures (collectively, the "**Assumption and Assignment Procedures**"), and the form and manner of notice thereof; and (iii) granting related relief; and (b) an order (the "**Sale Order**"),[2] (i) authorizing and approving the Debtor's entry into the Transaction Agreement with the Successful Bidder, Back-Up Bidder, or Stalking Horse Bidder (*each as defined herein*), as applicable; (ii) authorizing and approving the Sale of the Assets, free and clear of all Encumbrances other than those permitted by the applicable Transaction Agreement; (iii) authorizing and approving the assumption and assignment of the Assumed Contacts in connection therewith; and (iv) granting related relief.  In support of the Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

As described in the First Day Declaration, the Debtors commenced these chapter 11 cases to address their balance sheet and liquidity challenges.  To explore market interest in the company, on December 31, 2024, the Debtors, with the assistance of their proposed investment banker Hilco Corporate Finance ("**Hilco**"), launched a third-party marketing process (the "**Marketing Process**") to solicit proposals for the Sale of the Debtors' business and/or substantially all their Assets, or a restructuring of the Debtors' balance sheet.  At the outset of the Marketing Process, the Debtors, with Hilco's assistance, prepared teaser marketing materials and, in parallel, compiled a list of over 200 potentially interested parties, comprised of potential strategic and financial partners.  On January 23, 2025, Hilco commenced market outreach and provided the teaser materials to potentially interested parties.  Additionally, the Debtors, with Hilco's assistance,

---

[2]   The Debtors will file the applicable form of Sale Order as soon as practicable after such document is negotiated with the applicable purchaser.

prepared detailed confidential information memoranda (each, a **"CIM"**) about the Company, and are populating a virtual data room (the **"VDR"** or **"Data Room"**) containing significant company materials and financial models to facilitate parties' diligence.

To date, the initial outreach to 259 potentially interested parties resulted in 8 parties receiving access to the CIM after signing a non-disclosure agreement with the Company (an **"NDA"**). Hilco began distributing a formal process letter on January 29, 2025 to the interested parties that signed an NDA to inform them that the submission deadline for indications of interest was February 18, 2025, with binding proposals due no later than March 14, 2025.

In the near future, the Debtors will add a form of asset purchase agreement to the VDR to facilitate markups thereof by interested parties as part of their proposed submissions. The Debtors have yet to select a stalking horse bidder for any of their Assets; however, through this Motion, the Debtors are seeking the right to later designate a stalking horse bidder and offer certain protections in furtherance of facilitating a competitive sale process, should a stalking horse bidder emerge during the Marketing Process.

As further described in the First Day Declaration, the prepetition Marketing Process ran in parallel with the Company's efforts to obtain debtor-in-possession financing from HSBC Bank PLC (**"HSBC"** or the **"DIP Lender"**) as memorialized in the debtor-in-possession financing (the **"DIP Facility"**) to support the continuation of the prepetition Marketing Process on a postpetition basis, which the Debtors believe is the most value-maximizing path forward. The proposed Marketing Process timeline is expedited, but thorough, to allow the Debtors to administer these chapter 11 cases quickly and efficiently, avoid the value-destructive consequences of a protracted stay in chapter 11, and comply with the Debtors' requirements to maintain access to the DIP Facility.

Pursuant to the terms of the DIP Facility, the Debtors must satisfy certain milestones (the **"DIP Milestones"**) for the Sale of their Assets, including:

(a)     Within ten (10) business days after the Petition Date, the Debtors shall file with the Bankruptcy Court a motion seeking approval of bidding procedures, in form and substance reasonably acceptable to the DIP Lender;

(b)     Within forty (40) days after the Petition Date, the Debtors shall have obtained from the Bankruptcy Court an order approving the bidding procedures, all in form and substance reasonably acceptable to the DIP Lender;

(c)     no later than March 14, 2025, the Debtors shall deliver to the DIP Lender an executed purchase agreement and shall have received a nonrefundable deposit, which purchase agreement shall be acceptable to the DIP Lender in its sole discretion;

(d)     Within seventy-six (76) days after the Petition Date, the Debtors shall conduct an auction, or otherwise designate the successful bidder(s) without an auction, in accordance with the Bidding Procedures Order; and

(e)     Within ninety (90) days after the Petition Date, the Loan Parties shall have obtained from the Bankruptcy Court an order approving the sale of substantially all of the Debtors' assets and/or equity, in form and substance reasonably acceptable to the DIP Lender.

Conducting a thorough marketing and bidding process and consummating a Sale or restructuring transaction on the timeline contemplated herein is vitally important to the Debtors' efforts to maximize value. Such Sale or restructuring transaction(s) would benefit not only the Debtors, but also their vendors, dedicated employees, lenders, and other key stakeholders.

To preserve the value of the Debtors' estates — and to offer the Debtors a chance to increase that value — the Debtors propose the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order. The Bidding Procedures provide substantial flexibility with respect to the structure of any Sale transaction. Furthermore, while the Debtors have not yet selected a stalking horse (if any) to serve as a committed buyer of some or all of the Assets (the **"Stalking Horse Bidder"**), the Bidding Procedures provide the Debtors with flexibility to select a Stalking Horse Bidder and grant bid protections prior to the Sale Hearing. The Debtors will consider all

- 4 -

viable options in accordance with the Bidding Procedures before determining if selling Assets will, in their sound business judgment, maximize value for the estate.  However, if the Bidding Procedures are not approved or there is any material delay to the Sale timeline, the Debtors' access to the proposed DIP Facility would be jeopardized to the detriment of the value of the estates and all parties in interest. Accordingly, the proposed Bidding Procedures should be approved.

As set forth in further detail below, the Debtors submit that the Bidding Procedures, and the related relief requested in this Motion, are in the best interests of the Debtors' estates and their stakeholders. Accordingly, the Debtors respectfully request that the Court grant this Motion

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory and legal predicates for the relief sought herein are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

3.      Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BACKGROUND

### A.  GENERAL BACKGROUND

4.     On January 27, 2025 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**"), thereby commencing these cases (the "**Chapter 11 Cases**").

5.     The Debtors continue to be in possession of their property, to operate their business, and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.     No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

7.     The Company intends to be the first commercial U.S. designed and developed "Giga-scale" lithium-ion battery manufacturing company in the United States. The Company's manufacturing facility is located in Endicott, New York (the "**Facility**") and currently employs 22 people.  Debtors are a pre-revenue company that has exhausted all of their current funds and filed these cases to continue the Marketing Process to identify potential financial and strategic partners for the Debtors and execute on any potential asset Sale, in an effort to maximize value for all parties in interest.

8.     Additional factual background regarding the Debtors, including their business operations, their capital and debt structures and the events leading to the filing of these Chapter 11 Cases, is set forth in the *Declaration of Lukasz P. Cianciara in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings,* [Docket No. 10] (the "**First Day Declaration**"), which is fully incorporated herein by reference.

- 6 -

**B.**     **THE DEBTORS' MARKETING AND SALE EFFORTS**

9.     On December 31, 2024, the Debtors engaged Hilco to provide services in connection with the sale of the Debtors' Assets.  Since its retention by the Debtors, Hilco has begun a thorough market analysis for the Debtors, worked to complete the VDR for the Debtors, begun contacting entities potentially interested in acquiring the Debtors' Assets, and responded to various inquiries from the Debtors, their advisors, and third parties who might be interested in acquiring the Debtors' Assets.

10.     Prior to the Petition Date, the Debtors were not able to enter into a stalking horse agreement (a **"Stalking Horse Agreement"**).  However, in consultation with Hilco and the Debtors' other advisors, the Debtors have determined that, under the circumstances, the best way to preserve value for their estates and creditors is to pursue the Marketing Process for the Debtors' Assets and seek an order from this Court permitting the Debtors to enter into a Stalking Horse Agreement with customary bid protections for any such Stalking Horse Bidder after providing appropriate notice thereof.

**C.**     **THE SALE PROCESS**

11.     The Debtors' goal is to obtain maximum exposure of their Assets to potential buyers as quickly as possible under the circumstances, and they will consider any transaction that will result in obtaining the highest and best value for their Assets.  By pursuing multiple transactional avenues, the Debtors and their stakeholders can use all of the tools available under the Bankruptcy Code to maximize value for all the Debtors' stakeholders.

12.     Based on the experience of the Debtors' restructuring professionals, the Debtors believe it would further the goal of maximizing the value of the Assets to designate a party to serve as a Stalking Horse Bidder for the Sale of the Assets.  As is customary, the Debtors would likely

- 7 -

grant the Stalking Horse Bidder one or more of a limited break-up fee, expense reimbursement, or other limited bid protections.  Accordingly, the Debtors are reserving the right to request that the Court approve the Debtors' selection of the Stalking Horse Bidder and will provide the Court with appropriate notice thereof.

## THE PROPOSED BIDDING PROCEDURES[3]

### I.    TRANSACTION AGREEMENTS.

13.    The Debtors intend to solicit bids for all of the Assets in accordance with the proposed Bidding Procedures.  The Bidding Procedures describe, among other things, the Assets available for sale, the manner in which bids become "qualified," the coordination of diligence efforts among the bidders and the Debtors, the receipt and negotiation of bids received, the conduct of an auction, the selection and approval of the Successful Bidder, and the selection of the Back-Up Bidder.  The Bidding Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, manner, while ensuring that the highest or otherwise best bid is generated for the Assets.

14.    Certain of the key terms of the proposed Bidding Procedures are included below:[4]

(a)    **Qualification as Bidder**: Any person or entity that wishes to participate in the bidding process for the Assets (each, a "**Potential Bidder**") must first become a "Qualifying Bidder."  Parties interested in submitting a bid to purchase any of the Debtors' Assets are encouraged to qualify as soon as possible because the Bidding Procedures do not permit any due diligence or financing conditions in Qualifying Bids.  Section 2 of the Bidding Procedures identifies the requirements to be deemed a Qualifying Bidder, which include, among other things, (1) entering into a

---

[3]    The following is a summary of the Bidding Procedures.  It is qualified in its entirety by the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order, and parties are encouraged to read the Bidding Procedures and Bidding Procedures Order in their entirety.  To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order, the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order shall control.  Capitalized terms used but not defined in this summary of the Bidding Procedures shall have the meanings ascribed to such terms in the Bidding Procedures.

[4]    The proposed Bidding Procedures include certain dates requested by the Debtors, but all dates remain subject to Court approval.

confidentiality agreement in form and substance reasonably satisfactory to the Debtors and (2) providing sufficient information, as determined by the Debtors, to allow the Debtors, after consultation with, if any, any Consultation Parties, to determine that the interested party has, or can obtain, the financial wherewithal and any required internal corporate, legal, or other authorizations to close a transaction and to provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code (where applicable). Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated transaction.

Once qualified, Qualifying Bidders will be able to conduct due diligence and gain access to the Debtors' confidential electronic data room concerning the Assets (the "**Data Room**").

In the event the Debtors enter into a Stalking Horse Agreement with a Stalking Horse Bidder, upon the consummation of a Sale of all or any portion of the Assets to any party other than the Stalking Horse Bidder or as otherwise provided in the Sale Order, subject to the Stalking Horse Objection Process set forth below, the Debtors shall pay to the Stalking Horse Bidder a "break-up" fee equal to (i) three percent (3%) of the Stalking Horse Bid plus (ii) reimbursement of all actual costs and expenses incurred by the Stalking Horse Bidder not to exceed one percent (1%) of the Stalking Horse Bid. No bidder or any other party other than a Stalking Horse Bidder shall be entitled to any termination or "break-up" fee, expense reimbursement or any other bidding protections in connection with the submission of a bid for the Assets or for otherwise participating in the Auction or the Sale Transaction process, unless otherwise granted by the Debtors and approved by an order of the Court

Notwithstanding anything to the contrary in the Bidding Procedures, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (i) any designated Stalking Horse Bidder shall be considered a Qualifying Bidder, and a Stalking Horse Agreement shall be considered a Qualifying Bid (*as defined below*); and (ii) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtors may consider a combination of bids for the Assets. Moreover, the DIP Lender shall be considered a Qualifying Bidder and shall be entitled to credit bid, as and to the extent permitted by any agreements and applicable law.

(b)     **Due Diligence**: The Debtors will provide any Qualifying Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to Hilco, attention: Richard Klein (Telephone: (917) 520-3640; E-mail: rklein@hilcocf.com). The due diligence period shall extend through and include the Bid Deadline (*as defined below*). The Debtors may, but shall not be obligated to, in their sole discretion, furnish any due diligence information after the Bid Deadline. The Debtors reserve the right, in their sole discretion, to withhold or limit access to any due diligence information that the

Debtors determine is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder.  Notwithstanding any limitations provided for in such information, including, without limitation, any non-disclosure, confidentiality or similar provisions, the Debtors and their estates shall be authorized to provide due diligence information to the Qualifying Bidders, provided that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors.  The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures and the Sale.

(c)    **Bid Requirements**:

    i.    *Form of Agreement*.  Potential Bidders intending to submit bids must include with their bids:

        a.    a statement that such Potential Bidder offers to purchase the Assets, or a number or combination of the Assets, upon the terms set forth in their Transaction Agreement (as defined below);

        b.    a clean and duly executed Transaction Agreement (a **"Transaction Agreement"**) and a marked copy of the Transaction Agreement that reflects any variations from the Stalking Horse Agreement, if any, for the Assets that are the subject of the bid;

        c.    the purchase price to be paid by such Qualifying Bidder, and the liabilities proposed to be paid or assumed by such Qualifying Bidder; and

        d.    in the event that the Debtors enter into a Stalking Horse Agreement and a Potential Bidder wishes to acquire Assets that are the subject of a Stalking Horse Agreement, such statement shall provide that the Potential Bidder offers to purchase those Assets upon substantially the same terms as, or terms more favorable to the Debtors and their estates than, the terms set forth in the applicable Stalking Horse Agreement.

    ii.    *Qualifying Bid*.  Other than in the case of a Stalking Horse Bidder, to be deemed a "Qualifying Bid," a bidder's bid must be received on or before the Bid Deadline and satisfy each of the requirements set forth in Section 6 of the Bidding Procedures (each, a **"Bid Requirement"**), including that all bids must:

        a.    be in writing;

        b.    fully disclose the identity of the Qualifying Bidder and whether such party is an insider (as defined in section 101 of the

- 10 -

Bankruptcy Code) of any Debtor, and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors wish to discuss the bid submitted by the Qualifying Bidder;

c.  be accompanied by a clean, executed copy of a Transaction Agreement that satisfies the requirements of Section 4 of the Bidding Procedures, along with a marked copy of the Transaction Agreement that reflects any variations from the Debtors' form of Transaction Agreement, if any;

d.  set forth the purchase price to be paid by such Qualifying Bidder, including what amount is being paid as cash and what amount constitutes a credit bid, and identify the liabilities proposed to be paid or assumed by such Qualifying Bidder;

e.  specify the Assets that are included in the bid and, to the extent a Stalking Horse Bidder is designated, state that such Qualifying Bidder offers to purchase those Assets included in the applicable Stalking Horse Agreement upon substantially the same terms as, or terms more favorable to the Debtors and their estates than, the terms set forth in the applicable Stalking Horse Agreement;

f.  state that such Qualifying Bidder's offer is formal, binding, and unconditional and is irrevocable until the conclusion of the Sale Hearing unless such party is the Successful Bidder or Back-Up Bidder (*both as defined below*) in which case such offer is formal, binding, and unconditional and is irrevocable until two (2) business days after the closing of the Sale of the subject Assets;

g.  state that such Qualifying Bidder is financially capable of consummating the transactions contemplated by the Transaction Agreement and provide written evidence in support thereof;

h.  contain such financial and other information sufficient to allow the Debtors to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by its proposed Transaction Agreement, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code, including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to the Qualifying Bidder ("**Adequate Assurance Information**"), in a form that allows the Debtors to make

- 11 -

available such Adequate Assurance Information to any counterparties to any contracts or leases being assumed and assigned in connection with the Sale that have requested, in writing, such Adequate Assurance Information ("**Counterparties**");

i. identify with particularity each and every executory contract, unexpired lease, and unexpired sublease the assumption and assignment of which is a condition to close the transactions contemplated by the proposed Transaction Agreement;

j. include a commitment to close the transactions contemplated by the Transaction Agreement within two (2) business days after entry of a final order approving the Transaction Agreement;

k. not request or entitle such Qualifying Bidder (other than a Stalking Horse Bidder) to any break-up fee, termination fee, expense reimbursement, or similar type of fee or payment;

l. provide that in the event that there is a Stalking Horse Bidder, and the Qualifying Bidder wishes to bid on substantially the same Assets that are included in the Stalking Horse Agreement, the aggregate consideration proposed by the Qualifying Bidder must equal or exceed the sum of the amount of (A) the purchase price under the Stalking Horse Agreement, plus (B) any break-up fee, expense reimbursement, or other bid protection provided under the Stalking Horse Agreement, plus (C) $100,000.00;

m. not contain any contingencies of any kind, including, without limitation, contingencies related to financing, due diligence, or third party regulatory or internal approval;

n. contain written evidence satisfactory to the Debtors, in consultation with the Consultation Parties, that the Qualifying Bidder has a commitment for financing or other evidence of the ability to close the transactions contemplated by the Transaction Agreement;

o. contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and other information in making its Qualifying Bid, (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or

- 12 -

other information provided in connection with the Bidding Procedures and the Sale, and (iv) has not entered into any agreement with any other potential bidder concerning the Auction or the Sale or discloses any agreement with any other potential bidder concerning the Auction or Sale;

p.  provide for the Qualifying Bidder to serve as a backup bidder (the "**Back-Up Bidder**") if the Qualifying Bidder's bid is the next highest or otherwise best bid (the "**Back-Up Bid**") after the Successful Bid (*as defined below*), in accordance with the terms of the Transaction Agreement;

q.  include written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Transaction Agreement;

r.  provide a good faith cash deposit (the "**Deposit**") in an amount equal to ten percent (10%) of the total consideration provided under the proposed Transaction Agreement; and

s.  provide for liquidated damages in the event of the Qualifying Bidder's breach of, or failure to perform under, the Transaction Agreement equal to the amount of the Deposit.

A bid from a Qualifying Bidder satisfying all of the above requirements, as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a Qualifying Bid.  The Debtors reserve the right to work with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale.

iii.  *Bid Deadline*.  Any party seeking to be a Stalking Horse Bidder shall deliver a written and electronic copy of its Stalking Horse Agreement in both PDF and MS-WORD format to the Debtors and Hilco so as to be received on or before **February 28, 2025, at 4:00 p.m. (*prevailing* Eastern Time)** (the "**Stalking Horse Deadline**").  A Qualifying Bidder, other than a Stalking Horse Bidder, that desires to make a bid shall deliver a written and electronic copy of its bid in *both* PDF and MS-WORD format to the Debtors and HILCO so as to be received on or before **March 14, 2025, at 4:00 p.m. (*prevailing* Eastern Time)** (the "**Bid Deadline**"); *provided* that the Debtors

may extend the Bid Deadline without further order of the Court, subject to providing notice to the Consultation Parties. **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction**.

iv.  *Evaluation of Qualifying Bids*.   The Debtors will promptly deliver copies of all bids from Qualifying Bidders to the Consultation Parties. The Debtors, in consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid, and shall notify each Qualifying Bidder as to whether its bid has been determined to be a Qualifying Bid. In the event that a bid is determined not to be a Qualifying Bid, the Qualifying Bidder shall be notified by the Debtors and given the opportunity to modify its bid so as to become a Qualifying Bid prior to the start of the Auction; *provided* that any Qualifying Bid may be improved at the Auction as set forth in the Bidding Procedures.

v.  *Baseline Bid*.   Prior to the commencement of the Auction, the Debtors shall determine, in consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or otherwise best bid for purposes of constituting the opening bid of the Auction (the "**Baseline Bid**" and the Qualifying Bidder submitting the Baseline Bid, the "**Baseline Bidder**"), and shall promptly notify any Stalking Horse Bidder and all Qualifying Bidders with Qualifying Bids of the Baseline Bid.

vi.  *One Qualifying Bid*.   If only one Qualifying Bid is submitted on or before the Bid Deadline, the Debtors shall not hold an Auction and shall have the right to request at the Sale Hearing (as defined in the Bidding Procedures Order) that the Court approve the Transaction Agreement with the Qualifying Bidder and the transactions contemplated thereunder.

(d)  **Auction**:  In the event that the Debtors timely receive one or more Qualifying Bids other than any Stalking Horse Bidder's Qualifying Bid, the Debtors shall conduct an auction (the "**Auction**").  Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or otherwise best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors: (a) the transaction structure and execution risk, including conditions to, timing of, and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (b) variations between competing bids and any incremental execution risk that the Debtors reasonably determine, in consultation with the Consultation Parties, exist as a result of those variations; (c) the time needed to close a Sale or other transaction compared with other Qualifying Bids and the cost to the Debtors and their estates of any incremental delay; (d) the total consideration to be received by the Debtors and

- 14 -

their estates; (e) the ability to obtain a higher or better offer for Assets when sold individually or in combination with one or more of the Debtors' other Assets; (f) existing funding available or proposed to be provided by the Qualifying Bidder during the period necessary to close the Sale or other transaction; (g) the net benefit to the Debtors' estates, taking into account any Stalking Horse Bidder's rights to any break-up fee, expense reimbursement, or similar bid protection; (h) the impact on employees, Counterparties (including claims that may be asserted related to rejection and objections to adequate assurance), and other creditors; and (i) any other factors the Debtors may reasonably deem relevant.

The Auction shall be governed by the following procedures:

i. the Auction shall be held on **March 18, 2025, at 9:00 a.m. (_prevailing Eastern Time_)** (the "**Auction Date**") at the offices of Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801;

ii. only a Stalking Horse Bidder and the other Qualifying Bidders with Qualifying Bids (together, the "**Auction Bidders**") shall be entitled to make any subsequent bids at the Auction;

iii. the Auction Bidders shall appear in person at the Auction, or through a duly authorized representative. In the event that a Qualifying Bidder becomes a Successful Bidder or Back-up Bidder, then whomever is attending the Auction on behalf of a Qualifying Bidder must have the authority, immediately after the conclusion of the Auction, to complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which a Successful Bid or Back-up Bid was made;

iv. only the Debtors, the Auction Bidders, and the Consultation Parties, together with the professional advisors to each of the foregoing parties, may attend the Auction, provided that parties who intend to attend the Auction must provide counsel for the Debtors at least one (1) business day's written notice of their intent to attend the Auction so that the Debtors can make appropriate arrangements;

v. the Debtors and their professional advisors shall direct and preside over the Auction, which shall be transcribed;

vi. the Auction Bidders shall confirm that they have not engaged in any collusion with respect to the Bidding Procedures, the Auction, or the Sale;

vii. bidding on the Assets shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids in increments of at least the greater of $100,000.00 or one percent (1%) of the Baseline Bid, provided that: (i) each such successive bid must be a Qualifying

Bid; (ii) if the then-highest or otherwise best bid was made by any Stalking Horse Bidder, such bid shall be deemed to include the sum of the amount of any break-up fee, expense reimbursement, or other bid protections available to such Stalking Horse Bidder; (iii) any bid made by any Stalking Horse Bidder, including in each and every round of bidding, shall be deemed to include the sum of the amount of any break-up fee, expense reimbursement, or other bid protection available to such Stalking Horse Bidder in addition to the cash and other consideration provided for in its bid; and (iv) the Debtors shall retain the right to modify the bid increment requirements at the Auction;

viii.    the Auction may include individual negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

ix.    all material terms of the bid that is deemed to be the highest or otherwise best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtors' announcement of the then-current highest or otherwise best bid;

x.    the Debtors and their professional advisors, in consultation with the Consultation Parties, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any applicable order of the Court entered in connection with these Chapter 11 Cases, including, without limitation, the Bidding Procedures Order, and (ii) disclosed to the Auction Bidders;

xi.    each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating to the Bidding Procedures, the Sale, the Auction, and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

xii.    the Auction Bidders shall have the right to make additional modifications to their Transaction Agreement or Stalking Horse Agreement, as applicable, in conjunction with each Qualifying Bid

submitted in each round of bidding during the Auction, provided that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtors' discretion, in consultation with the Consultation Parties, be less favorable to the Debtors and their estates than the terms of any Stalking Horse Agreement for the Assets that are the subject of the bids, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Successful Bid or the Back-Up Bid, which shall remain binding as provided for in the Bidding Procedures;

xiii.    the Debtors shall have the right to request any additional financial information that will allow the Debtors to make a reasonable determination, in consultation with the Consultation Parties, as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by the Transaction Agreement or any Stalking Horse Agreement, as applicable, as may be amended during the Auction, and any further information that the Debtors may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

xiv.    upon the conclusion of the Auction, the Debtors shall determine, in consultation with the Consultation Parties, and subject to Court approval, the offer for the Assets that is the highest or otherwise best from among the Qualifying Bids submitted at the Auction (the "**Successful Bid**"). The bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities as set forth in the Transaction Agreement or any Stalking Horse Agreement. The Debtors may, in consultation with the Consultation Parties, designate a Back-Up Bid (and the corresponding Back-Up Bidder) for the Assets in the event that a Successful Bidder does not close a Sale; and

xv.    immediately after the conclusion of the Auction and without undue delay, each Successful Bidder and Back-Up Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid or Back-Up Bid was made.

**THE SUCCESSFUL BID AND ANY BACK-UP BID SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL THE TIME PERIOD SPECIFIED IN SECTION 6(F) OF THE BIDDING PROCEDURES.  EACH QUALIFYING BID THAT IS NOT THE SUCCESSFUL BID OR THE BACK-UP BID SHALL BE**

- 17 -

**IRREVOCABLE UNTIL THE CONCLUSION OF THE SALE HEARING, AT WHICH POINT THEY SHALL BE DEEMED WITHDRAWN AND TERMINATED.**

(e)     **Sale Hearing**:  The Successful Bid (which, if no Auction is held, may be the Stalking Horse Agreement) and any Back-Up Bid will be subject to approval by the Court.  The Sale Hearing to approve the Successful Bid and any Back-Up Bid shall take place on or before **March 20, 2025, at 10:00 a.m. (*prevailing* Eastern Time)**.  The Sale Hearing may be adjourned by the Debtors from time-to-time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice on the docket of the Debtors' Chapter 11 Cases.

(f)     **Backup Bidder**:  Notwithstanding any of the foregoing, in the event that a Successful Bidder fails to close within two (2) days after the Court enters an order approving the Successful Bid by (or such date as may be extended by the Debtors in consultation with the Consultation Parties), (i) the Back-Up Bid for that Sale will be deemed to be the Successful Bid, (ii) the Back-Up Bid will be deemed to be the Successful Bidder, and (iii) the Debtors will be authorized, but not directed, to immediately close that Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties.

(g)     **Return of Deposits**:  All Deposits shall be returned to each bidder not selected by the Debtors as a Successful Bidder or Back-Up Bidder for any Sale no later than three (3) business days following the conclusion of the Sale Hearing. The deposit of a Back-Up Bidder shall be returned within three (3) business days of the closing of the Sale to the Successful Bidder; the deposit of the Successful Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale.  If the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then the Debtors and their estates shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as liquidated damages resulting to the Debtors and their estates for such breach or failure to perform.

(h)     **Consultation Parties.**  The term "Consultation Parties" as used in the Bidding Procedures shall mean the Committee, if any, and the DIP Lender, unless such party is a potential bidder for some or all of the Assets.  For the avoidance of doubt, any consultation rights provided to the Consultation Parties by the Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

In the event that any Consultation Party, any member of an official committee or an affiliate of any of the foregoing participates as a potential purchaser in the sales process, any obligation of the Debtors to consult with the bidding party established

under the Bidding Procedures shall be waived, discharged, and released without further action, until such party advises the Debtors that they are irrevocably withdrawing as a potential purchaser in the sale process at which time such party's consultation rights will be reinstated; provided that the bidding party will have the same rights as any other Qualifying Bidder set forth above.

If a member of an official committee submits a Qualifying Bid, such committee will continue to have consultation rights as set forth in the Bidding Procedures; provided that the committee shall exclude such member from any discussions or deliberations regarding the sale of the Assets in question and shall not provide any information regarding the sale of the Assets to such member.

(i)     **Reservation of Rights**. Notwithstanding any of the foregoing, the Debtors and their estates reserve the right to, after consultation with the Consultation Parties, modify the Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth therein, allow for bidding on only a portion of the Assets and not all of them, modify bidding increments, waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn or cancel the Sale Hearing; provided, however, that the corresponding DIP milestones shall only be extended with the consent of the DIP Lender. Additionally, the Debtors, in consultation with the Consultation Parties, has the right to terminate the sale and auction process with respect to any or all of the Assets at any time.

(j)     **Buyer's Brokers/Indemnity.** Each Potential Bidder or Qualifying Bidder warrants and represents that it is a principal acting on its own behalf, and not as a broker, finder, or agent acting on another's behalf. Each Potential Bidder or Qualifying Bidder understands that the Debtors and Hilco and their respective representatives have not agreed to pay any brokerage commissions, finder's fee, or other compensation in connection with a Potential Bidder's or Qualifying Bidder's possible purchase. In addition, each Potential Bidder or Qualifying Bidder hereby agrees to indemnify, defend, and hold the Debtors, Hilco, and their respective representatives harmless from and against any and all claims, damages, losses and liabilities, costs, and expenses (including reasonable attorneys' fees and disbursements) arising out of any such claims made by third-party brokers on account of or related to such Potential Bidder or Qualifying Bidder.

### NOTICE PROCEDURES FOR THE SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING

15.     The Debtors also request approval of the sale notice (the "**Sale Notice**"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**. Within one (1) business day of the entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice

- 19 -

by first class mail on: (1) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Jane M. Leamy, [Jane.M.Leamy@usdoj.gov]); (2) counsel to the Committee, if any; (3) counsel to the DIP Lender, DLA Piper LLP (US), 1201 North Market Street, Suite 2100, Wilmington, DE 19801 (Attn: Stuart M. Brown [stuart.brown@us.dlapiper.com]), 1251 Avenue of the Americas, 27th Floor, New York, NY 10020 (Attn: Rachel Ehrlich Albanese [rachel.albanese@us.dlapiper.com]), and 444 West Lake Street, Suite 900, Chicago, IL 60606 (Attn: Oksana Koltko Rosaluk [oksana.koltkorosaluk@us.dlapiper.com]); (4) all parties known by the Debtors to assert a lien on any of the Assets; (5) all persons known by the Debtors to have asserted an interest in any of the Assets; (6) all non-Debtor parties to any of the Assumed Contracts; (7) all persons known by the Debtors to have expressed an interest in acquiring all or any portion of the Assets or making an equity or other investment in the Debtors within the twelve (12) months prior to the Petition Date; (8) the Office of the United States Attorney for the District of Delaware; (9) the Office of the Attorney General in each state in which the Debtors operate; (10) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (11) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (12) the United States Attorney General/Antitrust Division of Department of Justice; (13) the United States Environmental Protection Agency and similar state agencies for each state in which the Assets are located; and (14) all other parties that had filed a notice of appearance and demand for service of papers in this Chapter 11 Cases as of the date of service.

- 20 -

16.    The Debtors will also post the Sale Notice and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent, Stretto, at https://case.stretto.com/iM3NY.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

17.    To facilitate the Sale, the Debtors seek authority to potentially assume and assign to any acquirer in a Sale the Assumed Contracts in accordance with the Assumption and Assignment Procedures.  The Assumption and Assignment Procedures are detailed in the Bidding Procedures Order, and they include the following:

- The identification of contracts that could potentially be assumed or assumed and assigned and the proposed Cure Amount.

- Service of an assumption notice, substantially in the form attached hereto as **Exhibit 3**.

- The provision of fourteen (14) days for counterparties to the Assumed Contracts (each a "**Counterparty**") to object to the Debtors' ability to assume and/or assign any contract and the proposed Cure Amount, excluding adequate assurance of future performance of the applicable assignee.

- The requirement that a Counterparty make a request to receive Adequate Assurance Information.

- The requirement of notice promptly after the Auction to the proposed assignee with the ability to object to adequate assurance of future performance of the assuming Debtors or their proposed assignee, as applicable, at the Sale Hearing.

- The condition that failure to timely object to the proposed assumption, assignment (if applicable), and Cure Amount, will result in the Counterparty being deemed to consent to the proposed assumption or assumption and assignment and Cure Amount.

## STALKING HORSE PROCEDURES

18.    To the extent the Debtors, in consultation with the applicable Consultation Parties, designate a Stalking Horse Purchaser (the **"Designated Stalking Horse Purchaser"**), the Debtors shall file on the docket a notice (a) identifying the Designated Stalking Horse Purchaser; (b) identifying the Assets that are subject to such Designated Stalking Horse Purchaser's Stalking

- 21 -

Horse Agreement; (c) attaching a copy of such Stalking Horse Agreement; and (d) describing the key terms of the Stalking Horse Agreement, including any proposed break-up fee, expense reimbursement, or similar bid protection (the **"Proposed Bid Protections"**) to be provided to such Designated Stalking Horse Purchaser, if any (the **"Stalking Horse Notice"**).

19.    All parties in interest (including the Consultation Parties) shall have five (5) business days to object to the Stalking Horse Notice (the **"Stalking Horse Objection Period"**). If no objections are filed prior to the expiration of the Stalking Horse Objection Period, the Debtors shall be authorized to submit an order under certification of counsel to the Court approving the Designated Stalking Horse Purchaser and the Proposed Bid Protections.  If an objection is filed during the Stalking Horse Objection Period, or if the Court otherwise deems necessary, the Debtors shall notice a hearing for approval of the Designated Stalking Horse Purchaser and Proposed Bid Protections (the **"Stalking Horse Hearing"**), which shall be scheduled at the Court's earliest convenience prior to the Auction (collectively, the **"Stalking Horse Objection Process"**).  Any Party, other than the objecting party, shall have until 12:00 p.m. ET on the business day prior to the Stalking Horse Hearing to file and serve a reply to any objection filed in connection with the Stalking Horse Notice.

## **RELIEF REQUESTED**

20.    By this Motion, the Debtors seek entry of: (A) the Bidding Procedures Order, (1) scheduling a date for the Sale Hearing, (2) authorizing and approving the Bidding Procedures and the Assumption and Assignment Procedures, and the form and manner of notice thereof, and (3) granting related relief; and (B) the Sale Order, (1) authorizing and approving the Debtor's entry into the Transaction Agreement with Successful Bidder or Back-Up Bidder, as applicable, (2) authorizing and approving the Sale, free and clear of all Encumbrances, (3) authorizing and

approving the assumption and assignment of the Assumed Contacts in connection with such Sale, and (4) granting related relief.

21.    The Bidding Procedures Order, if approved, will establish the following timeline, which the Debtors believe is appropriate to maximize the value of the Assets:

| MILESTONES | PROPOSED DATES |
|---|---|
| Bidding Procedures Hearing | February 24, 2025 |
| Deadline to Serve Sale Notice | February 26, 2025 |
| Deadline to Serve Assumption Notice | February 26, 2025 |
| Stalking Horse Deadline | February 28, 2025 |
| Deadline to Object to Assumption Notice<br>(Other Than Adequate Assurance) | March 12, 2025 |
| Deadline to Object to Sale<br>(Other Than with Respect to Assumption and Assignment) | March 12, 2025 |
| Bid Deadline | March 14, 2025 |
| Auction | March 18, 2025 |
| Deadline to Object to Adequate Assurance | March 19, 2025 |
| Deadline to Object to Conduct of Auction, Designation of Successful Bidders, and Adequate Assurance | March 19, 2025 |
| Sale Hearing | March 20, 2025 |

22.    The Debtors respectfully submit that the timeline set forth in the Bidding Procedures is reasonable and necessary under the circumstances of this case.  It is expedited but still permits parties in interest sufficient time to formulate bids.  Further, the proposed timeline for the Sale and Marketing Process has been negotiated with the DIP Lender.

4922-5319-6564, v. 3

23.     Finally, the Debtors will also promptly make the disclosures required under Bankruptcy Rules 6004 and Local Rule 6004-1(b) with respect to any definitive Transaction Agreement the Debtors enter into, including any Stalking Horse Agreement.

**BASIS FOR RELIEF**

I.    **SUFFICIENT BUSINESS JUSTIFICATION EXISTS FOR CONSUMMATION OF THE SALE UNDER BANKRUPTCY CODE SECTIONS 105(a) AND 363(b).**

24.     Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re Lionel Corp.*); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (same).

25.     The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests

- 24 -

of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

26.     The Debtors submit that their decision to market and sell their Assets, through a section 363 sale, represents a reasonable exercise of the Debtors' business judgment and, accordingly, the Sale should be approved under sections 105(a) and 363(b) of the Bankruptcy Code.  As discussed in the First Day Declaration, as a result of impending liquidity issues and inability to raise new funds to continue operations in the ordinary course of business, the Debtors were unable to continue as a going concern with their existing capital structure.  Accordingly, the Debtors filed the Chapter 11 Cases to facilitate a restructuring or going concern sale of the Assets.

27.     Through this Motion, the Debtors seek to obtain the highest or otherwise best value for their Assets through a going concern sale.  The Debtors, however, are committed to considering all rational and viable proposals in order to maximize the value of the Assets.  The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest and best value available for the Assets by allowing the market to set the purchase price of the Assets (or test any purchase price that may be agreed to under a Stalking Horse Agreement).  Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by any Successful Bidder and establish that the Debtors and the Successful Bidder have proceeded in good faith.

28.     Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances.  Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections.  The Debtors believe that the proposed

- 25 -

notice procedures fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Sale, Bidding Procedures, Auction, and Sale Hearing to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

29.     The Sale conducted in accordance with the Bidding Procedures will generate significant value for the Debtors' estates and represents the best path forward for maximizing recoveries to the estate, the Debtors' creditors, and all parties in interest.  The Debtors submit that ample business justification exists for the consummation of the Sale and, therefore, request that this Court approve the Sale.

## II.     THE SALE OF THE ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES IS AUTHORIZED UNDER BANKRUPTCY CODE SECTION 363(f).

30.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

31.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests. *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a

court may approve a sale free and clear if any one subsection is met); *see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same). Furthermore, a debtor possesses broad authority to sell assets free and clear of liens. *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

32.    In order to attract the best offers, it is appropriate for the Debtors to sell their Assets free and clear of any and all Encumbrances (except as otherwise expressly set forth in a Sale Order and a Stalking Horse Agreement or Transaction Agreement with a Successful Bidder, as applicable) in accordance with section 363(f) of the Bankruptcy Code, because one or more of the tests of section 363(f) are, or will be, satisfied with respect to any Sale.  In particular, the Debtors believe that section 363(f)(2) of the Bankruptcy Code will be met, because HSBC, the DIP Lender (which is also the Debtors' prepetition lender (the **"Pre-Petition Lender"**)), is secured by, among other things, the Assets, and the proceeds of the Sale of the Assets (subject to any permitted liens) will be paid to the DIP Lender and Pre Petition Lender at closing of the Sale pursuant to their various loan and security documents.

33.    The Debtors further anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f).  The Debtors will serve the Sale Notice on all parties known to assert a lien, claim, or encumbrance against the Assets, so lienholders will receive notice and will be given sufficient opportunity to object to the relief requested.  Lienholders that are on notice of, and do not object to, a Sale should be deemed to have consented to that Sale. *See, e.g., FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute

- 27 -

a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same).  In the event of an objection from a secured creditor to the Debtors' requested section 363(f) finding, the Debtors reserve the right to demonstrate that the other provisions of section 363(f) have been satisfied.

34.     Moreover, the Debtors' secured lender, HSBC, as Pre-Petition Lender, Agent and DIP Lender, has expressly consented to the Sale, as set forth herein.

**III.    THE SALE SHOULD BE SUBJECT TO THE PROTECTIONS OF SECTION 363(m).**

35.     Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. *See* 11 U.S.C. § 363(m).

36.     In approving a Sale free and clear of Encumbrances, the Debtors request that the Court find and hold that all purchasers of Assets purchased in accordance with the Bidding Procedures are entitled to the protections afforded by section 363(m) of the Bankruptcy Code. Such relief is appropriate in that the selection of the Successful Bidder will be the result of a competitive bidding process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction.  *See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where notice is provided to lienholders).

IV.    **THE COURT SHOULD APPROVE THE BIDDING PROCEDURES.**

37.    The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same). Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

38.    The Debtors have designed the Bidding Procedures to promote a competitive and fair bidding process and, thus, to maximize value for the Debtors' estates and creditors. The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or otherwise best possible consideration for the Assets. Furthermore, the Bidding Procedures provide an appropriate framework for the Debtors to review, analyze, and compare any bids received in order to determine which bids are in the best interests of the Debtors' estates and their creditors. The Debtors submit that this timetable is fair and reasonable in light of the Debtors' current circumstances and the negotiated terms of the Debtors' DIP financing arrangement.

39.    The Debtors further believe that that the Bidding Procedures are fair and transparent and will result in the highest and best bids for the Assets. Therefore, the Debtors request that the Court approve the Bidding Procedures, including the dates established thereby for the Auction and the Sale Hearing.

## V.  THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS IN CONNECTION WITH THE SALE SATISFIES BANKRUPTCY CODE SECTION 365.

40.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  *See* 11 U.S.C. § 365(a).  Courts have held that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'"  *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (*quoting* 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

41.    As set forth above, the Sale should provide significant benefits to the Debtors' estates and maximize the value of the Assets.  To that end, permitting the Debtors to assume and assign the Assumed Contracts should provide the Debtors with flexibility to enter into a transaction that will obtain the greatest benefits from any Sale.  In addition, under section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." *See* 11 U.S.C. § 365(k).  Thus, following an assignment of any Assumed Contract, the Debtors will be relieved from any liability for any subsequent breach associated therewith.

42.    Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured. *See* 11 U.S.C. § 365(b)(1).  The Debtors propose to file with this Court and serve on each Counterparty to an Assumed Contract an Assumption Notice that indicates the proposed Cure Amount for each such contract.  As such, each Counterparty will have the opportunity to object to the proposed assumption and assignment

to the Successful Bidder and to the proposed Cure Amount, if applicable.  Moreover, the payment or reserve of the applicable Cure Amount will be a condition to the Debtors' assumption and assignment of any Assumed Contract.

43.     Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." *See* 11 U.S.C. § 365(f)(2).  The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption. *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

44.     Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where assignee of lease has financial resources and expresses willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, chief determinant of adequate assurance is whether rent will be paid).

45.     Here, the Successful Bidder will have provided adequate assurance of future performance with respect to any Assumed Contract.  In order for its bid to be deemed a Qualifying

Bid, each Qualifying Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code (the "**Adequate Assurance Information**"), including: (a) the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such Qualifying Bidder; (b) a contact person for the proposed assignee that the applicable Counterparty may directly contact in connection with the adequate assurance of future performance; and (c) the actual assignee's identity.  Furthermore, given that the Debtors and/or Successful Bidder will have the opportunity to submit evidence that they have satisfied all requirements for the assumption and assignment of the Assumed Contracts at the Sale Hearing, the Court and other interested parties will have the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance.[5]

46.     Therefore, the Debtors respectfully request that the Court (a) approve the proposed assumption and assignment of the Assumed Contracts, and (b) find that all anti-assignment provisions of such contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[6]

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h) AND 6006(d)

47.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the

---

[5]  Within twelve hours of receiving Adequate Insurance Information from a Qualifying Bidder, the Debtors shall provide the Adequate Assurance Information to any Counterparty that (i) submits a written request to receive the Adequate Assurance Information by email that specifically identifies the Assets for which such Counterparty would like to receive Adequate Assurance Information in accordance with the terms of the Bidding Procedures Order, and (ii) agrees to be bound by the confidentiality provisions set forth in the Bidding Procedures Order.

[6]  Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease..."  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  *Id.* § 365(f)(3).

order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Furthermore, Bankruptcy

Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or

unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order,

unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

48.    Any delay in the Debtors' ability to consummate the Sale(s) would be detrimental

to the Debtors, their creditors, and estates, and would impair the Debtors' ability to take advantage

of the substantial benefits that will be achieved by an expeditious closing of the Sale.

49.    For this reason and those set forth above, the Debtors submit that ample cause exists

to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h) and 6006(d),

to the extent applicable.

## <u>NOTICE</u>

50.    Notice of this Motion shall be provided to: (a) the Office of the United States

Trustee for the District of Delaware; (b) the Debtors' seventeen (17) largest unsecured creditors as

identified on the voluntary petition; (c) the United States Attorney's Office for the District of

Delaware; (d) counsel to the DIP Lender (e) all applicable federal, state, and local taxing and

regulatory authorities having jurisdiction over the Assets; (f) all parties known to the Debtors who

hold any liens or security interest in the Debtors' Assets who have filed UCC-1 financing

statements against the Debtors, or who, to the Debtors' knowledge, have asserted any liens on the

Debtors' Assets; and (g) all parties who have filed a notice of appearance and request for service

of papers pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein,

the Debtors submit that no other or further notice is necessary.

4922-5319-6564, v. 3

**NO PRIOR REQUEST**

51.     The Debtors have not previously sought the relief requested herein from this or any

other Court.

**CONCLUSION**

**WHEREFORE**, the Debtors respectfully request entry of the Order, substantially in the form

attached hereto as **Exhibit A**, (a) granting the relief requested herein and (b) granting such other

relief as the Court deems appropriate under the circumstances.

Dated: February 3, 2025          **CHIPMAN BROWN CICERO & COLE, LLP**
       Wilmington, Delaware

           */s/ William E. Chipman, Jr.*
           William E. Chipman, Jr. (No. 3818)
           Mark D. Olivere (No. 4291)
           Aaron J. Bach (No. 7364)
           Alison R. Maser (No. 7430)
           Hercules Plaza
           1313 North Market Street, Suite 5400
           Wilmington, Delaware 19801
           Telephone:     (302) 295-0191
           Email:          chipman@chipmanbrown.com
                       olivere@chipmanbrown.com
                       bach@chipmanbrown.com
                       maser@chipmanbrown.com

           *Proposed Counsel for Debtors and*
           *Debtors in Possession*