**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>iM3NY LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-10131 (BLS)<br><br>(Jointly Administered) |

**OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS TO THE DEBTORS' (I) DIP FINANCING**
**MOTION AND (II) BIDDING PROCEDURES MOTION**

The official committee of unsecured creditors (the "Committee") appointed in the chapter 11 bankruptcy cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors-in-possession (the "Debtors"), by and through its undersigned counsel, hereby submits this omnibus objection (the "Objection") to the (i) *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lender; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Dkt. No. 11] (the "DIP Motion") and (ii) *Debtors' Motion for (i) an Order Establishing Bidding Procedures and Granting Related Relief, and (ii) an Order Approving the Sale of the Assets* [Dkt. No. 46] (the "Bidding Procedures Motion").[2] In support of this Objection, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1.    The DIP Motion seeks approval of $2.5 million in postpetition financing (the "DIP Financing") to be provided by HSBC Bank PLC (in such capacity, the "DIP Lender"), which

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of their respective tax identification numbers, are as follows: (i) iM3NY LLC (N/A); and (ii) Imperium3 New York, Inc. (4574).  The address of the Debtors' corporate headquarters is 1093 Clark Street, Endicott, New York 13760.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Motion or Bidding Procedures Motion, as applicable.

recently purchased the Debtors' prepetition debt, presumably for pennies on the dollar.  The relief requested in the DIP Motion is not fair and reasonable and is very obviously crafted to benefit one party and one party only—the DIP Lender—rendering such relief inappropriate.  The budget provided by the Debtors in connection with the DIP Motion (the "DIP Budget") shows that the Debtors' estates, in the best case, become administratively insolvent somewhere around March 14, 2025, the bid deadline (the "Bid Deadline") that would be established by the Bidding Procedures Motion.  Shortly after the Bid Deadline, the DIP Budget shows a $343,000 hole—$343,000 in administrative expenses that the Debtors will not have the wherewithal to pay.  These expenses include employee wages and benefits ($104,000 coming due that week) among other critical expenditures that will be in grave jeopardy of being incurred but left unsatisfied.  The DIP Lender cannot be permitted to short fund these Chapter 11 Cases so that it can gauge interest in its collateral (which inures only to the DIP Lender's benefit), and then unilaterally decide whether it will finance debts that the Debtors incurred post-petition.  This is an unequivocal abuse of the chapter 11 process, far outside of what section 363 is intended to accomplish, and the DIP Motion must be denied.

2.        The Debtors' estates, particularly unsecured creditors, would fare better if the Chapter 11 Cases were immediately converted to chapter 7 rather than allowed to proceed as contemplated by the DIP Motion.[3]  If the proposed final order granting the DIP Motion (the "Final DIP Order") is entered, the DIP Lender is provided with a number of benefits that it would not be entitled to in a chapter 7, which would severely prejudice the ability of other creditors to achieve any recovery.  First, the DIP Motion would grant the DIP Lender liens on and claims to previously

---

[3] Conversion is often raised by unsecured creditors' committees at this stage, at least in recent years, as lenders have become more aggressive.  The facts in this case, however, are so egregious that the Committee is fully prepared to proceed with conversion.  Accordingly, the Committee anticipates filing a motion to convert prior to the hearing on the DIP Motion.

unencumbered assets, which include commercial tort claims, insurance proceeds, tax refunds, and, most importantly, all claims and causes of action arising under chapter 5 of the Bankruptcy Code (the "Avoidance Actions").  The Avoidance Actions may very well be the only avenue to recovery for unsecured creditors.  Pursuant to the Final DIP Order, however, the Avoidance Actions would secure not only $2.5 million in DIP Financing, but $17.5 million in debt for the benefit of the DIP Lender by virtue of the 6:1 roll-up.  Unsecured creditors could very well recover nothing and then be the subject of an action by the DIP Lender to recover funds that it never actually advanced.  The Final DIP Order would also provide releases and exculpations, not only for the DIP Lender (in its capacity as DIP Lender), but broad releases and exculpations for the DIP Lender's conduct prior to the bankruptcy in connection with the prepetition debt.  This conduct must be the subject of investigation.

3.    The DIP Lender is also the sole beneficiary of any economic upside that may come from the DIP Financing.  If the sale process were to yield results, only the DIP Lender would benefit to the extent of the proceeds,[4] unless the proceeds exceed the $125 million in prepetition debt,[5] which all parties would concede is virtually impossible.  The Debtors' estates and unsecured creditors receive nothing.  At the very least, in a chapter 7, a chapter 7 trustee would require the lender to carve out a percentage of proceeds for the benefit of other creditors before it endeavored to sell assets in which only the lender has an interest.  No such arrangement is proposed here.  The sole tangible benefit afforded unsecured creditors is a proposed Committee budget of $110,000 in the aggregate, which represents less than 10% of the budget proposed for the Debtors' professionals.  This only acts to further disenfranchise any creditor other than the DIP Lender.

---

[4]  The DIP Lender would also be granted fees, interest and other economic benefits.

[5]  The Committee does not concede the validity or amount of the prepetition debt and reserves all rights with respect thereto.

4.      The Debtors may assert that the DIP Financing funds a <u>portion</u> of a sale process, and that process, if successful, <u>may see</u> some of the Debtors' employees retained and some creditors' claims assumed.  That is, unfortunately, pure speculation.  As noted, the DIP Financing may be insufficient to get the Debtors to the Bid Deadline.  Further, the sale process is extraordinarily truncated and not designed to facilitate robust bidding and value maximization.  The sale process is constructed simply to permit the DIP Lender to "kick the tires" and see what is out there.  There is no stalking horse promising retention of employees, and no evidence that bids will ultimately materialize.  Thus, the indirect prospective "benefits" of any sale process must be discounted.

5.      The case construct created by the DIP Motion and the Bidding Procedures Motion is painfully transparent.  If approved, the Final DIP Order would permit the DIP Lender to ascertain whether it can sell its collateral (that it likely obtained for cents on the dollar) for a quick profit.[6]  If that is not the case, the DIP Lender can decline to lend further, leaving the Debtors' estates administratively insolvent and fated to convert or dismiss.  The DIP Lender will have protected any downside in that scenario by virtue of its newfound collateral, namely the Avoidance Actions, that it can prosecute to recover the $2.5 million it lent and the $15 million it did not.

6.      Courts have stated that if a lender seeks to utilize chapter 11 to sell its collateral, that lender must "pay the freight" of the chapter 11 process.  That concept has eroded in recent years as lenders have become more aggressive, and many cases are funded to the conclusion of a sale process rather than through a wind-down and confirmation.  Those cases arguably run afoul of the true intent of chapter 11.  The DIP Motion and the Bidding Procedures Motion, however,

---

[6] The other possibility is that the DIP Lender intends to credit bid its debt for its benefit or the benefit of the Debtors' equity owner and licensor, C4V, to which, on information and belief, it is also lender.

ask the Court to go even further, partially funding a sale process to a date short of the Bid Deadline, leaving the Debtors' estates administratively insolvent, and concurrently shifting any prospective value to the DIP Lender.  This would set a dangerous precedent.  The relief requested in the DIP Motion is not fair and reasonable, and is not in the best interests of the estate or within the Debtors' business judgment.  As currently constructed, the DIP Motion must be denied, and the Bidding Procedures must be revised to provide for an appropriate process.[7]

## **BACKGROUND**

**I.     GENERAL BACKGROUND**

7.      On January 27, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      On February 12, 2025, the Office of the United States Trustee appointed the Committee in these Chapter 11 Cases pursuant to 11 U.S.C. § 1102.  *See* Dkt. No. 59.[8]

9.      On February 15, 2024, the Committee selected Seward & Kissel LLP as lead counsel, and thereafter, Potter Anderson & Corroon LLP as Delaware co-counsel, and Genesis Credit Partners as financial advisor.

10.     Since its appointment, the Committee has been considering the motions at issue, engaging in dialogue with the case constituents, and otherwise seeking to get up to speed with respect to the Chapter 11 Cases.  Discussions with respect to any resolution of case issues are still

---

[7] As fully set forth below, certain terms incorporated into the Bidding Procedures are also objectionable.

[8] The Committee consists of three members: Ramboll Americas Integrated Solutions, Inc., mPLUS, and Phoenix Endicott Industrial Investors LLC.

in their infancy and the Committee is required to file this Objection to protect the interests of unsecured creditors.

## II.   THE DEBTORS' CAPITAL STRUCTURE

11.     As of the Petition Date, the Debtors state that they have approximately $135.8 million in outstanding secured and unsecured debt obligations.  The Debtors' largest purported prepetition secured debt obligations are amounts advanced under that certain Senior Secured Term Loan Credit Agreement, dated April 14, 2022 (the "Prepetition Facility").  On October 24, 2024, the former lender, R-SPV II, L.L.C., assigned all its interests in the Prepetition Facility to HSBC Bank PLC (in such capacity, the "Prepetition Lender"), with ACP Post Oak Credit I LLC as administrative agent (in such capacity, the "Administrative Agent"), pursuant to the terms of a certain Loan Purchase, Assignment, and Agreement.

12.     The Prepetition Lender then made available to the Debtors certain loans in an aggregate principal amount of (i) $600,000 on October 25, 2024; (ii) $320,000 on November 8, 2024; (iii) $320,000 on November 22, 2024; (iv) $320,000 on December 12, 2024; (v) $200,000 on December 17, 2024; (vi) $750,000 on December 24, 2024; and (vii) $320,000 on January 8, 2025 (collectively, the "Bridge Funding").

13.     On December 18, 2024, the Debtors entered into a forbearance agreement (the "Forbearance Agreement") pursuant to which the Administrative Agent and Prepetition Lender agreed to forbear from enforcing remedies with respect to certain specified events of default. Under the Forbearance Agreement, the Debtors purportedly granted releases in favor of the Prepetition Lender and the Administrative Agent.

14.     The Debtors assert that they are indebted to the Prepetition Lender in an aggregate principal amount of approximately $125.8 million, including the Bridge Funding and accrued and

unpaid interest, fees, and other claims (the "Prepetition Secured Obligations").  The Prepetition Secured Obligations are allegedly secured by first-priority liens and security interests in substantially all of the Debtors' assets.  Default interest on the Prepetition Secured Obligations was accruing at approximately 12.62% as of the Petition Date.

15.     The Debtors further note that their unsecured debt obligations consist of approximately $10 million in unsecured trade debt—although the Committee has reason to believe the actual amount of unsecured debt is several million dollars greater.

**III.    THE DIP MOTION**

16.     On the Petition Date, the Debtors filed the DIP Motion.  On January 29, 2025, the Bankruptcy Court approved the DIP Motion, on an interim basis, pursuant to the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Lender; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Dkt. No. 31] ("Interim DIP Order"), attaching to it, as Exhibit 2, the DIP Budget.

17.     Through the DIP Motion, the Debtors seek final approval of, among other things, the DIP Financing consisting of an aggregate principal amount not to exceed $2.5 million to be provided by the DIP Lender consisting of (i) $1.5 million in new money funded to the Debtors under the Interim DIP Order; (ii) $1 million in additional new money to be funded under the Final DIP Order; and (iii) the roll-up of $15 million in Prepetition Secured Obligations (the "Roll-Up Amount") into DIP Obligations upon entry of the Interim Order.  Some of the key terms of the proposed DIP Financing include: (i) liens on all of the Debtors' assets, including previously unencumbered assets like Avoidance Actions and commercial tort claims; (ii) interest at a rate of SOFR + 6%, an additional 2.5% exit fee, and the DIP Lender's costs and expenses, including

professionals' fees; (iii) the right to credit bid the Roll-Up Amount; (iv) adequate protection to the extent of any diminution in value to be provided to the Prepetition Lender in the form of replacement liens on and superpriority claims payable from all of the Debtors' assets, including the Avoidance Actions and commercial tort claims; and (v) section 506(c), section 552(b), and marshaling waivers. Moreover, the DIP Budget provides for approximately $1.28 million in fees and expenses for the Debtors' professionals, while allocating only $110,000 for the Committee's professionals.

## IV.  THE BIDDING PROCEDURES MOTION

18. On February 3, 2025, the Debtors filed the Bidding Procedures Motion, which seeks authority to sell substantially all of the Debtors' assets in a going concern sale (the "Sale") pursuant to section 363 of the Bankruptcy Code. To facilitate a purportedly competitive sale process, the Bidding Procedures Motion seeks approval of, among other things, procedures for the submission and consideration of bids and the scheduling of an auction, to the extent necessary (the "Bidding Procedures").

19. According to the Debtors, they did not provide marketing materials to potentially interested parties until January 23, 2025. Bidding Pro. Mot. at 2. On January 29, 2025, the Debtors distributed a formal process letter to the eight (8) parties who had signed a non-disclosure agreement to inform them that the submission deadline for indications of interest was February 18, 2025—despite this date not being included in the Bidding Procedures—and that binding proposals were due no later than March 14, 2025. *Id.* at 3. The Debtors did not circulate a form asset purchase agreement ("APA") to those eight interested parties until February 17, 2025. Although the Bidding Procedures Motion leaves open the possibility of a stalking horse asset purchase

agreement, all signs currently suggest that such a scenario is unlikely.  All of this suggests a haphazard marketing process that requires additional time.

20.     The current timeline set for the marketing and sale process is exceedingly short, with the following dates proposed by the Debtors:

- Stalking Horse Bid Deadline: February 28, 2025;

- Bid Deadline: March 14, 2025;

- Auction: March 18, 2025;

- Sale Objection Deadline: March 12, 2025;

- Post-Auction Objection Deadline: March 19, 2025; and

- Sale Hearing: March 20, 2025.

## OBJECTION

### I.   THE DIP MOTION

21.     Debtor in possession financing should only be approved if it is fair and reasonable under the circumstances, comports with basic notions of fairness and equity, and will ultimately inure to the benefit of the debtor's estate.  *See In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990).  Courts routinely recognize that "[d]ebtors in possession generally enjoy little negotiating power with a proposed lender[.]"  *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (9th Cir. B.A.P. 1992).  As a result, courts are hesitant to approve financing terms that are considered harmful to an estate and its creditors.  *See, e.g.*, *Ames Dep't Stores*, 115 B.R. at 40 (noting that "the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy

process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").

22.     The burden of making such a showing is on the debtor.  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).  Thus, while certain favorable terms may be permitted as a reasonable exercise of a debtor's business judgment, bankruptcy courts have not approved financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the sole (or primary) benefit of the lender.  *See Ames Dep't Stores*, 115 B.R. at 38 (citing *In re Tenney Vill. Co.,* 104 B.R. 562, 568 (Bankr. D.N.H. 1989)) (holding that the terms of a postpetition financing facility must not "pervert the reorganizational process from one designed to accommodate all classes of creditors . . . to one specially crafted for the benefit" of one creditor); *see also Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) ("In Chapter 11 cases where no trustee is appointed, § 1107(a) provides that the debtor-in-possession, i.e., the debtor's management, enjoys the powers that would otherwise vest in the bankruptcy trustee.  Along with those powers, of course, comes the trustee's fiduciary duty to maximize the value of the bankruptcy estate."); *In re Penn Traffic Co.*, 524 F.3d 373, 382 (2d Cir. 2008) ("The interests of the creditors collectively and the bankrupt estate as a whole will not yield easily to the convenience or advantage of one creditor out of many.") (internal citations omitted); *In re R.H. Macy & Co.*, 170 B.R. 69, 74 (Bankr. S.D.N.Y. 1994) (a debtor in possession has "an affirmative, overarching duty to reorganize and maximize estate assets for the benefit of all creditors," not just a select few).

23.     Moreover, and importantly, a debtor's obligations to justify the terms of a given financing and to administer the estate for the benefit of all creditors are not abrogated simply because its financing options are limited.  *See* Hr'g. Tr. 206:12-16, *In re LandSource Cmtys. Dev.,*

*LLC*, Case No. 08-11111 (KJC) (Bankr. D. Del. July 14, 2008) [Dkt. No. 331] ("The standard here is not that there's only one option available to the Debtor, and therefore the Court has to approve it. In my view such an arrangement has to be fair and reasonable under the circumstances. And I don't think this proposed D-I-P financing is.").[9]

24.     The Debtors have not, and cannot, meet their burden to establish that the DIP Financing, as currently proposed, is in the best interests of their estates. At this stage, there appears to be no prospect of recovery for general unsecured creditors. Although the Committee has only recently become involved in these cases, the Committee believes that significant unencumbered assets may exist, including, but not limited to, Avoidance Actions, commercial tort claims, lender liability claims, insurance claims, and D&O claims, among others. The Final DIP Order, however, does not permit the Committee to preserve these assets. Instead, the Final DIP Order would transfer these assets to the DIP Lender and in turn leave the estates administratively insolvent. The Final DIP Order thus seeks to abrogate the rights and powers that the Bankruptcy Code confers creditors and the Committee, and unjustifiably benefits the DIP Lender at the expense of the Debtors' unsecured creditors. The DIP Motion should be denied. In the event that the Court is inclined to grant the DIP Motion on a final basis, the Final DIP Order should only be approved if significant changes are made.

**A.     The DIP Budget Leaves the Debtors Administratively Insolvent**

25.     As stated above, the proposed DIP Financing is a bridge to nowhere. The DIP Financing purports to provide funding to some date in March, on or around the Bid Deadline. Unless the Debtors cease business at that exact moment, the funding will certainly leave payroll and other operating expenses incurred and unpaid. It cannot be disputed that the DIP Financing

---

[9] All hearing transcripts cited herein can be provided to the Court or parties-in-interest upon request.

fails to provide funds to conclude the Sale process, let alone conduct an orderly wind-down and chapter 11 exit. The Committee understands, as evidenced by the currently filed DIP Budget, that there will be at least a $343,000 shortfall around the Bid Deadline, which deficit balloons to $2.2 million at the end of the DIP Budget period.[10]

26.     The Debtors therefore cannot satisfy their burden to establish that the DIP Financing is in the best interests of the estates. The DIP Financing leaves the estates administratively insolvent and is crafted to solely benefit the DIP Lender and should not be approved. *See, e.g.*, Hr'g. Tr. 36:6-10, *In re Casa Sys. Inc.*, Case No. 24-10695 (KBO) (Bankr. D. Del. May 3, 2024) [Dkt. No. 290] (refusing to grant certain waivers over committee's objection where sale process was not adequately funded); Hr'g. Tr. 87:14-21, *In re Nova Wildcat Shur-Line Holdings, Inc.*, No. 23-10114 (CTG) (Bankr. D. Del. Mar. 2, 2023) [Dkt. No. 212] ("if you're a secured creditor and want to invoke the bankruptcy process for the purpose of what will likely be maximizing the value of your collateral, you don't get to impose the costs of that on other people . . . you've got to pay the freight associated with [that] process . . . includ[ing] paying the expected administrative expenses [of the case] includ[ing] reasonable committee fees."). On its face, the DIP Financing funds not only a truncated Sale, but only part of that process while shifting any remaining value to the DIP Lender to the detriment of all other creditors. The Committee respectfully represents that the Court should not countenance such an egregious abuse of the bankruptcy process.

27.     Further, the budget for Committee professionals is deficient and hampers the ability of the Committee to properly discharge its fiduciary duties. The Committee professionals' current

---

[10]  The Committee is taking the DIP Budget at face value. Upon information and belief, the DIP Budget was sized to exclude amounts for certain routine repairs and maintenance so that the DIP Lender could extract value at minimal expense.

budget is only $110,000, in comparison to the Debtors' budget of approximately $1.28 million. In this District, courts typically deem a committee professionals' fee budget adequate when it is approximately 33-40% of the debtors' professionals' fee budget.[11] Here, the budget is merely 8.6% of the Debtors' budget. The Committee respectfully proposes that the Committee budget should be increased to align with District precedent (and such budget should not act as a cap on administrative fees and expenses).

28.      The Committee was only recently appointed and received access to limited diligence shortly before filing this Objection. Accordingly, the Committee and its professionals continue to diligence the DIP Budget and the Debtors' anticipated cash needs over the course of the Chapter 11 Cases. In any case, it was immediately clear that the DIP Budget was wholly inappropriate. The DIP Budget must be adjusted to fund a full sale process, protect the interests of the Debtors' estates, and ensure that the DIP Lender does not take undue advantage of the bankruptcy process without satisfying attendant obligations.

**B.      The Roll-Up Should be Reconsidered**

29.      The Court approved the roll-up on an interim basis at the first day hearing on January 29, 2025. The Court did not consider at that time, however, the Debtors' request that the

---

[11] *See, e.g.*, *In re Cal Dive Int'l, Inc.*, Case No. 15-10458 (CSS), 2015 Bankr. LEXIS 4355 (Bankr. D. Del. Dec. 28, 2015) (granting committee counsel's first interim fee application and noting that committee counsel fees were approximately 30% of Debtors' counsel); *In re Eastern Outfitters, LLC*, Case No. 17-10243 (LSS) (Bankr. D. Del. Mar. 31, 2017) [Dkt. No. 260] (approving final DIP Financing order where the budget reflected committee professional fees being approximately 35% of the Debtors' professional fees); *In re Pacific Sunwear of California, Inc.*, No. 16-10882 (LSS) (Bankr. D. Del. Apr. 7, 2016) (approving fees and expenses of Committee professionals totaling approximately 35% of those incurred by the Debtor's professionals); *In re The Wet Seal, LLC*, Case No. 17-10229 (CSS) (Bankr. D. Del. Feb. 2, 2017) [Dkt. No. 463] (cash collateral budget providing for committee fees and expenses of up to approximately 39% of those incurred by the Debtor's professionals for an eight-month period); *In re Channel Master Holdings, Inc.*, Case No. 13-13004, 2004 Bankr. LEXIS 576, *8-9 (Bankr. D. Del. Apr. 26, 2004) (refusing to enforce a $75,000 cap on committee's professional fees under a postpetition financing facility, finding such cap unreasonable in light of the much larger caps on the other professionals in the case); Hr'g. Tr. at 42-51, *In re Evergreen Solar, Inc.*, Case No. 11-12590 (MFW) (Bankr. D. Del. Sept. 6, 2011) [Dkt. No. 189] (declining to apply the debtor's proposed caps and instead, substituting a general pool for all professionals from which debtor and committee professionals could recover fees on a pro rata basis).

Roll-Up Amount be collateralized by previously unencumbered assets, which issue was deferred to this final hearing.

30.    Courts are generally reluctant to approve postpetition financing that converts prepetition debt into postpetition obligations, as it is viewed as a form of cross collateralization that circumvents the Bankruptcy Code's priority scheme. *See, e.g.*, *Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 569 n.4 (M.D. Pa. 2005) (noting that roll-up provisions "have the effect of improving the priority of a prepetition creditor"); *In re Tenney Vill. Co.*, 104 B.R. 562, 570 (Bankr. D.N.H. 1989) (holding that section 364 of the Bankruptcy Code does not authorize the granting of administrative expense priority for prepetition debt).[12]    A roll-up should not be approved if its sole purpose is elevating a prepetition lender's claim. *See In re Wildcat Met Mining, Inc.*, No. 1:22-bk-10080, 2024 Bankr. LEXIS 586, at *29-30 (Bankr. S.D. W. Va. Mar. 8, 2024) (finding that "proposed 'roll-up' was patently unapprovable[, as r]oll-ups are generally disfavored and this particular 'roll-up' would have unquestionably elevated [lender's] prepetition claim . . . to the detriment of other creditors"); *In re Ames Dep't Stores*, 115 B.R. at 39 (finding that proposed cross-collateralization warrants "examin[ation of] all the facts and circumstances to determine if the estate is being benefitted rather than principally the pre-petition creditor," whose loan may be elevated ahead of similar claims).

---

[12] *See also* Hr'g. Tr. 32:20-25, *In re Verasun*, Case No. 08-12606 (BLS) (Bankr. D. Del. Dec. 3, 2008) [Dkt. No. 316], where this Court noted that the Bankruptcy Court of the District of Delaware, the Southern District of New York, and other courts have found that "roll-ups are not favored. They are strongly discouraged on day one, and the bottom line is that for approval a substantial showing [of need for the financing] has to be made." This Court further noted seeing "cases where you've had $15 million of pre–petition liability being rolled up and another million and a half of new money coming in. That's, I think, the kind of circumstance that the proposed rules speak to and that I find to be an abuse of the system . . ." *Id.* at 34:4-8.

31.     The Court recognized that this was a significant issue at that hearing, noting that when reviewing a roll-up its primary consideration is whether "somebody [is] glomming on to additional collateral.  Are they taking stuff that might, otherwise, be unencumbered and available?" Hr'g. Tr. 71:20-22, *In re iM3NY LLC, et al.*, Case No. 25-10131 (BLS) (Bankr. D. Del. Jan. 29, 2025).   That is precisely what is happening here—the DIP Lender is glomming on to unencumbered assets which might otherwise be available for unsecured creditors.  As discussed in the colloquy that day, the issue might be moot if sale proceeds were to exceed the amount of the DIP Financing, inclusive of the Roll-Up Amount ($17.5 million, exclusive of interest, fees and expenses).  While counsel to the DIP Lender represented to the Court that the collateral value is sufficient to cover the Roll-Up Amount, that is uncertain at best.  No evidence is set forth in the record to support that conclusion.  Moreover, while the Roll-Up Amount is seemingly insignificant compared to the $125 million Prepetition Facility, the DIP Lender almost certainly did not pay full value for the debt, and there is thus no evidence that $15 million is insignificant as compared to the value provided by the DIP Lender.  If this is the case, elevating $15 million in prepetition debt to superpriority status and collateralizing it with previously unencumbered assets may result in a windfall to the DIP Lender.

C.     **No Liens or Claims on Previously Unencumbered Assets Should be Permitted**

32.     The Committee objects to any liens being placed on, and superpriority claims being made payable from, previously unencumbered assets (or the proceeds thereof), including but not limited to, Avoidance Actions, commercial tort claims, tax refunds, D&O claims, claims against insiders, and insurance policies.

33.     Courts in this District have expressed hesitation to grant liens on previously unencumbered assets of a debtor's estate where such assets would otherwise inure to the benefit

of unsecured creditors. *See, e.g.*, Hr'g. Tr. 21:17-20, 26:9-23, *In re SFX Entm't, Inc.*, Case No. 16-10238 (MFW) (Bankr. D. Del. Mar. 4, 2016) [Dkt. No. 198] (refusing to grant liens to DIP lenders on unencumbered assets, but permitting DIP lenders to retain liens on commercial tort claims to the extent such lenders had existing interests in such claims). Hence, all unencumbered assets and the proceeds thereof should remain unencumbered for the benefit of the unsecured creditors. *See, e.g.*, *In re Excel Maritime Carriers, Ltd.*, No. 13-23060 (RDD) (Bankr. S.D.N.Y. Aug. 6, 2013) [Dkt. No. 133] (granting the use of cash collateral and adequate protection but excluding avoidance actions and proceeds thereof from property that could be used to pay super-priority claims under § 507(b) and from the scope of adequate protection liens).[13]

34.    Here, where unsecured creditors are faced with little to no recoveries, Avoidance Actions and other estate causes of action may be their only source of recovery. Accordingly, for many of the reasons discussed above, neither the DIP Lender nor the Prepetition Lender should receive the benefit of liens on and proceeds recoverable from Avoidance Actions and other estate claims.

---

[13] Avoidance actions, in particular, are uniquely for the benefit of general unsecured creditors of the estate and not secured creditors. The intent behind avoidance powers and a debtor's power to bring causes of action is to allow the debtor in possession to gain recoveries for the benefit of all unsecured creditors. *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Partn. IV*, 229 F.3d 245, 250 (3d Cir. 2000); *In re Sweetwater*, 55 B.R. 724, 735 (D. Utah 1985) (avoiding powers are meant to benefit creditors generally and promote equitable distribution among all creditors). Accordingly, bankruptcy courts customarily restrict the ability of debtors in possession to pledge avoidance actions and their proceeds as security. *See, e.g.*, *Official Comm. of Unsecured Creditors v. Gould Elecs. Corp.*, No. 93 C 4196, 1993 U.S. Dist. LEXIS 14318, at *12 (N.D. Ill. Sep. 20, 1993) (vacating DIP financing order to the extent that the order granted the lender a security interest in the debtor's preference actions); *Buncher Co.*, 229 F.3d at 250 (stating, "when recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors"); *Mellon Bank, N.A. v. Glick (In re Integrated Testing Prods. Corp.)*, 69 B.R. 901, 904 (D.N.J. 1987) (finding that only the trustee, acting on behalf of all creditors, has a right to recover payments made as preferences); *In re Cybergenics Corp.*, 226 F.3d at 243-47 (holding that a fraudulent transfer claim belongs to creditors and not to a chapter 11 debtor-in-possession); *In re Tribune Co.*, 464 B.R. 126, 171 (Bankr. D. Del. 2011) (noting "that case law permits all unsecured creditors to benefit from avoidance action recoveries"); *In re Bethlehem Steel Corp.*, 390 B.R. 784, 786-87 (Bankr. S.D.N.Y. 2008) ("Avoidance actions . . . never belonged to the Debtor, but rather were creditor claims that could only be brought by a trustee or debtor in possession . . . ."); *In re Sapolin Paints*, 11 B.R. 930, 937 (Bankr. E.D.N.Y. 1981) (reciting "the well-settled principle that neither a trustee . . . nor a debtor-in-possession, can assign, sell *or otherwise transfer* the right to maintain a suit to avoid a preference") (emphasis added). The Debtors have not provided any justification for the extraordinary grant of liens or superpriority claims on the unencumbered assets (including, on avoidance actions or the proceeds thereof).

**D.**    **Investigation of the Prepetition Transactions Should be Permitted**

35.    The Committee objects to the Final DIP Order to the extent that it seeks to impair the Committee's ability to investigate prepetition transactions.  First, it is critical to the Committee that the Prepetition Lender (or any predecessor or related party) is not released or discharged of any obligations, claims, or causes of action through the Final DIP Order without an opportunity for an investigation by the Committee.  As currently proposed, the Final DIP Order would do just that pursuant to the release contained in paragraph F.viii, the findings on limitations of lender liability contained in paragraph 39, and the limitation of liability contained in paragraph 40 of the Interim DIP Order (collectively, the "Release Provisions").  Shielding the DIP Lender from liability with respect to its prepetition activity would interfere with the Committee's fiduciary duty to investigate prepetition transactions and would have the effect of releasing potentially valuable causes of action without any consideration to the estates.  The Release Provisions must not be approved, or at the very least, should be made explicitly subject to the Challenge Deadline.

36.    Second, the Committee requires an appropriate budget to investigate the liens and claims of the DIP Lender, as Prepetition Lender, including liens and claims covering the Roll-Up Amount.  The proposed Final DIP Order imposes an inadequate budget of only $25,000 for such investigation.  An investigation budget of $75,000 would better align the proposed Final DIP Order with provisions in other cases of similar size and complexity.[14]  Further, the proposed Final DIP

---

[14] *See, e.g.*, *In re Virgin Orbit Holdings, Inc.*, No. 23-10405 (KBO) (Bankr. D. Del. May 1, 2023) [Dkt. No. 202] ($125,000 cap); *In re Starry Group Holdings, Inc.*, No. 23-10219 (KBO) (Bankr. D. Del. March 31, 2023) [Dkt. No. 263] ($75,000 cap); *TECT Aerospace Group Holdings Inc.*, No. 21-10670 (KBO) Bankr. D. Del. May 13, 2021) [Dkt. No. 174] ($75,000 cap); *GNC Holdings, Inc.*, No. 20-11662 (KBO) (Bankr. D. Del. July 21, 2020) [Dkt No. 502] ($150,000 cap); *24 Hour Fitness Worldwide, Inc.*, No. 20-11558 (KBO) (Bankr. D. Del. August 3, 2020) [Dkt. No. 652] ($100,000 cap); *see also* Hr'g. Tr. 35:15-25, *In re Casa Sys. Inc.*, Case No. 24-10695 (KBO) (Bankr. D. Del. May 3, 2024) [Dkt. No. 290] ("If you want to pursue a case timeline of this nature, then you have to understand that the Committee, rightly, is going to have to get up to speed and spend enormous time looking into every single thing . . . . They cannot stand-down. So I have no doubts that the Committee has spent $800,000 already. . . . So that was your choice, to pursue the timeline that you have pursued in this case and as a result, the Committee now has had no choice but to look at everything.").

Order should make explicit that nothing provided therein shall limit or otherwise prohibit the Committee's professionals from applying for (and, if approved, being entitled to) administrative expenses with respect to work performed in connection with any investigation or challenge.

### E.    Additional Concessions are Required

37.    For the convenience of the Court, the Committee's remaining key concerns with the Final DIP Order are identified herein:

a.    Credit Bid Right Limited.  As currently proposed, the Final DIP Order provides an absolute right for the DIP Lender to credit bid the full amount of the obligations under the DIP Financing, including the Roll-Up Amount.  If the DIP Lender were to exercise its right to credit bid, it should not be permitted to credit bid the Roll-Up Amount until the expiration of the Committee's challenge period.  Any other result would make the preservation of the Committee's rights to challenge the DIP Lender's liens on the Roll-Up Amount illusory.

b.    Remedies Upon Default Modified.  The proposed Final DIP Order would allow the DIP Lender to exercise certain remedies upon a default without the benefit of notice or Court intervention.  The proposed Final DIP Order should be modified to allow both the Debtors and the Committee to seek emergency relief from this Court to challenge any purported default prior to termination of the DIP Financing or the exercise of any remedies.

c.    Surcharge Waiver Eliminated:  The DIP Financing unquestionably fails to ensure payment of all administrative obligations of the Debtors, fund the Debtors through the Sale, or provide for a wind-down of any kind.  As such, the Court should not grant the proposed section 506(c) waiver.  This section is designed to "prevent a windfall to the secured creditor [because Section 506(c)] understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate."  *Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus.)*, 57 F.3d 321, 325 (3d Cir. 1995).  By waiving their rights under section 506(c), the Debtors are eliminating the estates' ability to recover costs incurred that benefit the DIP collateral, thereby shifting all risk to unsecured creditors.  Moreover, courts in this District generally refuse to approve waivers of section 506(c) surcharge rights when a creditors' committee objects to the waiver.  Accordingly, absent modifications to the DIP Budget discussed herein, the Court should deny the proposed 506(c) waiver.

d.    Equities of the Case and Marshalling Waivers Eliminated:  The Committee objects to the proposed section 552(b) waiver.  As a recovery for the Debtors' unsecured creditors is currently contemplated to be zero, a prospective waiver of the "equities of the case" exception contained in section 552(b) is wholly inappropriate and

should be stricken.  *See, e.g.*, Hr'g. Tr. 134:19-25, *In re Linn Energy, LLC*, Case No. 16-60040 (DRJ) (Bankr. S.D. Tex.) [Dkt. No. 746] (noting that preservation of the official committee's right to seek application of section 552(b) exception "really just conforms with applicable Circuit law anyway"); Hr'g. Tr. 74:17-21, *In re Gen. Maritime Corp.*, Case No. 11-15285 (MG) (Bankr. S.D.N.Y.) [Dkt. No. 54] ("[T]he parties cannot limit the Court's power with respect to the doctrine of the equities of the case. The debtor can agree that it will not assert the equities of the case doctrine under 552(b), but you can't preclude [the Court] from applying it.").  Likewise, marshaling "prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *Meyer v. United State*s, 375 U.S. 233, 237 (1963).  Such an exemption here would enable the DIP Lender to cherry pick the collateral it could liquidate most expeditiously, without regard for the overall value realized by the estates.

## II.    THE BIDDING PROCEDURES MOTION

38.    Section 363(b) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp.*, 330 F.3d at 573 (same).

39.    To that end, bidding procedures utilized in connection with the sale of estate property may only be approved where they benefit the estate by serving to maximize the value of the estate's assets.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535-37 (3d Cir. 1999) (affirming bankruptcy court denial of bid protections where the protections were not necessary to preserve value to the estate); *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206-08 (3d Cir. 2010) (reaffirming *O'Brien* standard); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").  When examining bidding procedures, courts look to what is fair and reasonable to the estates as a whole,

rather than simply deferring to a debtor's purported business judgment. *See* Hr'g Tr. 132:23-133:5, *In re American Safety Razor Co., LLC*, Case No. 10-12351 (MFW) (Bankr. D. Del. Sept. 30, 2010) [Dkt. No. 318] ("I don't think, as the debtors suggest, that my consideration of bid procedures is based on the business judgment rule. I need not accept the debtors' business judgment with respect to process. The Bankruptcy Code and Rules and the process under the Bankruptcy Code are all matters . . . for the Court's determination as to what is fair and reasonable. In fact, I think that's my only role in this case; to determine what is fair *for all the parties*.") (emphasis added). Bidding procedures should not be approved where they facilitate a sale for which the sole purpose is to liquidate assets for the benefit of a secured lender. *See In re Encore Healthcare Assocs.*, 312 B.R. 52, 54- 58 (Bankr. W.D. Pa. 2004) (denying bidding procedures motion because court would not approve the sale, "the sole purpose of which was to liquidate assets for the benefit of the secured creditor," and which would render the estate administratively insolvent, noting that an "asset sale can easily be accomplished outside of bankruptcy either with the consent of the secured creditor or by abandoning the asset to the secured creditor to sell on its own").

40.     Here, the Bidding Procedures fail to meet the goals of fostering an open and fair bidding process designed to maximize the value for the Debtors' estates. Instead, the Bidding Procedures merely facilitate a sale (or a portion thereof) that benefits one party, the DIP Lender. The Committee therefore respectfully requests that the Court only approve the Bidding Procedures to the extent that the Committee's objections are adequately resolved.

A.    <u>**The Expedited Sale Timeline is not Warranted**</u>

41.     The Debtors' proposed sale timeline will not promote, enhance, or encourage bidding.  Instead, it is designed to allow the DIP Lender to usurp the bankruptcy process to its advantage.

42.     The current Bid Deadline is set for less than three weeks after the hearing to approve the Bidding Procedures, which is not a sufficient amount of time for prospective bidders to conduct all due diligence, secure qualified bidder status, prepare a purchase agreement and necessary ancillary documents, and submit a bid—particularly in a case, as here, where there is no stalking horse bidder and it appears that the Debtors have only meaningfully engaged with a handful of parties that have signed NDAs.  Greater participation facilitated by expanding the current timeline would further the fundamental policy underpinning the Bankruptcy Code: maximizing value for the benefit of all stakeholders.  *See* Hr'g. Tr. 20:16-20, *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del. Nov. 3, 2014) [Dkt. No. 2699] (holding that "the proposed timelines must be stretched . . . to allow for sufficient time for any interested party to develop an alternative transaction").

43.     Any exigency is of the DIP Lender's own creation—manufactured by providing inadequate financing.  The Committee thus objects to the process unless it is subject to a modest extension and appropriately funded.  The Committee would propose an additional two weeks added to the process, which might remedy confusion caused to date, with specific dates to be agreed upon by the parties, accounting for the Court's schedule.  Extending the marketing and sale process will not only serve to maximize the potential value to the Debtors' estates, but will also protect the rights of non-debtor counterparties and allow the Committee sufficient time to get up

to speed, explore strategic options, and advocate for the best possible sale designed to benefit all stakeholders.

**B.**    **The DIP Lender Must Carve Out Sale Proceeds from its Liens to Fund a Sufficient Wind Down Budget**

44.    The Bidding Procedures establish the framework of a foreclosure sale conducted solely for the benefit of the DIP Lender, to the detriment of the Debtors' estates, and should not be approved.  At this stage, there is no indication of any possibility that the Sale proceeds might even approach the amount of the Prepetition Facility.  Instead, the DIP Lender will be the only party to benefit from the Sale and any proceeds.  This result is contrary to the fundamental goal of chapter 11 reorganization to "maximize estate assets for the benefit of *all creditors*."  *In re R.H. Macy & Co.*, 170 B.R. 69, 74 (Bankr. S.D.N.Y. 1994) (emphasis added).

45.    The Debtors should not be permitted to abuse the chapter 11 sale process by pushing through Bidding Procedures designed only to prop up a process for the secured lender. The Bidding Procedures should thus be modified to provide unsecured creditors with some upside from Sale proceeds.  Leaving this issue to a Sale hearing or a plan process (which, given the circumstances, seems remote at this juncture) will leave unsecured creditors with little to no leverage.  The Committee respectfully requests that the process be amended to provide some benefit to all creditors.

**C.**    **The Sale Framework Should Protect the Interests of Unsecured Creditors**

46.    For the convenience of the Court, some of the Committee's key concerns with the Bidding Procedures and the APA[15] at this time are summarized as follows:

---

[15] As of the writing hereof, the form APA has yet to be finalized or shared with the Committee.  Accordingly, there is currently great uncertainty surrounding any proposed Sale terms.  While the Committee understands that consummation of any Sale remains subject negotiations with a prospective purchaser and ultimately this Court's approval, the Committee submits that certain fundamental provisions must be included in the form APA shared with prospective bidders.

    a.   <u>No Automatic Qualified Bid Status for Assignees</u>:  The Committee objects to the Bidding Procedures to the extent that they provide that any assignee of the DIP Lender's right to credit bid is automatically deemed a "Qualified Bid."  Instead, the Bidding Procedures should require that all third-party credit bids be subject to challenge and vetted by the Debtors and the consultation parties in the same manner as other bidders.

    b.   <u>Estate Claims Must Not Be Transferred as Part of Any Sale</u>:  The Committee is concerned with the proposed sale of estate claims at this stage—potentially one of the few unencumbered assets possessed by the Debtors.  These causes of action are uniquely for the benefit of general unsecured creditors.  *See, e.g.*, *Buncher Co*, 229 F.3d at 250 ("When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors."); *In re Cybergenics Corp.*, 226 F.3d at 243-47 (holding that a fraudulent transfer claim belongs to creditors and not to a chapter 11 debtor in possession); *In re Tribune Co.*, 464 B.R. at 171 (noting "that case law permits all unsecured creditors to benefit from avoidance action recoveries"); *Claridge Assocs., LLC v. Schepis (In re Pursuit Capital Mgmt., LLC)*, 595 B.R. 631, 671 (Bankr. D. Del. 2018) ("Fraudulent transfer actions, whether brought under § 544(b) or § 548, do not belong to a debtor; '[t]hey are creatures of statute, available in bankruptcy solely for the benefit of creditors of the debtor, whose rights the trustee enforces.'").  Accordingly, no estate claims should be sold under the APA unless proper value is provided to general unsecured creditors for such claims.

    c.   <u>Any Sale Must Provide for the Assumption of Cure Costs</u>: The APA should set forth that the purchaser must assume the cure costs related to any assumed go-forward contracts as part of its bid, rather than leaving those obligations behind to be satisfied by the Debtors' estates.

## **RESERVATION OF RIGHTS**

47.    Nothing contained herein shall constitute a waiver of any of the Committee's rights or remedies under the Bankruptcy Code or applicable law, including, without limitation, the right to modify or supplement this Objection prior to or at any hearing to consider approval of the DIP Motion or the Bidding Procedures Motion.

WHEREFORE, the Committee respectfully requests that, absent modifications to the proposed Final DIP Order and Bidding Procedures generally described above, the Court should deny the DIP Motion and the Bidding Procedures Motion and grant such other and further relief as the Court deems just and proper.

Dated: February 19, 2025           Respectfully submitted,
       Wilmington, Delaware

*/s/ James R. Risener III*

Christopher M. Samis (No. 4909)
R. Stephen McNeill (No. 5210)
James R. Risener III (No. 7334)
Ethan H. Sulik (No. 7270)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email:  csamis@potteranderson.com
       rmcneill@potteranderson.com
       jrisener@potteranderson.com
       esulik@potteranderson.com


-and-

Robert J. Gayda
Catherine V. LoTempio
Andrew J. Matott
**SEWARD & KISSEL LLP**
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile:  (212) 450-8421
Email:  gayda@sewkis.com
       lotempio@sewkis.com
       matott@sewkis.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*