**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| iM3NY LLC, *et al.,* | Case No. 25-10131 (BLS) |
| Debtors.[1] | (Jointly Administered) |
| | **Hearing Date: March 20, 2025 at 10:00 a.m. (ET)** |
| | **Objection Deadline: March 7, 2025 at 4:00 p.m. (ET)** |

**MOTION OF THE COMMITTEE FOR AN ORDER CONVERTING DEBTORS'**
**CHAPTER 11 CASES TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

The official committee of unsecured creditors (the "Committee") appointed in the chapter 11 bankruptcy cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors-in-possession (the "Debtors"), by and through its undersigned counsel, hereby submits this motion (the "Motion") requesting entry of an order converting the Chapter 11 Cases to cases under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"). In support of this Motion, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT[2]**

1.      These Chapter 11 Cases are destined for administrative insolvency.[3]  The Debtors openly admit this fact through their own DIP Budget, which, while setting forth $4,826,000 in cash disbursements, provides for only $2,500,000 in cash receipts, all of which comes in the form of the DIP Loans.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: (i) iM3NY LLC (N/A) and (ii) Imperium3 New York, Inc. (4574).  The address of the Debtors' corporate headquarters is 1093 Clark Street, Endicott, New York 13760.

[2] All capitalized terms used in this Preliminary Statement shall be defined *infra*.

[3] Prior to filing this Motion, the Committee filed the *Omnibus Objection of the Official Committee of Unsecured Creditors to the Debtors' (i) DIP Financing Motion and (ii) Bidding Procedures Motion* [Dkt. No 74] (the "Omnibus Objection").

2.      According to the Debtors' own DIP Budget, the Debtors will be underwater by the seventh week of this case, a mere three weeks from the filing of this Motion, with the DIP Loans barely taking the Debtors through the Bid Deadline of the Debtors' proposed sale process.  The DIP Budget also demonstrates that the Debtors will not be able to cover their payroll costs, asking employees to fund these Chapter 11 Cases after the Bid Deadline.

3.      The DIP Lender has the unilateral right, after underfunding the Chapter 11 Cases, to simply wash its hands of this deal and walk away if the economic winds appear unfavorable. The DIP Lender will not, however, walk away empty-handed in this case.  Instead, the DIP Lender will, upon approval of its proposed debtor in possession financing terms, leave these Chapter 11 Cases having cross-collateralized a portion of its prepetition secured debt through a staggering 6-to-1 roll up, securing those obligations with previously unencumbered collateral, including potentially valuable Avoidance Actions, to the detriment of the Debtors' unsecured creditors. Moreover, the DIP Lender is seeking broad releases and waivers of certain rights such as those related to surcharge under section 506(c), the marshaling doctrine, and the "equities of the case" exception.

4.      As is more fully set forth in the Omnibus Objection, these Chapter 11 Cases are a textbook example DIP Lender overreach—the DIP Lender desires the benefits of superpriority debtor-in-possession financing and a chapter 11 sale process but does not want to pay the corresponding freight of these Chapter 11 Cases.  Rather, the DIP Lender wishes to upgrade its collateral package and procure broad releases and waivers of certain estate rights, while keeping the freedom to unilaterally walk away if things do not go its way.  Indeed, the DIP Lender has built in a condition for the DIP Facility that requires the Debtors to secure an executed and binding agreement for the sale of their assets by March 14, 2025.

5.      According to the DIP Budget, by the week of March 14, 2025, the Debtors' cash will be all but spent, leaving nothing to finance the remainder of the sale process even if the Debtors produce a binding sale agreement.  Instead, the Debtors will continue to accrue administrative expenses they cannot pay and will otherwise be forced to dismiss or convert these Chapter 11 Cases to cases under chapter 7.

6.      Not only does the DIP Budget, on its face, leave the estates administratively insolvent, the lack of funding defeats the purpose of the sale process.  The Debtors' assets are complicated, and prospective purchasers need time to diligence those assets and to formulate a bid. That requires the investment of time and resources.  Bidding will be chilled because (i) there is no assurance the process will be run to its conclusion and (ii) bidders simply are not afforded enough time to get comfortable with the assets and their bid.  The loss of potential bidders minimizes the chance of a successful sale, and without a value-maximizing transaction, the likelihood of a positive outcome in these Chapter 11 Cases for anyone other than the DIP Lender.

7.      If the DIP Lender will not pay the freight for these Chapter 11 Cases by funding a sale process with a proper timeline through closing, then, at the very least, it does not deserve the rich debtor in possession financing package it seeks.  And if these Chapter 11 Cases are spiraling toward administrative insolvency anyway, it is in the best interest of the Debtors' unsecured creditors to convert to chapter 7 right away, rather than waiting for the DIP Lender to collect its spoils through a Final DIP Order.

8.      Indeed, immediate conversion prior to final approval of the DIP Facility may give unsecured creditors a fighting chance, as they would have the opportunity to elect a trustee who could pursue potential claims and causes of action on their behalf—rather than allowing the DIP

Lender to usurp those proceeds through cross collateralization of and superpriority claims over otherwise unencumbered assets.

9.      The Committee has attempted to engage the DIP Lender to seek a consensual resolution of the issues raised.  It is unclear, however, whether the DIP Lender will respond. Certainly, no agreement has been reached to date.  In the event the parties cannot reach a consensual resolution, the Committee respectfully requests that this Court stop the bleeding and convert these Chapter 11 Cases to cases under chapter 7.

## JURISDICTION AND VENUE

10.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

11.     Pursuant to Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Committee consents to the entry of a final judgment or order with respect to this Motion, if it is determined the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

12.     Venue of these Chapter 11 Cases in this District is proper under 28 U.S.C. §§ 1408 and 1409.

13.     The predicates for the relief requested herein are sections 105(a) and 1112(b) of the Bankruptcy Code, and rules 1017 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND[4]

**A.      General Background**

14.      On January 27, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

15.      On February 12, 2025, the Office of the United States Trustee appointed the Committee in these Chapter 11 Cases pursuant to 11 U.S.C. § 1102.  *See* Docket. No. 59.[5]

16.      On February 15, 2024, the Committee selected Seward & Kissel LLP as lead counsel, and thereafter, Potter Anderson & Corroon LLP as Delaware co-counsel, and Genesis Credit Partners as financial advisor.

17.      Since its appointment, the Committee has been engaged in several important workstreams, including identification of any and all sources of value to fund distributions to general unsecured creditors.  These sources may include causes of action, including Avoidance Actions and breach of fiduciary duty claims, as well as other assets that may be discovered through the Committee's investigation.  These investigations are still in their infancy.

**B.      The Debtors' Capital Structure**

18.      On April 14, 2022, the Debtors entered into that certain Senior Secured Term Loan Credit Agreement (the "Credit Agreement"), with certain lenders from time-to-time party thereto, and ACP Post Oak Credit I LLC (the "Agent") as administrative agent and collateral agent.

---

[4] Much of the factual background is from the *Declaration of Lukasz P. Cianciara in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Dkt. No. 10] (the "First Day Declaration").  The Committee does not warrant or endorse its accuracy but includes this information for background purposes.

[5] The Committee consists of three members: Ramboll Americas Integrated Solutions, Inc., mPLUS, and Phoenix Endicott Industrial Investors LLC.

19.    On October 24, 2024, the Debtors' former lender, R-SPV II, L.L.C., assigned all of its interests in the Credit Agreement and other loan documents to HSBC Bank PLC ("HSBC" or the "Prepetition Lender") pursuant to that certain Loan Purchase, Assignment and Agreement (the "Assignment Agreement").

20.    Following consummation of the Assignment Agreement, the Prepetition Lender made several loans to the Debtors, of which, as of the Petition Date, approximately $125.8 million, including accrued and unpaid interest, fees, and other claims, remains outstanding (the "Prepetition Secured Obligations").  According to the Debtors, the Prepetition Secured Obligations are secured by first priority liens and security interests in substantially all of the Debtors' assets.

21.    The Debtors state that they are in default of the Credit Agreement.  On December 18, 2024, the Debtors and the Prepetition Lender entered into a forbearance agreement (the "Forbearance Agreement").  The Forbearance Agreement provided for certain milestones related to, among other things, commencing these Chapter 11 Cases.

22.    The Prepetition Lender is also the Debtors' post-petition debtor in possession lender (in such capacity, the "DIP Lender") pursuant to that certain *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Lender; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Dkt. No. 31] (the "Interim DIP Order").

23.    The Interim DIP Order approved, on an interim basis, a superpriority, secured, debtor in possession credit facility (the "DIP Facility") consisting of a multi-draw priming debtor in possession term loan credit facility.  Pursuant to the Interim DIP Order, the Debtors were permitted to borrow up to $1.5 million under the DIP Facility (the "Initial DIP Loan").

24.    Attached as Exhibit 2 to the Interim DIP Order was a 13-week budget (the "DIP Budget") ending the week of April 25, 2024.  The DIP Budget contemplates total cash disbursements of $4,826,000.  However, the only cash receipts set forth in the DIP Budget are the $1,500,000 Initial DIP Loan and the remaining $1,000,000 sought on a final basis (the "Final DIP Loan" and together with the Initial DIP Loan, the "DIP Loans").

25.    In addition to the $2,500,000 in new money DIP Loans, the Interim DIP Order approved a roll up of $15,000,000 of the Prepetition Secured Obligations, a 6-to-1 ratio of rolled-up funds to new money (the "Roll-Up").

26.    Moreover, the Interim DIP Order approved, subject to entry of a final order approving debtor in possession financing (the "Final DIP Order") (i) broad releases of the DIP Lender and its affiliates and other related parties, (ii) a waiver of the Debtors' surcharge rights under section 506(c) of the Bankruptcy Code, (iii) a prohibition on application of the marshaling doctrine, and (iv) a waiver of the "equities of the case" exception.

**C.    The Debtors' Proposed Sale Process**

25.    On February 3, 2025, the Debtors filed the *Debtors' Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief, and (II) an Order Approving the Sale of the Assets* [Dkt. No. 46] (the "Sale Motion").

26.    The Sale Motion proposes a deadline of February 28, 2025 at 4:00 p.m. (ET) for submission of bids to be the stalking horse bidder for the Debtors' assets.

27.    The Sale Motion proposes a deadline (the "Bid Deadline") of March 14, 2025 at 4:00 p.m. (ET) for the submission of bids for the Debtors' assets.

28.     The Interim DIP Order also sets forth certain milestones with respect to the Debtors' sale process.  Among other things, the Debtors must close the sale of their assets, if any, within 90 days from the Petition Date, setting an outside closing date of April 29, 2025.

**D.      The Debtors' Budgetary Shortfalls**

29.     As noted previously, the DIP Budget provides a 13-week forecast during which the Debtors are projected to spend approximately $4.826 million, and the DIP Loans amount to $2.5 million.  The Debtors have no source of cash other than the DIP Loans.  Accordingly, the Debtors' own DIP Budget projects approximate budgetary shortfalls of $2.326 million.  That is $2.326 million in administrative expenses of the Debtors' estates that will accrue to get to a sale closing with no clear plan for their satisfaction.

30.     The DIP Loans do not even provide funding for the Debtors through seven weeks of this case, after which the Debtors are projected to have a remaining cash balance of negative $343,000.  The administrative insolvency of the Debtors' estates only grows from this point forward, resulting in, among other things, an inability of the Debtors to meet their payroll obligations.  Instead, the Debtors apparently plan to rely on their employees providing their labor without any compensation.

31.     While the DIP Lender has the unilateral option to extend funding for another 45 days, it is not obligated to do so, the amount and other terms of such additional funding is not contemplated by the DIP Motion, and such funding would be contingent on certain sale milestones being achieved.  This option gives the DIP Lender complete control over the Chapter 11 Cases, the Debtors, and the Debtors' sale process at the expense of the Debtors themselves and their other creditors.

32.     Moreover, these DIP Budget shortcomings chill bidding in the sale process.  First, prospective bidders are likely to turn away from the process simply because they are not allowed the necessary time to diligence the Debtors' assets and to formulate a bid.  Additionally, bidders are likely dissuaded from investing time and resources to participate in a process that it uncertain to be consummated.  Accordingly, the chances of a successful sale are slim, and only the DIP Lender stands to gain from the proposed process, whether successful (through increased recoveries) or not (through increased collateral and obtaining releases and waivers).

33.     Given the refusal of the DIP Lender to properly fund these Chapter 11 Cases or to reconsider its aggressive sale timeline and onerous debtor in possession financing terms, as well as the clear path of these Chapter 11 Cases into administrative insolvency based on the Debtors' own DIP Budget, the Committee urges the Court to convert these Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code.

## RELIEF REQUESTED

34.     The Committee respectfully requests the Court enter an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), converting these Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code.

## ARGUMENT

**A.     Conversion of the Debtors' Chapter 11 Cases to Cases under Chapter 7 of the Bankruptcy Code**

35.     Section 1112(b)(1) of the Bankruptcy Code mandates conversion from chapter 11 to chapter 7 on request of a party-in-interest if there is "cause."  11 U.S.C. § 1112(b)(1).  Section 1112(b)(4) contains a non-exclusive list of what constitutes "cause", including "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." *Id*. § 1112(b)(4)(A).  Notably, a bankruptcy court may consider other factors and

employ its equitable powers to reach the result appropriate in the particular case. *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 161-62 (3d. Cir. 2012); *In re Camden Ordnance Mfg. Co. of Ark., Inc.*, 245 B.R. 794, 798 (E.D. Pa. 2000). In applying section 1112(b), the Court *must* convert the case if it finds that "cause" exists under section 1112(b)(4). *See, e.g.*, *In re Riverbend Cmty., LLC*, Case No. 11-11771 (KG), 2012 WL 1030340, at *3 (Bankr. D. Del. Mar. 23, 2012).

36.     Absent an agreement by the DIP Lender to fund the full freight of the Debtors' sale process, the Committee believes that conversion of these Chapter 11 Cases to cases under chapter 7 is in the best interests of the Debtors' estates, as well as the Debtors' unsecured creditors. This is the case given (i) the Debtors' inevitable administrative insolvency according to the DIP Budget; (ii) the looming possibility of final approval of the DIP Facility, which will use previously unencumbered assets to collateralize previously prepetition debt; and (iii) the low likelihood of a successful, value-maximizing sale given the heavily truncated sale process.

37.     Continuing to operate in chapter 11 will result in substantial and continuing losses to the estates, including the incurrence of additional administrative expenses, professional fees, and U.S. Trustee fees without any ability to pay or concomitant benefit to the estates.

38.     The Committee also believes that conversion, and the appointment of a chapter 7 trustee, will best protect the interests of all general unsecured creditors in this case. The chapter 7 trustee may liquidate and distribute the Debtors' assets, including the prosecution of any claims or causes of action that may exist. Indeed, two of the members of the Committee control a sufficient amount of the Debtors' unsecured debt to elect a chapter 7 trustee that will diligently pursue potential claims and causes of action on their behalf. The Committee is aware of the likely existence of certain causes of action already, and unsecured creditors almost certainly will have a better chance of recovery on such claims in chapter 7 than in the context of administratively

insolvent cases under chapter 11, especially if these causes of action become subject to the Roll-Up.  Accordingly, the Committee submits that conversion to chapter 7 of the Bankruptcy Code is necessary and appropriate.

**B.      Establishment of Deadline for Final Fee Applications and Scheduling a Hearing Thereon**

39.      The Committee also requests that the Court establish a deadline for retained professionals to file their final fee applications.  Doing so will allow the Debtors' estate to determine, in a timely and efficient manner, the final amount owed to retained professionals for fees and expenses related to the Chapter 11 Cases.

40.      The Committee further requests that the Court schedule a hearing to consider approval of the Final Fee Applications.

## NO PRIOR REQUEST

41.      The Committee has not made a prior request seeking the relief requested by this Motion to this or any other Court.

## NOTICE

42.      Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors; (c) the United States Attorney's Office for the District of Delaware, (d) the DIP Lender; and (e) any party requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Committee submits that no other or further notice is necessary.

WHEREFORE, the Committee respectfully requests that the Court enter the Proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion, and grant such other and further relief as the Court may deem just and proper.

11

Dated: February 21, 2025
       Wilmington, Delaware

Respectfully submitted,

*/s/ Christopher M. Samis*_____
Christopher M. Samis (No. 4909)
R. Stephen McNeill (No. 5210)
James R. Risener III (No. 7334)
Ethan H. Sulik (No. 7270)
POTTER ANDERSON & CORROON LLP
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: csamis@potteranderson.com
        rmcneill@potteranderson.com
        jrisener@potteranderson.com
        esulik@potteranderson.com

-and-

Robert J. Gayda, Esq.
Catherine V. LoTempio, Esq.
Andrew J. Matott, Esq.
**SEWARD & KISSEL LLP**
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421
Email: gayda@sewkis.com
        lotempio@sewkis.com
        matott@sewkis.com

*Proposed Counsel for the Official Committee of
Unsecured Creditors*